**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JANICE STEVENSON,<br>                    Plaintiff,<br><br>v.<br><br>NEIGHBORHOOD HOUSE CHARTER<br>SCHOOL,<br>                    Defendant. | )<br>)<br>)<br>)<br>)  CIVIL ACTION NO.  05-CV-11584-DPW<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT'S MOTION FOR TERMINATING SANCTIONS, OR IN THE ALTERNATIVE, TO COMPEL DEPOSITION TESTIMONY

Defendant Neighborhood House Charter School ("Defendant," "NHCS," or the "School") hereby moves for sanctions against Plaintiff Janice Stevenson ("Plaintiff" or "Stevenson") for her refusal to participate in her deposition in good faith.  As grounds for this motion, Defendant states that Plaintiff has willfully flouted her discovery obligations in this matter by engaging in exceptionally combative and obstructionist behavior at her deposition. Among other misconduct, Plaintiff overtly refused to respond to deposition questions on a variety of subjects for no valid reason, refused even to look at documents that she deemed unfavorable to her claims, and refused to testify as to whether documents placed before her contained her own name or signature.  Plaintiff's obstinate failure to cooperate at deposition has deprived NHCS of evidence to which it is entitled and, like Stevenson's larger pattern of misconduct in this case, has caused significant undue expense to the School.  NHCS, therefore, requests that the Court award sanctions against Plaintiff that are proportionate to the gravity of her misconduct in this case by dismissing her claims with prejudice, or in the alternative, ordering her to pay substantial monetary sanctions to NHCS, appear for continued deposition, and provide substantive responses to all of NHCS's deposition questions.

As further grounds for this motion, NHCS states as follows:

## I.     Plaintiff Improperly Refused to Participate in Her Deposition

### A.     Stevenson Refused to Answer Questions That Are Directly Relevant to the Claims and Defenses in this Case

Stevenson stubbornly refused to answer questions on a variety of subjects, with no proper basis for her refusals.  From the beginning of her deposition, Stevenson refused to answer even very simple background questions.  For example, Stevenson refused to divulge her residential address and engaged in an extended effort to evade questions on that subject.  *See* Excerpted Transcript of Deposition of Janice Stevenson ("Trans."), attached as Exhibit A, 15:2 – 27:14, 113:10 – 122:18.  In the course of her disingenuous gamesmanship, she testified that she did not know where she had slept the night before her deposition and that she did not know whether there is a place to which she customarily returns to sleep at night.  Trans. 116:20 – 117:10.  She similarly refused to identify the high school she attended, stating as her grounds "Because I don't think I want you investigating my past."  Trans. 86:8 – 88:16.

Stevenson also refused to answer questions about subject matter that directly relates to her claims in this case.  In Count I of her Complaint, Stevenson argues that the School errantly classified her as an independent contractor and that she is entitled to "overtime" pay under the Fair Labor Standards Act for hours she spent providing services to the School through her own company, TuckNT.  *See* Amended Complaint, ¶¶ 5, 18 - 23.  Nonetheless, Stevenson refused to answer questions that relate to her status as an independent contractor.  For example, Stevenson repeatedly refused to answer questions about whether she performed services for NHCS from her home.  *See* Trans. 285:1 – 287:24.  This information bears directly on her status as an independent contractor.  *See, e.g.*, *Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 10 (D.C. Cir. 2001) (considering worker's performing services from her home among factors

bearing on independent contractor status); *Com. v. Savage*, 31 Mass. App. Ct. 714, (1991) (fact that worker maintained home office and performed services from home supported finding that she was an independent contractor). Whether Stevenson performed services for NHCS from her home also bears on the number of "overtime" hours she claims to have worked, and is essential to any calculation of her putative damages in this matter.

Stevenson also refused to testify as to whether she maintained a computer at her residence during the period of time that she performed services for NHCS. Trans. 187:13-17, 291:15 – 293:1. She similarly refused to testify as to whether she accessed the online payroll system that she used in performing services from her home. Trans. 189:9 – 190:7. When it was established that she did own a computer during some period of time that may have bordered on the timeframe relevant to this case, she refused to answer questions about how she came to possess it. Trans. 180:1 – 182:16. This information is also directly relevant to Stevenson's status as an independent contactor. *See, e.g.*, *Santelices v. Cable Wiring, Inc.*, 147 F. Supp. 2d 1313, 1320-21 (S.D. Fla. 2001) (worker's investment in tools of trade relevant to independent contractor status); *Savage*, 31 Mass. App. Ct. at 716 (considering worker's purchase of her own supplies in determining independent contractor status).

In addition to specific questions to which she refused to respond, Stevenson categorically refused to answer questions about any subject matter bearing on her currently pending bankruptcy petition.[1] *See, e.g.*, Trans. 539:21 – 542:7. That field of inquiry includes questions that are indisputably relevant to her claims in this matter. For example, in the context of

---

[1] Stevenson's refusals in this regard appear to be motivated by the fact that she has made misrepresentations to the Bankruptcy Court. The Chapter 13 Trustee assigned to Stevenson's bankruptcy case has informed counsel for NHCS that Stevenson failed to report the pendency of this action to the Trustee or to the Bankruptcy Court, and that the testimony Stevenson gave at her deposition in this matter is inconsistent with her representations to the Bankruptcy Court. When NHCS's counsel asked Stevenson questions as to whether she had reported this matter to the Bankruptcy Court, she engaged in a variety of infantile behavior including ignoring counsel's questions and playing with a magnifying glass that NHCS's counsel provided for her convenience in reviewing documents. Trans. 444:12 – 446:1.

questioning related to her bankruptcy, Stevenson was presented with numerous exhibits

reflecting adversary proceedings she commenced against the Massachusetts School of Law

relating to her attendance at that institution.  She claimed to have no memory of these multiple

lawsuits and appeals, and she refused to answer questions related to her attendance at law

school.[2]  This subject matter is centrally relevant to Stevenson's claims against NHCS because

the services that she provided to NHCS, by her own description, included advice on compliance

with a panoply of state and federal laws and regulations.[3]  Trans. 663:9 – 666:16, 674:6 –

675:23, 679:18 – 681:10.  She further testified that the services she performed for NHCS

included research on legal topics.  Trans. 664:4-13, 690:10-22.  Stevenson's legal education

relates directly to the expertise that she brought to bear on these issues of legal compliance, and

there is no question that such expertise is material to whether, as NHCS contends, the services

she performed are subject to the Fair Labor Standards Act's white collar exemptions.  *See, e.g.,*

*Kavanagh v. City of Phoenix*, 87 F. Supp. 2d 958, 964 (D. Ariz. 2000) (holding worker who

spent time "dispensing legal advice" by "analyzing data and drawing conclusions" and "making

recommendations" was subject to professional and administrative exemptions to FLSA overtime

requirements).  Stevenson's refusals to discuss subject matter such as her law school education,

therefore, have unjustifiably deprived NHCS of evidence necessary to respond to her claims.

---

[2] On this point, Stevenson's obstinance was manifested in repeated claims that she had, in fact, answered the
question at an earlier stage of the deposition and a refusal to answer any question twice.  *See, e.g.*, Trans. 547:17 –
548:14, 564:12 – 567:12, 571:15 – 572:14.  In fact, Stevenson never responded in substance to NHCS's counsel's
questions as to whether she attended law school.

[3] Whether Stevenson attended the Massachusetts School of Law also bears on her credibility as a witness.
Stevenson gave false and contradictory testimony on a number of points, and she attempted to mitigate the impact of
her irreconcilable responses by refusing to answer further questions after her deception was exposed.  For example,
early in her deposition, she described herself as "ignorant," stating that she had only finished the eleventh grade.
Trans. 87:5-22.  After laborious cross-examination, Stevenson eventually admitted that, in fact, she graduated from
college and took several post-graduate courses toward a Master's Degree.  Trans. 195:23 – 198:4.  After these facts
were established, she repeatedly insisted that she had exhausted her educational credentials.  Trans. 129:14-15,
156:10-15, 532:10-20.  That testimony was false, and when faced with evidence of her deception, Stevenson refused
to proceed or respond to further inquiries on this topic.

**B.     Stevenson Refused Even To Look At A Number of Documents Marked As Exhibits To Her Deposition**

Stevenson childishly refused to review numerous documents that NHCS's counsel marked as exhibits to her deposition because she knew that testimony on the subject matter of those documents would paint her in an unflattering light and expose falsehoods in her prior testimony.  Stevenson's obstructive behavior needlessly extended the length of her deposition by many hours and extended the transcript of her deposition by hundreds of pages.

After Stevenson falsely testified that she had filed for bankruptcy only once in her life, NHCS's counsel marked as an exhibit the docket from a prior bankruptcy proceeding she had commenced in Louisiana.  Stevenson refused to look at the document, then refused to answer any questions that bordered on the subject of bankruptcy.  Trans. 442:16 – 444:11.  She then ignored questions that NHCS's counsel asked that had a direct bearing on her claims in this matter, refusing to give any verbal response to questions about the relationship between her claims in this matter and her currently pending bankruptcy.  Trans. 446:24 – 448:13.

Stevenson also refused to review documents that pertained to her history as a serial litigant.  In the first session of her deposition, Stevenson testified that, other than the various proceedings she had commenced against NHCS and appearances in traffic or small claims court, she had been a party to only one other litigation proceeding.  Trans. 77:22 – 78:15.  NHCS's counsel then marked as exhibits documents reflecting that Stevenson has, in fact, initiated numerous lawsuits in state and federal court against a wide variety individuals and government agencies, in some cases seeking hundreds of millions of dollars in damages.[4]  Stevenson refused even to look at the documents or answer even the most basic questions relating to them.  Trans. 449:19 – 451:14 (refusing to look at docket from Tax Court case against IRS), 458:1 – 464:3

---

[4] For example, Stevenson commenced two lawsuits against the Andover Public Schools for $175,500,000 and $250,000,000, respectively.  *See* USDC MA Docket Nos. 02-cv-12381, 03-cv-11420.

(refusing to look at decision from Fifth Circuit Court of Appeals in claim Stevenson filed against U.S. government and a federal judge), 474:4 – 476:12 (refusing to look at or handle docket from Stevenson's civil rights suit against State of Vermont), 500:9 – 501:11, 511:18 – 515:7 (refusing to look at docket from case Stevenson commenced against a charitable organization that ran a homeless shelter, stating "I don't want to do this" because "it does not reflect well on the record"), 550:4 – 554:16 (refusing to review document related to claims against Massachusetts School of Law).  Stevenson also refused to verify her signature on documents that she has filed with various courts.  *See, e.g.*, Trans. 479:9 – 483:1, 489:6 – 491:2.  She even refused to acknowledge that her name appeared in print on documents placed before her as exhibits.  *See* Trans. 502:7 – 503:3, 508:14 – 510:1, 516:4-14, 519:19 – 520:7, 605:3-606:6.  These instances are far from an exhaustive review of Stevenson's stubborn refusals to review documents or answer questions, and NHCS is prepared to submit additional examples of her intransigence, if the Court so requests.

## II.   Stevenson Had No Proper Basis for Her Refusals

### A.   A Party Witness May Not Refuse To Answer Deposition Questions on Grounds of Relevance

Stevenson exhibited willful disregard for her discovery obligations in refusing to answer questions or review documents at her deposition.  It is well settled that a party witness may not refuse to answer questions on grounds of relevance.  Fed. R. Civ. P. 30(c); *Gober v. City of Leesburg*, 197 F.R.D 519, 520 (M.D. Fla. 2000) (holding refusal to answer question on grounds of relevance was improper and sanctionable); *Athridge v. Aetna Cas. & Sur. Co.*, 184 F.R.D. 200, 208 (D.D.C. 1998) (holding witness's refusal to answer question on grounds of relevance or on grounds that question was asked and answered was improper and sanctionable).  Making allowances for Stevenson's *pro se* status, NHCS's counsel informed her that the School believed

her refusals to be improper, and that the Rules of Civil Procedure required that her testimony be taken subject to any objections she made.  Counsel went so far as to provide Stevenson with a copy of the governing rule and explain to her in detail NHCS's position regarding her improper objections.  Trans. 107:13 – 111:24.  She nonetheless persisted in evading and refusing to respond to questions.

### B.     Stevenson's Constitutional Objections Are Improper

After NHCS's counsel explained the School's position that Stevenson could not properly refuse to answer questions on grounds of relevance, she began to cite inapplicable constitutional provisions as the basis for her refusals to testify.  She initially cited the Fifth Amendment, in response to questions about her Social Security Number, marital status, the date that she moved to Massachusetts, and where she stores documents that may be responsive to Defendant's Requests for Production of Documents.  Trans. 123:17 – 124:5, 126:10-21, 130:21 – 131:4, 176:3-14.  In light of Stevenson's *pro se* status, NHCS's counsel indulged her improper constitutional objections and explained to her that the School believed that her assertion of the Fifth Amendment privilege was inappropriate and, after she continued to refuse to cooperate, informed her that the School would seek relief from the Court.  Trans. 125:6 – 126:1.  Stevenson then invoked the Fourteenth Amendment (providing for due process and equal protection), and later the Seventh Amendment (providing for jury trials) and the Ninth Amendment (providing that certain unenumerated rights are retained by the people) in response to very simple factual questions.  *See* Trans. 126:22, 466:2 – 467:8.  Plainly, none of these constitutional provisions has any bearing on the questions to which Stevenson refused to respond, and she raised them for purely dilatory purposes.

### III.    Stevenson's Misconduct Warrants Imposition of Harsh Sanctions

Stevenson's conduct at deposition constitutes an inexcusable disregard for her discovery obligations as a plaintiff.  Moreover, as discussed in detail in Defendant's Motion to Compel Production of Documents and for Sanctions (docket nos. 32-33), Stevenson's refusal to participate in her deposition is compounded by her failure to comply with the School's document request.   In light of Stevenson's serious and continuing pattern of misconduct, the Court should impose substantial sanctions against her.

### A.    The Court Should Dismiss Stevenson's Claims With Prejudice

It is within the Court's inherent powers to dismiss a plaintiff's claims as a sanction for her discovery abuses.  *Torres-Vargas v. Pereira*, 431 F.3d 389, 392 (1st Cir. 2005) (collecting authorities); *Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico*, 248 F.3d 29, 37 (1st Cir. 2001) (District Court was within its discretion to dismiss plaintiff's claims with prejudice for contumacious discovery abuses); Fed.R.Civ.P. 37(b)(2)(C).   In this case, Stevenson's abuses are rampant and willful.  She refused to answer even questions seeking basic factual information about her claims, and even refused to review documents placed before her.  She has also continued through the date of this motion to fail and refuse to produce documents responsive to NHCS's requests, while at the same time continuing to file such responsive documents with various state and federal agencies.  *See, e.g.*, Trans. 640:4 – 642:20. Stevenson's conduct is grounds for the harshest of sanctions, including dismissal of her claims with prejudice.

Stevenson's baseless invocation of the inapposite constitutional privileges is, itself, sufficient grounds for the dismissal of her claims.  When a plaintiff invokes the privilege against self-incrimination in refusing to answer relevant questions during her deposition, it is within the Court's discretion to dismiss her claims.  *Serafino v. Hasbro, Inc.*, 893 F. Supp. 104, 107 (D.

-8-

Mass. 1995) (collecting authorities) *aff'd* 82 F.2d 515, 518 (1st Cir. 1996).  The Court may

dismiss a plaintiff's claims for failure to answer relevant deposition questions even in the

absence of a prior order compelling answers.  *The Stop & Shop Cos., Inc. v. Interstate Cigar Co.*,

110 F.R.D. 105, 108 (D. Mass. 1986).  Here, Stevenson has deprived NHCS of evidence

necessary to respond to her claims that the School misclassified her as an independent contractor,

and the Court should not allow her to continue to pursue those claims while refusing to

participate in discovery.

> **B.    In the Alternative, the Court Should Order Stevenson to Pay Substantial Monetary Sanctions and to Provide Complete and Truthful Deposition Testimony**

If the Court allows Stevenson to continue to pursue her claims, notwithstanding her

misconduct, it should require her to pay substantial monetary sanctions to the School, and it

should Order her to appear for a continued deposition and to participate in her deposition fully

and in good faith.  Stevenson's conduct at deposition made the examination take markedly

longer than was necessary.  She was unduly combative on virtually every point, stretching what

should have been a routine deposition into a grueling two-day examination spanning nearly 800

pages of transcript.  Her conduct has caused NHCS to incur thousands of dollars in unnecessary

and unjustifiable expenses, which has diverted resources away from the School's public service

mission.  The Court should hold Stevenson responsible for these expenses in full and Order her

to repay NHCS its costs, including attorneys' fees, in taking her extended deposition and

bringing the present motion.

<u>CONCLUSION</u>

WHEREFORE, Defendant respectfully requests that the Court dismiss Plaintiff's claims in this matter in their entirety and with prejudice as a sanction for her discovery abuses. In the alternative, Defendant requests that the Court Order Plaintiff to pay substantial monetary sanctions to NHCS, appear for further deposition, and provide substantive answers to all questions asked.

Respectfully submitted,
NEIGHBORHOOD HOUSE CHARTER SCHOOL,
By its attorneys,

/s/ Barry J. Miller
Lynn A. Kappelman (BBO # 642017)
Barry J. Miller (BBO # 661596)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone:     (617) 946-4800
DATED:  September 22, 2006        Telecopier:     (617) 946-4801

<u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULES 7.1 AND 37.1</u>

I hereby certify that I attempted in good faith to resolve or narrow the issues presented by this motion by conferring with *pro se* Plaintiff Janice Stevenson.  During Plaintiff's deposition, on September 7 and 14, 2006, I engaged in on-the-record conversations with Plaintiff and informed her that Defendant believed her refusal to answer questions and otherwise to participate in the deposition was inappropriate and grounds for sanctions.  I also repeatedly stated to Plaintiff that Defendant intended to seek relief from the Court for her intransigence.  Plaintiff continued to refuse to answer questions and participate in the deposition.

/s/ Barry J. Miller
Barry J. Miller

<u>CERTIFICATE OF SERVICE</u>

I, Barry J. Miller, hereby certify that on this 22nd day of September, 2006, a true copy of the foregoing document was sent by electronic mail to Janice Stevenson at janicestevensonus@gmail.com and by First Class Mail to P.O. Box 400372. Cambridge, MA, 02140.

/s/ Barry J. Miller
Barry J. Miller

Page 1

09:56:32

VOLUME: I

PAGES: 1 to 407

EXHIBITS: See Index

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

JANICE STEVENSON

          Plaintiff       Civil Action

      v.                No. 05-CV-11584-DPW

NEIGHBORHOOD HOUSE CHARTER SCHOOL

          Defendant

- - - - - - - - - - - - - - - - - - x

DEPOSITION of JANICE L. STEVENSON

Thursday, September 7, 2006

10:30 a.m.

Seyfarth Shaw LLP

Two Seaport Lane

Boston, Massachusetts

Michelle Keegan, Court Reporter

| Page 14 | Page 16 |
|---|---|

**Page 14**

10:34:54 1     Q. Could you give us your full legal name,
10:34:58 2 please.
10:34:58 3     A. Janice, J-A-N-I-C-E, Stevenson, S-T-E
10:35:07 4 V-E-N-S-O-N.
10:35:07 5     Q. And your middle name?
10:35:09 6     A. Well, the IRS says it's Wilson. The state
10:35:15 7 of Texas it's Lorraine.
10:35:18 8     Q. Is Wilson your middle name?
10:35:20 9     A. Yes.
10:35:21 10     Q. So your given name was Janice Lorraine
10:35:27 11 Stevenson and you subsequently -- I'm sorry. Janice
10:35:33 12 Lorraine Wilson was your given name?
10:35:33 13     A. Yes.
10:35:34 14     Q. And then at some point you were married and
10:35:37 15 took the name Stevenson?
10:35:38 16     A. Yeah, I took the name.
10:35:39 17     Q. Have you ever been known by any other name
10:35:42 18 or alias?
10:35:43 19     A. No, I don't use aliases.
10:35:45 20     Q. Any other variation on your name?
10:35:47 21     A. No, unless the person doesn't understand my
10:35:50 22 accent and they got Janet and I tried to say, No.
10:35:53 23 Janice. It's all in the translation.
10:35:57 24     Q. But you've never deliberately used anything?

**Page 15**

10:36:01 1     A. No, no, no, no, no.
10:36:02 2     Q. What's your home address?
10:36:04 3     A. Post Office Box 400372, Cambridge 02140.
10:36:16 4     Q. That's your mailing address, correct?
10:36:18 5     A. Yes.
10:36:18 6     Q. What's the address of your residence?
10:36:20 7     A. Do you really need that?
10:36:23 8     Q. This isn't for you to debate. Your only job
10:36:26 9 here is to answer the questions that I ask.
10:36:28 10     A. I'll give you a physical address. It
10:36:30 11 probably won't be where I live at, but it's a little
10:36:34 12 more permanent than where I am.
10:36:36 13     Q. Okay. Why don't you give me the address you
10:36:39 14 have in mind.
10:36:39 15     A. 647 Massachusetts Avenue.
10:36:39 16     Q. Is that in Cambridge?
10:36:42 17     A. Yes.
10:36:43 18     Q. And who owns that building?
10:36:48 19     A. I have no idea.
10:36:49 20     Q. Are you renting an apartment in that
10:36:52 21 building?
10:36:52 22     A. No.
10:36:53 23     Q. Are you staying with someone who is renting
10:36:55 24 an apartment in that building?

**Page 16**

10:36:56 1     A. No.
10:36:57 2     Q. So under what circumstances are you staying
10:36:59 3 in that building?
10:36:59 4     A. In the daytime.
10:37:03 5     Q. So is it a public assistance facility?
10:37:05 6     A. Kind of.
10:37:07 7     Q. What's the name of it?
10:37:08 8     A. I don't know.
10:37:12 9     Q. How did you come to be staying there?
10:37:17 10     A. I don't stay there. Didn't we just go
10:37:19 11 through that? I don't stay there.
10:37:20 12     Q. Is that a work address?
10:37:22 13     A. No.
10:37:22 14     Q. This is just a place that you go during the
10:37:25 15 day?
10:37:26 16     A. Yes.
10:37:26 17     Q. For what purpose?
10:37:27 18     A. It depends.
10:37:30 19     Q. For example?
10:37:30 20     A. I have no examples.
10:37:36 21     Q. When was the last time you were there?
10:37:39 22     A. Two days ago.
10:37:43 23     Q. And what were you doing there?
10:37:44 24     A. Talking to someone.

**Page 17**

10:37:48 1     Q. Who?
10:37:49 2     A. I don't know her name.
10:37:54 3     Q. What were you talking about?
10:37:55 4     A. I forget the subject.
10:38:01 5     Q. Was this a business-related conversation?
10:38:03 6     A. No.
10:38:04 7     Q. Is there any sort of business that's housed
10:38:07 8 in this housing?
10:38:09 9     A. Probably.
10:38:10 10     Q. Is it a residence?
10:38:11 11     A. I don't know. Probably so. I don't know.
10:38:13 12 I don't go beyond where I have to go there.
10:38:15 13     Q. Okay. Why do you have to go there?
10:38:17 14     A. I guess it's -- Why do you go anyplace?
10:38:25 15 Because it's someplace to go. You go.
10:38:28 16     Q. And are there people you tend to meet there?
10:38:31 17 Is this a meeting facility?
10:38:32 18     A. Parts of it.
10:38:35 19     Q. Are you employed there?
10:38:35 20     A. Didn't we just answer that question?
10:38:39 21     Q. I don't think we did.
10:38:40 22     A. Yes, you did.
10:38:41 23     Q. Mrs. Stevenson, the purpose of this is not
10:38:44 24 to debate.

5 (Pages 14 to 17)

Janice L. Stevenson                                                    09/07/2006

| Page 18 | Page 20 |
|---|---|

**Page 18**

10:38:44 1    A. I'm not debating.
10:38:46 2    Q. Let me get my responses out so Ms. Keegan
can take them down.
10:38:48 3
10:38:50 4        The purpose of this deposition is not a
10:38:51 5    debate, it's not a game for you to try to evade my
10:38:54 6    questions. If you don't give me direct answers to
10:38:56 7    the questions I ask you and give me answers that
10:38:59 8    meet the substance of my question, there's no chance
10:39:01 9    that we're going to finish this today let alone
10:39:04 10   within two hours. Okay?
10:39:05 11   A. I gave you the address.
10:39:07 12   Q. And I'm asking you why you visit that
10:39:09 13   address, and you've given me a series of very
10:39:12 14   evasive responses.
10:39:13 15   A. I don't think it's evasive.
10:39:15 16   Q. If you won't tell me the purpose you're
10:39:17 17   going there, you won't tell me if you're using it as
10:39:19 18   a residence or business --
10:39:20 19   A. You asked for a physical address. You have
10:39:22 20   one.
10:39:23 21   Q. And I'm asking you what you do at that
10:39:24 22   address.
10:39:25 23   A. Nothing.
10:39:26 24   Q. You do nothing at that address?

**Page 19**

10:39:27 1    A. I do nothing.
10:39:28 2    Q. So if I want to track you down and I go to
10:39:32 3    this address I will find you there doing nothing?
10:39:32 4    A. Why would you track me down?
10:39:35 5    Q. Ms. Stevenson, the purpose is not for you to
10:39:38 6    debate me or ask the purpose of my questions. The
10:39:40 7    purpose for you being here today is only to --
10:39:42 8    A. Are you trying to irritate me?
10:39:44 9    Q. No, I'm not trying to irritate you. I'm
10:39:47 10   trying to get substantive responses to my questions.
10:39:49 11   A. Can we move on to another question and move
10:39:51 12   back?
10:39:51 13   Q. Absolutely not.
10:39:52 14   A. Then we have stalled.
10:39:53 15   Q. You need to give me a substantive response
10:39:56 16   to my question.
10:39:56 17   A. I will not.
10:39:57 18   Q. You refuse to give me --
10:39:59 19   A. Yes, that's the answer.
10:40:00 20   Q. And you've characterized this facility that
10:40:02 21   you refuse to tell me your purpose of going to as
10:40:06 22   somewhere you go in the daytime; is that right?
10:40:08 23   A. Yup.
10:40:08 24   Q. Where do you live?

**Page 20**

10:40:10 1    A. (No verbal response)
10:40:16 2    Q. Do you understand the question?
10:40:17 3    A. We need to move on to another question.
10:40:22 4    Q. No, Ms. Stevenson. You need to answer the
10:40:23 5    question.
10:40:24 6    A. Then we have stalled.
10:40:24 7    Q. You're going to refuse to tell me your
10:40:27 8    address?
10:40:27 9    A. Yes. If I've given you one, you need to
10:40:30 10   move on.
10:40:30 11   Q. You haven't, for the record, given me an
10:40:33 12   address where you live, correct?
10:40:34 13   A. That's not correct.
10:40:35 14   Q. So you're now the telling me you live at 647
10:40:38 15   Mass. Ave; is that right?
10:40:45 16   A. Maybe you need to reread the transcript.
10:40:48 17   Q. There's no reason for that. All we have now
10:40:51 18   is notes. You can just answer my question. I asked
10:40:54 19   you for --
10:40:55 20   A. I'm not going to answer the question again.
10:40:59 21   Q. I asked you for an address and you gave me a
10:41:02 22   P.O. box, right? Is that correct?
10:41:05 23   A. You want an e-mail address?
10:41:07 24   Q. No. I want you to respond to my questions

**Page 21**

10:41:09 1    and only my questions as we discussed before. I
10:41:11 2    asked you for an address and you gave me a P.O. box,
10:41:13 3    correct?
10:41:14 4    A. Yes.
10:41:14 5    Q. And then I asked you for a physical address
10:41:17 6    and you gave me 647 Mass. Ave, correct?
10:41:21 7    A. Yes, I did.
10:41:21 8    Q. You told me you go there in the daytime,
10:41:24 9    correct?
10:41:24 10   A. Yes.
10:41:24 11   Q. So that's not your residence, correct?
10:41:26 12   A. I thought we said that.
10:41:26 13   Q. Is that your response, that's not your
10:41:27 14   residence?
10:41:28 15   A. I've answered this question.
10:41:31 16   Q. Tell me the answer again and then we can
10:41:33 17   move on.
10:41:33 18   A. I'm not going to answer questions twice.
10:41:35 19   Let's set the ground rules. I'm not answering
10:41:38 20   questions twice, Mr. Miller. I answered you
10:41:40 21   truthfully, but I'm not going to answer it twice.
10:41:43 22   You asked me do I work there, you asked me do I live
10:41:45 23   there.
10:41:45 24   Q. And your response was no, correct?

6 (Pages 18 to 21)

Page 22

10:41:47 1    A. Why do I go there?
10:41:48 2    Q. Ms. Stevenson, this is not productive for
10:41:50 3  you to debate.
10:41:51 4    A. No, we're not. Do you want to go to number
10:41:54 5  3?
10:41:54 6    Q. Absolutely.
10:41:54 7    A. Let's go.
10:41:54 8    Q. Now, is 647 Mass. Ave your residential
10:41:58 9  address?
10:41:59 10   A. Let's go to number 4.
10:42:00 11   Q. You're refusing to answer that question?
10:42:02 12   A. Yes.
10:42:02 13   Q. And do you have any other residential
10:42:05 14  address?
10:42:06 15   A. No.
10:42:09 16   Q. You have no other residential address, is
10:42:17 17  that your testimony?
10:42:18 18   A. Mr. Miller, why are you badgering me?
10:42:28 19   Q. Because you're not answering very simple
10:42:30 20  questions.
10:42:30 21   A. You're being mean to me.
10:42:31 22   Q. I'm not being the least bit mean to you,
10:42:34 23  Ms. Stevenson. I've done nothing other than ask you
10:42:38 24  very simple factual questions that you're trying to

Page 23

10:42:40 1  evade.
10:42:41 2    A. I'm not evading. That's your opinion.
10:42:44 3    Q. That is my opinion --
10:42:46 4    A. My opinion is it is not.
10:42:48 5    Q. How is it not evasive?
10:42:49 6    A. Sir?
10:42:50 7    Q. Yes?
10:42:51 8        If I ask you your residential address --
10:42:53 9    A. I filed a lawsuit.
10:42:54 10   Q. That's right. By filing that lawsuit,
10:42:56 11  Ms. Stevenson, you took on certain obligations.
10:42:58 12   A. To file a lawsuit I don't really need a
10:43:01 13  physical address.
10:43:02 14   Q. That's not the question. The question is
10:43:04 15  whether you have a physical address.
10:43:05 16   A. I think what you're doing here is you're
10:43:07 17  shifting the focus of this -- of my claim, overtime
10:43:15 18  wages. If I stay in the subway at Government Center
10:43:20 19  that would not affect my status as a plaintiff in
10:43:22 20  this case, so why are you stuck on -- I don't know
10:43:27 21  if this is the first or third question. Move on.
10:43:30 22  Let's go to the claim.
10:43:30 23   Q. No, Ms. Stevenson. I'm not going to let you
10:43:33 24  take control of the deposition and --

Page 24

10:43:35 1    A. I'm not trying to take --
10:43:36 2    Q. You do not decide what is relevant to your
10:43:39 3  claims.
10:43:40 4    A. This question, what will we have achieved?
10:43:44 5    Q. Ms. Stevenson, your purpose is not to
10:43:47 6  question my motives here, it's not to question the
10:43:49 7  reason for my examination of you.
10:43:50 8    A. Do you want to cooperate?
10:43:51 9    Q. Would you let me --
10:43:52 10   A. We need to discover stuff here, right? I'd
10:43:56 11  like to know what questions you're asking.
10:43:58 12       By the way, can I have a copy?
10:44:00 13   Q. Absolutely not. This is privileged
10:44:02 14  material.
10:44:02 15   A. Questions you're going to ask me, just
10:44:05 16  questions, privileged material?
10:44:06 17   Q. Anything I prepare in the course of
10:44:08 18  defending this lawsuit is privileged.
10:44:09 19   A. Anything I prepare in defending my lawsuit
10:44:13 20  is privileged, correct?
10:44:15 21   Q. I'm not going to debate you, but no. You're
10:44:18 22  not an attorney.
10:44:19 23   A. I don't have to be an attorney.
10:44:22 24   Q. I'm not going to argue with you on -- Can we

Page 25

10:44:27 1  get back to the questions?
10:44:28 2    A. No.
10:44:28 3    Q. You're going to refuse to participate in
10:44:30 4  this deposition?
10:44:30 5    A. If that's the way you want to stop it.
10:44:33 6        I like these chairs, too.
10:44:34 7    Q. You're the one that's refusing to answer the
10:44:37 8  questions. So you'll give me no other address than
10:44:41 9  the 647 Mass. Ave. address; is that right?
10:44:44 10   A. Yes, sir.
10:44:44 11   Q. And we've established that that's not your
10:44:47 12  residence; is that right?
10:44:48 13   A. If that's what you want to put on the
10:44:51 14  record, go ahead and put it on the record.
10:44:52 15   Q. I want to put on the record your testimony.
10:44:54 16  Is it your testimony that 647 Mass. Ave is not your
10:44:57 17  residential address?
10:44:57 18   A. What address did the school have when I was
10:45:01 19  an employee there?
10:45:01 20   Q. Your purpose is not to ask me questions
10:45:03 21  here, Ms. Stevenson.
10:45:05 22   A. We're here about a case.
10:45:06 23   Q. We're here because I noticed your
10:45:08 24  deposition. Your purpose in sitting there in that

7 (Pages 22 to 25)

Janice L. Stevenson                                    09/07/2006

---

### Page 26

10:45:11 1 chair is only to respond to the questions I ask you,
10:45:13 2 not to debate the relevancy.
10:45:14 3      A. We could have had this over the phone.
10:45:16 4      Q. No, we could not have had it over the phone,
10:45:19 5 but that's irrelevant as well. Ms. Stevenson, you
10:45:22 6 got to let me get my statements on the record. You
10:45:25 7 can't keep interrupting me.
10:45:27 8      A. The same questions?
10:45:28 9      Q. I'm not even asking you a question right
10:45:31 10 now. I'm responding to your suggestion that we
10:45:33 11 could have done this over the telephone.
10:45:34 12      I've properly noticed your deposition.
10:45:38 13 You are required under the Rules of Civil Procedure
10:45:38 14 as the plaintiff in a lawsuit to appear in person
10:45:40 15 for your deposition. Okay?
10:45:43 16      A. I have met the requirements.
10:45:46 17      Q. Okay. Who lives with you? Do you share
10:45:56 18 your residence with anyone else?
10:45:58 19      A. (No verbal response)
10:46:02 20      Q. Do you understand the question?
10:46:03 21      A. What has that got to do with --
10:46:06 22      Q. Your purpose here is not to question my --
10:46:12 23      A. I'm not giving you my private information.
10:46:14 24      Q. So you're going to refuse to tell me with

### Page 27

10:46:17 1 whom you live; is that right?
10:46:17 2      A. (No verbal response)
10:46:21 3      Q. Do you understand the question?
10:46:22 4      A. (No verbal response)
10:46:29 5      Q. I'll ask you again, do you understand the
10:46:30 6 question?
10:46:31 7      A. (No verbal response)
10:46:34 8      Q. For the record, you're just sitting there
10:46:36 9 staring at me and not responding. Do you intend to
10:46:39 10 respond to the question?
10:46:39 11      A. (No verbal response)
10:46:42 12      MR. MILLER: For the record,
10:46:43 13 Ms. Stevenson has not responded to that question
10:46:45 14 either.
10:46:48 15      Q. What's your home telephone number?
10:46:49 16      A. I have no land line. Is that what you're
10:46:54 17 asking me?
10:46:54 18      Q. That's responsive. Do you have a cell
10:46:57 19 phone?
10:46:57 20      A. Yes. The one that's noted on record.
10:47:01 21      Q. What's your cell phone number?
10:47:02 22      A. Well, for the next 15 minutes until I use
10:47:09 23 those up it's 617-721-2638, then after the 15
10:47:16 24 minutes are gone I won't have any.

### Page 28

10:47:17 1      Q. So is it a disposable cell phone?
10:47:20 2      A. No. It's a prepaid.
10:47:22 3      Q. It's a pay as you go?
10:47:23 4      A. Yes.
10:47:24 5      Q. So at some point when you purchase more
10:47:27 6 minutes that phone number will still be valid?
10:47:30 7      A. At some point.
10:47:30 8      Q. Do you have any other telephone numbers?
10:47:34 9      A. Oh, my fax number.
10:47:39 10      Q. What's that number?
10:47:40 11      A. Well, there are two of them. It depends on
10:47:44 12 which stops working first. There's 866-838-4286 and
10:47:52 13 then there's the 201 number.
10:47:55 14      Q. What's the rest of that number?
10:47:56 15      A. 622-4890.
10:48:00 16      Q. Are these, like, Internet fax services?
10:48:02 17      A. Yes, sir.
10:48:03 18      Q. Who are the providers?
10:48:05 19      A. One is jFax.
10:48:08 20      Q. Which number is that?
10:48:10 21      A. The 201.
10:48:14 22      And the other one is my fax.
10:48:19 23      Q. And you said something about one of them
10:48:21 24 stopping working first. Do you expect one or both

### Page 29

10:48:24 1 of these numbers to go out of service?
10:48:26 2      A. One is like a trial. They want you to pay.
10:48:29 3      Q. Which one is that?
10:48:30 4      A. jFax is supposed to be free unless you go
10:48:33 5 over a limit. It's like you send me all this paper
10:48:37 6 and then you push me over my limit. Now they want
10:48:40 7 to cut me off.
10:48:40 8      Q. Okay.
10:48:42 9      A. You did that to me.
10:48:43 10      Q. I don't think I've ever faxed you anything,
10:48:46 11 Ms. Stevenson.
10:48:47 12      A. When you send me the e-mail. Oh, yes, you
10:48:52 13 did. You sent it by fax.
10:48:53 14      Q. What did I send you by fax?
10:48:55 15      A. Didn't you fax -- Don't you fax me your
10:48:59 16 deposition -- not deposition, but those --
10:49:01 17      Q. I think all communications I've had with
10:49:03 18 you, Ms. Stevenson, have been by e-mail.
10:49:06 19      A. We have got to start chatting.
10:49:08 20      Q. What's that mean?
10:49:10 21      A. You know, IMing.
10:49:11 22      Q. Is there some sort of limit on your e-mail
10:49:15 23 account?
10:49:15 24      A. No. It's more responsive because, see, when

---

8 (Pages 26 to 29)

eb2827ab-6285-4fb1-b765-9962caa2bd64

Janice L. Stevenson                                        09/07/2006

---

### Page 74

11:32:54 1  right?

11:32:55 2     A. It is a publicly traded --

11:32:59 3     Q. I'm not asking you why. These are simple

11:33:02 4  limited questions. You filed a complaint against

11:33:04 5  Ajilon, right?

11:33:04 6     A. Mr. Miller, I'm doing the best I can.

11:33:06 7     Q. And I'm trying to help you.

11:33:08 8     A. Okay, but I think I've answered the

11:33:11 9  question.

11:33:11 10    Q. But you haven't. You've missed it. It's a

11:33:13 11  very narrow question. In filing a charge against

11:33:15 12  Ajilon with the Department of Labor, you filed a

11:33:19 13  document, a complaint, right?

11:33:20 14    A. Yes. You write up...

11:33:27 15    Q. In that complaint you made allegations about

11:33:27 16  things that Ajilon did and your relationship with

11:33:31 17  Ajilon and things like that, right?

11:33:31 18    A. Yes.

11:33:31 19    Q. Did any of those allegations have anything

11:33:33 20  to do with Vertex?

11:33:34 21    A. In my complaint against Ajilon I felt

11:34:05 22  that -- I described what they did. And I had

11:34:12 23  complained. And that because of what they did and

11:34:18 24  my complaint were part of the reason I did not work

---

### Page 75

11:34:26 1  for them anymore.

11:34:26 2     Q. Your claim when they retaliated against you?

11:34:30 3     A. I claimed that because I complained about

11:34:38 4  something I felt was illegal.

11:34:39 5     Q. The Vertex thing, is that what you're

11:34:41 6  talking about? The internal complaint regarding

11:34:43 7  Vertex, is that what you're talking about?

11:34:45 8     A. I filed a complaint.

11:34:46 9     Q. That's the complaint that you think led to

11:34:48 10  the termination of your relationship with Ajilon; is

11:34:51 11  that what you're telling me?

11:34:52 12    A. Yes.

11:34:52 13    Q. So just to clarify -- And I'm not trying to

11:34:55 14  get you to answer the same question twice or

11:34:57 15  anything like that. I want to sum up so we both

11:34:59 16  understand what the testimony is. All right?

11:35:01 17    A. Uh-hmm.

11:35:02 18    Q. You filed a complaint against Ajilon. One

11:35:04 19  of the allegations in your Sarbanes-Oxley

11:35:06 20  whistleblower complaint against Ajilon was that you

11:35:09 21  had been subject to some sort of adverse action

11:35:13 22  because of the internal complaint that you filed

11:35:14 23  about Vertex?

11:35:18 24    A. I guess, yeah.

---

### Page 76

11:35:19 1     Q. That's right?

11:35:20 2     A. Yeah, because I filed a complaint against

11:35:22 3  them. And right after that I was relieved from

11:35:28 4  working for Ajilon.

11:35:28 5     Q. And you still don't remember the substance

11:35:35 6  of your internal complaint about Vertex other than

11:35:37 7  it had something to do with working conditions?

11:35:39 8     A. Probably. Yeah, I guess. There was

11:35:49 9  probably something -- I don't remember specifically.

11:35:51 10  There was probably something fishy I felt like was

11:35:54 11  going on.

11:35:55 12    Q. You told me before you thought it was

11:35:57 13  working conditions.

11:35:58 14    A. It is, yeah, fishy working conditions.

11:36:01 15  Something I don't make sense.

11:36:02 16    Q. You don't know what it was that didn't make

11:36:04 17  sense?

11:36:04 18    A. Not word for word. I was concerned, and I

11:36:09 19  brought the complaint. It's just like on some

11:36:12 20  assignments -- The biggest thing working for

11:36:14 21  temporary agencies is that they tell you you're

11:36:17 22  coming to do one thing. They says, Oh, we need,

11:36:22 23  say, an accounts payable clerk, and you get there

11:36:24 24  and they have you as a receptionist.

---

### Page 77

11:36:31 1     So you go back to your person and you

11:36:36 2  say, This ain't right. I haven't been in accounts

11:36:40 3  payable since I've been here.

11:36:42 4     So the person calls and says, Oh, she

11:36:46 5  said she's not doing accounts payable. She's doing

11:36:49 6  receptionist. So at that point they says, Oh, well,

11:36:55 7  if she's going to be complaining, relieve her of her

11:37:01 8  duties.

11:37:03 9     Q. Okay. And you believe that the complaint

11:37:05 10  you made about Vertex to Ajilon had something to do

11:37:07 11  with the work that you had been assigned there; is

11:37:10 12  that what you're telling me?

11:37:11 13    A. Yeah. The only relationship we had was

11:37:15 14  work.

11:37:15 15    Q. Okay. Do you recall what kind of work you

11:37:20 16  did, in fact, do for Vertex?

11:37:21 17    A. Clerical work, I guess.

11:37:27 18    Q. Is that a guess or is that your memory?

11:37:29 19    A. I only do clerical work.

11:37:32 20    Q. Through Ajilon you've only done clerical?

11:37:35 21    A. Clerical, yeah.

11:37:36 22    Q. So we've gone through a few different

11:37:41 23  lawsuits. We've talked about your bankruptcy, this

11:37:43 24  case, the DUA proceedings involving NHCS, the

---

20 (Pages 74 to 77)

eb2827ab-6285-4fb1-b765-9962caa2bd64

| Page 78 |
|---|
| 11:37:46 1 Sarbanes-Oxley complaints involving NHCS and the |
| 11:37:50 2 Sarbanes-Oxley complaints involving Ajilon, right? |
| 11:37:52 3    A. Yes, and the appeal tax board, tax appeal |
| 11:37:59 4 board. |
| 11:38:01 5    Q. You're talking about the Massachusetts |
| 11:38:03 6 agency? |
| 11:38:03 7    A. Yeah. |
| 11:38:03 8    Q. What was the nature of the complaint that |
| 11:38:05 9 you filed with that agency? |
| 11:38:07 10    A. That's against you. |
| 11:38:08 11    Q. What was the nature of it? |
| 11:38:09 12    A. Unreported withholdings. |
| 11:38:15 13    Q. Any other lawsuits to which you've been a |
| 11:38:26 14 party? |
| 11:38:26 15    A. Not that I can recall. |
| 11:38:30 16    Q. Have you ever been a defendant in a lawsuit? |
| 11:38:34 17    A. Has someone ever sued me? Traffic ticket. |
| 11:38:44 18    Q. We'll put aside traffic tickets for this |
| 11:38:51 19 question. |
| 11:38:51 20    A. I don't know. |
| 11:38:52 21    Q. You don't know? |
| 11:38:52 22    A. I would remember, wouldn't I? |
| 11:38:56 23    Q. I'm asking you. |
| 11:39:00 24    A. Okay. Give me a hint. |

| Page 79 |
|---|
| 11:39:02 1    Q. There is no hint. I'm just asking you a |
| 11:39:04 2 question. |
| 11:39:04 3    A. Give me a hint what you're defending, like |
| 11:39:08 4 here where I am. |
| 11:39:09 5    Q. A defendant -- |
| 11:39:11 6    A. No, no, no. Like, I know traffic court if |
| 11:39:16 7 they give you a ticket you become a defendant. What |
| 11:39:21 8 else? |
| 11:39:21 9    Q. Well, you understand that if someone files a |
| 11:39:24 10 lawsuit against you, you become a defendant, right? |
| 11:39:25 11    A. Yeah. |
| 11:39:28 12    Q. Has anyone ever filed a lawsuit against you? |
| 11:39:30 13    A. Not that I can recall. Wouldn't I know |
| 11:39:32 14 this? Well, if I can remember. I don't know. I |
| 11:39:38 15 can't recall. |
| 11:39:38 16    Q. So to the best of your memory, you've never |
| 11:39:40 17 been a defendant? |
| 11:39:41 18    A. I don't remember right now. I could |
| 11:39:43 19 remember when I leave. |
| 11:39:47 20    Q. But you've just told me that you think you |
| 11:39:47 21 would remember if you've been a defendant in a |
| 11:39:49 22 lawsuit, right? |
| 11:39:49 23    A. I think I would remember. I wouldn't expect |
| 11:39:52 24 to be answering questions like this where I been in |

| Page 80 |
|---|
| 11:39:55 1 a court, who I've done it with. |
| 11:39:56 2    Q. Okay. Have you ever had any criminal |
| 11:39:58 3 charges filed against you? |
| 11:40:00 4    A. Parking tickets? Not parking tickets, |
| 11:40:05 5 but... |
| 11:40:11 6    Q. Talking about a moving violation? |
| 11:40:13 7    A. Unpaid tickets. |
| 11:40:16 8    Q. Let's put aside anything to do -- |
| 11:40:19 9    A. I don't know. I can't recall someone |
| 11:40:21 10 charging me with anything. I can't recall. |
| 11:40:24 11    Q. To the best of your memory, no one has ever |
| 11:40:26 12 filed criminal charges against you other than |
| 11:40:28 13 traffic tickets; is that right? |
| 11:40:29 14    A. As far as I know, no. |
| 11:40:34 15    Q. Have you ever filled out a criminal |
| 11:40:38 16 complaint against any other person or entity? |
| 11:40:40 17    A. Other than the Neighborhood House? |
| 11:40:47 18    Q. Well, we've talked about the six or so |
| 11:40:49 19 lawsuits that we've talked about, so we'll consider |
| 11:40:51 20 those covered for purposes of this question. |
| 11:40:53 21    A. I can't remember. Aren't we kind of |
| 11:40:56 22 answering the same thing over and over again? |
| 11:40:58 23    Q. No. They're different questions. The |
| 11:40:59 24 question pending right now is, have you ever sought |

| Page 81 |
|---|
| 11:41:03 1 to -- |
| 11:41:03 2    A. Not that I know of. |
| 11:41:04 3    Q. Let me get the question out so the record is |
| 11:41:06 4 clear. Have you ever sought to initiate a criminal |
| 11:41:08 5 proceeding against anyone? |
| 11:41:09 6    A. Is that the same as have I filed a lawsuit? |
| 11:41:18 7 Is that the same question? |
| 11:41:19 8    Q. It's not as a legal matter. But you've told |
| 11:41:21 9 me about all of the lawsuits you remember, right? |
| 11:41:23 10    A. Yes, I filed those. Yes, I've filed |
| 11:41:27 11 whatever you just said. |
| 11:41:27 12    Q. The six or so that we've just covered? |
| 11:41:29 13    A. Yes, I filed those charges against those |
| 11:41:32 14 people. |
| 11:41:32 15    Q. Okay. Have you ever attempted to initiate |
| 11:41:34 16 any sort of legal proceeding other than the ones |
| 11:41:37 17 we've discussed? |
| 11:41:38 18    A. You mean, like, if I'm doing something now? |
| 11:41:47 19    Q. Anything ever. |
| 11:41:55 20    A. Well, I got something in mind, but I haven't |
| 11:41:57 21 done it. |
| 11:41:57 22    Q. What's that? |
| 11:41:57 23    A. I haven't done it. |
| 11:41:59 24    Q. That's not the question. What is it you |

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

eb2827ab-6285-4fb1-b765-9962caa2bd64

Janice L. Stevenson                                    09/07/2006

Page 86

11:46:38 1  filings?
11:46:41 2     A. No.
11:46:41 3     Q. And other than the various proceedings that
11:46:43 4  we've talked about, have you ever been a party to
11:46:47 5  any other legal proceeding?
11:46:48 6     A. Not that I know of. This is all I can
11:46:54 7  remember.
11:46:55 8     Q. That's all I want is your memory. Okay.
11:46:58 9  Did you graduate from high school?
11:46:5810    A. (No verbal response)
11:47:0611    Q. Do you understand the question?
11:47:0712    A. I understand the question.
11:47:0913    Q. Will you answer it, please.
11:47:1314    A. I went to the 11th grade.
11:47:1515    Q. You went through the 11th grade? You
11:47:1716  completed the 11th grade?
11:47:1917    A. Yes.
11:47:1918    Q. Where?
11:47:2019    A. In high school.
11:47:2020    Q. Where did you attend high school?
11:47:2421    A. (No verbal response)
11:47:2722    Q. Do you understand the question?
11:47:2823    A. I understand the question.
11:47:2924    Q. Would you answer it, please.

Page 87

11:47:30 1     A. No.
11:47:31 2     Q. Why not?
11:47:31 3     A. I'm not because I think you're getting into
11:47:36 4  my personal business.
11:47:38 5     Q. I'm asking you questions about your
11:47:40 6  education.
11:47:41 7     A. I have no education.
11:47:42 8     Q. You have no education. So it's your
11:47:45 9  testimony that the last grade you completed was the
11:47:4810  11th grade?
11:47:4911    A. No, that's not my testimony. My testimony
11:47:5112  is I'm not going to answer personal questions and
11:47:5413  it's my testimony that I have no advanced education.
11:47:5814  I'm ignorant.
11:47:5915    Q. By "advanced education," do you mean college
11:48:0316  education?
11:48:0317    A. No. It means no professional education.
11:48:0918    Q. Okay. I'm going to ask you questions about
11:48:1119  the education that you do have. And you told me
11:48:1420  that --
11:48:1421    A. It is none. It's obsolete. I have an
11:48:1822  obsolete education.
11:48:1923    Q. Just let me get through it and we'll get the
11:48:2124  details. You told me you completed the 11th grade.

Page 88

11:48:24 1  You won't tell me what high school you attended; is
11:48:29 2  that right?
11:48:29 3     A. It doesn't exist anymore.
11:48:31 4     Q. That's not the question. The question is,
11:48:33 5  what high school did you attend?
11:48:34 6     A. No, I won't tell you.
11:48:36 7     Q. Why won't you tell me?
11:48:37 8     A. Because it doesn't exist anymore.
11:48:40 9     Q. That's not a reason not to tell me what the
11:48:4310  name of it was when it existed.
11:48:4511    A. No.
11:48:4612    Q. You won't tell me?
11:48:4613    A. No.
11:48:4714    Q. And what are the grounds?
11:48:4815    A. Because I don't think I want you
11:48:5116  investigating my past.
11:48:5217    Q. Is there something in your past that you
11:48:5418  think would be embarrassing to you?
11:48:5619    A. No. Because I think it's irrelevant to an
11:48:5920  overtime claim.
11:49:0021    Q. Well, what you think is not what governs the
11:49:0322  scope of this deposition.
11:49:0323    A. But you know what, I govern how much I give
11:49:0624  you about my personal life.

Page 89

11:49:07 1     Q. Well, do you understand that --
11:49:08 2     A. You have no public records.
11:49:10 3     Q. Are you done?
11:49:11 4     A. Don't go there, Mr. Miller. Don't start
11:49:16 5  this again.
11:49:16 6     Q. Ms. Stevenson, I'm not going to let you
11:49:18 7  determine the scope of this deposition.
11:49:19 8     A. And I'm not going to let you badger me.
11:49:21 9     Q. I'm not badgering you. I'm asking you
11:49:2410  simple factual questions relating to your education
11:49:2611  at the moment. And you've told me that you're going
11:49:2912  to refuse to tell me --
11:49:3013    A. Are you going to ask me this in front of a
11:49:3214  jury?
11:49:3315    Q. I'm not going to make any representations to
11:49:3516  you now as to what I might ask you in front of a
11:49:3817  jury.
11:49:3918    A. Okay. Because I will say the same thing in
11:49:4219  front of a jury.
11:49:4320    Q. You would say what in front of a jury?
11:49:4521    A. I'm not going to answer that question.
11:49:4622    Q. You would refuse to testify in a court of
11:49:4923  law about where you attended high school?
11:49:5124    A. Yeah.

23 (Pages 86 to 89)

eb2827ab-6285-4fb1-b765-9962caa2bd64

Janice L. Stevenson                                                    09/07/2006

## Page 106

| | | |
|---|---|---|
| 12:26:18 | 1 | (Exhibit Number 2 |
| 12:26:18 | 2 | marked for identification) |
| 12:26:18 | 3 | Q. Ms. Stevenson, before we took a break you |
| 12:26:36 | 4 | agreed that you're available to continue this until |
| 12:26:39 | 5 | 2:30 today; is that right? |
| 12:26:40 | 6 | A. Yes. |
| 12:26:40 | 7 | Q. And at that time you stated that you have to |
| 12:26:43 | 8 | leave? |
| 12:26:43 | 9 | A. I'll be able to finish this. There won't be |
| 12:26:48 | 10 | any more depositions? |
| 12:26:49 | 11 | Q. That has yet to be established. Discovery |
| 12:26:52 | 12 | is still ongoing. |
| 12:26:53 | 13 | A. Discovery is until the 27th. |
| 12:26:55 | 14 | Q. The 22nd, I think. |
| 12:26:56 | 15 | A. Yes. |
| 12:26:57 | 16 | Q. Right. So discovery remains open. |
| 12:27:00 | 17 | So are you now telling me that you're |
| 12:27:02 | 18 | available to stay here all day? |
| 12:27:04 | 19 | A. I'll stay to get this over with. |
| 12:27:06 | 20 | Q. Is that a yes? |
| 12:27:07 | 21 | A. Yes. And of course, our day is -- We've |
| 12:27:13 | 22 | agreed on the day as being 3:15. |
| 12:27:15 | 23 | Q. I don't think we've made any such agreement. |
| 12:27:18 | 24 | Are you now telling me you've agreed to stay here |

## Page 107

| | | |
|---|---|---|
| 12:27:21 | 1 | until 3:15? |
| 12:27:21 | 2 | A. Let's agree on the end of the day. You're |
| 12:27:25 | 3 | saying 5:00? |
| 12:27:25 | 4 | Q. 5:00 is the end of the traditional business |
| 12:27:28 | 5 | day. |
| 12:27:29 | 6 | A. Your traditional business day is 5:00? |
| 12:27:34 | 7 | Q. In this market sector generally 5:00 is |
| 12:27:40 | 8 | considered the end of the business day. |
| 12:27:41 | 9 | A. I'm not normally in this market. |
| 12:27:43 | 10 | Q. Let's not quibble. Are you willing and able |
| 12:27:45 | 11 | to stay here until 5 o'clock today? |
| 12:27:47 | 12 | A. Yes. |
| 12:27:51 | 13 | Q. I've asked Ms. Keegan to mark this document |
| 12:27:53 | 14 | as Exhibit 2. |
| 12:27:54 | 15 | A. "Massachusetts rules of courts. See prefix |
| 12:27:59 | 16 | for currentness information." |
| 12:28:01 | 17 | Q. You don't necessarily need to read it into |
| 12:28:03 | 18 | the record. I marked that. And I'll represent to |
| 12:28:06 | 19 | you that it is a copy of Rule 30 of the Federal |
| 12:28:10 | 20 | Rules of Civil Procedure. |
| 12:28:12 | 21 | A. "Depositions may be taken when leave" -- |
| 12:28:16 | 22 | Q. Again, you don't need to read it into the |
| 12:28:18 | 23 | record. |
| 12:28:18 | 24 | A. Is it for me? |

## Page 108

| | | |
|---|---|---|
| 12:28:19 | 1 | Q. Just let me get the question out. |
| 12:28:22 | 2 | A. Okay. |
| 12:28:22 | 3 | Q. I'll represent to you that this deposition |
| 12:28:24 | 4 | and all depositions in federal court like this one |
| 12:28:28 | 5 | are governed by Rule 30, which is what I handed you |
| 12:28:31 | 6 | a copy of. Do you understand that? |
| 12:28:32 | 7 | A. Yes. |
| 12:28:36 | 8 | Q. You see that I've handed you a copy of |
| 12:28:39 | 9 | rule -- |
| 12:28:39 | 10 | A. You handed me Massachusetts rules of court, |
| 12:28:41 | 11 | federal. |
| 12:28:42 | 12 | Q. If you turn to the second page, you'll see |
| 12:28:44 | 13 | what I handed you includes Rule 30; is that right? |
| 12:28:46 | 14 | A. Uh-hmm. Yes, sir. |
| 12:28:48 | 15 | Q. If you turn to the third page, you'll see |
| 12:28:50 | 16 | subsection C. That section says that it governs |
| 12:28:56 | 17 | examination and cross-examination. Do you see that? |
| 12:28:58 | 18 | A. Yes. Examinations and cross-examinations, |
| 12:29:02 | 19 | record of -- |
| 12:29:03 | 20 | Q. And I want you to look about halfway down |
| 12:29:05 | 21 | that paragraph. It says, "All objections made." Do |
| 12:29:07 | 22 | you see that? |
| 12:29:08 | 23 | A. "All objections made at the time of the |
| 12:29:09 | 24 | examination to the"... |

## Page 109

| | | |
|---|---|---|
| 12:29:21 | 1 | (Pause) |
| 12:29:21 | 2 | A. Oh, so if I have any objections I state it |
| 12:29:24 | 3 | for the record? |
| 12:29:25 | 4 | Q. Have you had a chance to read through this |
| 12:29:27 | 5 | paragraph? |
| 12:29:27 | 6 | A. All the way to the end? |
| 12:29:43 | 7 | (Pause) |
| 12:29:43 | 8 | A. Okay. Why didn't you give me a set of |
| 12:29:46 | 9 | written questions? |
| 12:29:46 | 10 | Q. I'm not obligated to do that. I want you to |
| 12:29:49 | 11 | look at the section that says -- after the |
| 12:29:51 | 12 | preparatory bit about objections being made it says, |
| 12:29:55 | 13 | "The examination shall proceed with the testimony |
| 12:29:57 | 14 | being taken subject to the objections." Do you see |
| 12:29:59 | 15 | that? |
| 12:29:59 | 16 | A. Yes. "The examination shall proceed with |
| 12:30:06 | 17 | the testimony being taken subject to the |
| 12:30:08 | 18 | objections." |
| 12:30:09 | 19 | Q. I'll represent to you that means any basis |
| 12:30:13 | 20 | you have to object to my questions does not excuse |
| 12:30:16 | 21 | you from answering those questions. Do you |
| 12:30:18 | 22 | understand that? |
| 12:30:18 | 23 | A. It may not excuse me, but it can't compel me |
| 12:30:23 | 24 | either. |

28  (Pages 106 to 109)

eb2827ab-6285-4fb1-b765-9962caa2bd64

Janice L. Stevenson                                                    09/07/2006

---

### Page 110

12:30:23 1      Q. Well, I can't, but you understand the court
12:30:26 2   can; is that right?
12:30:29 3      A. Okay.
12:30:30 4      Q. Do you understand that the procedural rules
12:30:32 5   do not allow you to refuse to answer my questions
12:30:34 6   because you feel they are irrelevant, immaterial or
12:30:38 7   otherwise inappropriate?
12:30:39 8      A. I see what the rule says, but then you're
12:30:46 9   saying the court can also intervene and tell me I
12:30:49 10   have to. But then I can take up matters with the
12:30:56 11   court that I can't take up with you, can't I?
12:30:58 12      Q. You're free to address with the court
12:30:59 13   whatever you want.
12:31:00 14      A. That's right.
12:31:01 15      Q. What I'm asking you is, you understand that
12:31:03 16   under the rules governing this deposition it's not
12:31:05 17   appropriate for you to refuse to respond to my
12:31:08 18   questions on the basis of your belief that they're
12:31:10 19   irrelevant or not related to the heart of your
12:31:13 20   claims. Do you understand that?
12:31:14 21      A. Yes, sir.
12:31:15 22      Q. Now, you've refused to answer a number of my
12:31:18 23   questions so far today; do you understand that?
12:31:21 24      A. (No verbal response)

### Page 111

12:31:22 1      Q. Is that correct, you've refused to answer a
12:31:24 2   number of questions I've asked you?
12:31:25 3      A. I don't know. Which ones?
12:31:26 4      Q. I'm not asking you to identify them now.
12:31:29 5   Can we just agree that you've refused to answer a
12:31:32 6   number of questions I've asked you?
12:31:34 7      A. There are some questions I've had difficulty
12:31:35 8   answering.
12:31:36 9      Q. In fact, you have expressly refused to
12:31:38 10   answer a number of questions, yes?
12:31:39 11      A. That was the difficulty, yes.
12:31:41 12      Q. The difficulty being your refusal?
12:31:43 13      A. Yes, that was the difficulty.
12:31:44 14      Q. It's not an inability. You're just
12:31:47 15   refusing, right?
12:31:47 16      A. An ability?
12:31:50 17      Q. You're capable of answering the question.
12:31:51 18   You just won't; is that right?
12:31:53 19      A. I don't want to analyze that.
12:31:59 20      Q. Well, you understand that that's not
12:32:01 21   appropriate either. If I ask you a question, under
12:32:03 22   this rule you're obligated to respond. Do you
12:32:06 23   understand that?
12:32:06 24      A. To the best of my ability I will.

### Page 112

12:32:08 1      Q. Right. And so now you've refused. And
12:32:11 2   you've used the word "refused" at least half a dozen
12:32:15 3   times to answer a number of questions that I've
12:32:17 4   asked you today. So now I will ask you whether
12:32:19 5   you've reconsidered and will give me answers to
12:32:20 6   those questions?
12:32:21 7      A. Sure, I'll give you answers to the
12:32:24 8   questions. I don't remember them, though.
12:32:25 9      Q. I'll go back through them.
12:32:28 10          I'll take this back. Would you like to
12:32:31 11   review it further?
12:32:32 12      Q. Are you going to keep it?
12:32:34 13      Q. I'm going to keep all the exhibits to your
12:32:38 14   deposition. If you want copies of them, I'll
12:32:38 15   provide you copies when it's over.
12:32:40 16      A. When this deposition is over?
12:32:43 17      Q. Correct.
12:32:43 18      A. Okay. Just this one.
12:32:44 19      Q. If it's okay with you, I'll just make copies
12:32:47 20   and send them to you. It's easier that way. Is
12:32:49 21   that okay?
12:32:50 22      A. Before the week is over with?
12:32:53 23      Q. I can put them in the mail to you this
12:32:55 24   evening.

### Page 113

12:32:55 1      A. Good. To the post office box or even the
12:32:59 2   physical address.
12:32:59 3      Q. You haven't given me one yet.
12:33:01 4      A. I did.
12:33:01 5      Q. Let's go back to those questions. We have
12:33:05 6   agreed I will send you copies of all the exhibits to
12:33:07 7   the deposition?
12:33:08 8      A. To the post office box.
12:33:09 9      Q. I'll do that.
12:33:10 10          Now, the first question you refused to
12:33:12 11   answer is your residential address; is that right?
12:33:17 12   Do you recall refusing to answer that question?
12:33:18 13      A. I'm not sure I gave you a physical one. You
12:33:23 14   kept asking me.
12:33:24 15      Q. I asked you if that was your residence, and
12:33:26 16   you said no. You said you went there in the
12:33:29 17   daytime. So now I'll ask you again, will you give
12:33:34 18   me your residential address?
12:33:35 19      A. I have to still say 647 Massachusetts.
12:33:38 20      Q. That's where you sleep at night?
12:33:39 21      A. It could be.
12:33:42 22      Q. Is that where you slept last night?
12:33:44 23      A. No.
12:33:45 24      Q. Is that where you slept the night before

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

eb2827ab-6285-4fb1-b765-9962caa2bd64

Janice L. Stevenson                                     09/07/2006

---

### Page 114

```
12:33:47 1   that?
12:33:47 2       A. Probably not.
12:33:49 3       Q. So where did you sleep last night?
12:33:51 4       A. Somewhere else other than 647 Massachusetts
12:33:55 5   Avenue.
12:33:55 6       Q. What is the address of the place that you
12:33:57 7   slept last night?
12:33:58 8       A. I'm not sure.
12:33:59 9       Q. It's your testimony that you don't remember
12:34:01 10  the address?
12:34:02 11      A. It's my testimony that I'm not sure.
12:34:05 12      Q. What's your best memory of the address of
12:34:07 13  the building in which you slept last night?
12:34:08 14      A. I don't know. I don't have a best memory.
12:34:16 15      Q. You have no idea where you slept last night?
12:34:18 16      A. Yes, of course I do. I just don't have a
12:34:20 17  best memory of my recollection of the building, but
12:34:27 18  I do have an address.
12:34:29 19      Q. That's not material. On what street was the
12:34:32 20  building on which you slept last night?
12:34:33 21      A. I'm not sure.
12:34:34 22      Q. How did you get here today?
12:34:35 23      A. I took the T.
12:34:38 24      Q. And at what stop did you get on the T?
```

### Page 115

```
12:34:42 1       A. The World Trade Center.
12:34:48 2       Q. That's where you got off the train, right?
12:34:49 3       A. Yes.
12:34:50 4       Q. Where did you get on the train?
12:34:52 5       A. In Cambridge.
12:34:53 6       Q. What stop?
12:34:54 7       A. I walked to Central.
12:34:59 8       Q. You got on the train at the Central station?
12:35:03 9       A. Across from 647 Massachusetts Avenue.
12:35:05 10      Q. But you didn't sleep at 647 Massachusetts
12:35:07 11  Avenue last night, right?
12:35:08 12      A. (No verbal response)
12:35:10 13      Q. Do you remember the path you took to get to
12:35:13 14  the train station this morning?
12:35:15 15      A. Yes. I walked up Mass. Avenue and got on
12:35:20 16  the T stop.
12:35:21 17      Q. And what street did you take to get to Mass.
12:35:23 18  Avenue?
12:35:23 19      A. Massachusetts Avenue.
12:35:24 20      Q. So you slept at a building on Massachusetts
12:35:28 21  Avenue last night?
12:35:28 22      A. I'm not sure.
12:35:29 23      Q. You're uncertain whether the building you
12:35:33 24  slept in last night was on Massachusetts Avenue,
```

### Page 116

```
12:35:35 1   that's your testimony under oath?
12:35:36 2       A. I'm not sure.
12:35:38 3       Q. What about the situation in which -- Strike
12:35:43 4   that.
12:35:43 5           What about the building in which you
12:35:45 6   slept last night are you uncertain of?
12:35:47 7       A. I don't know.
12:35:49 8       Q. How many times have you slept in the
12:35:52 9   building in which you slept last night?
12:35:53 10      A. I don't know. I don't count.
12:35:54 11      Q. More than 10?
12:35:55 12      A. I don't know.
12:35:56 13      Q. You don't know if you've slept there more
12:36:01 14  than 10 times?
12:36:02 15      A. I'm not sure.
12:36:03 16      Q. More than five times?
12:36:03 17      A. I don't know.
12:36:04 18      Q. More than twice?
12:36:05 19      A. I'm not sure.
12:36:05 20      Q. So is it your testimony that there is no
12:36:12 21  building to which you customarily return at night to
12:36:16 22  sleep?
12:36:16 23      A. I'm not sure.
12:36:18 24      Q. You don't know if there's a building to
```

### Page 117

```
12:36:20 1   which you customarily return to at night, that's
12:36:25 2   your testimony under oath?
12:36:26 3       A. I'm not really sure. I can't describe
12:36:29 4   buildings. I don't see them that way.
12:36:31 5       Q. You don't know what a building is, is that
12:36:33 6   your testimony?
12:36:34 7       A. I know what a building is. To describe it.
12:36:36 8       Q. What I'm asking you is the address of the
12:36:38 9   location where you slept last night.
12:36:39 10      A. I told you I'm not sure.
12:36:41 11      Q. I think you're evading my question.
12:36:43 12      A. There's that word again.
12:36:45 13      Q. That's the word I'm going to use for what
12:36:47 14  you're doing. You're evading my question.
12:36:49 15          Have we established that the building in
12:36:51 16  which you slept last night was on Massachusetts
12:36:53 17  Avenue?
12:36:53 18      A. (No verbal response)
12:36:57 19      Q. Do you understand the question?
12:36:59 20      A. I've given you a physical address.
12:37:01 21      Q. You've given me a physical address and
12:37:04 22  you've told me that's not your residence and that's
12:37:06 23  not where you slept last night. What I want to know
12:37:08 24  is, what is your physical residence?
```

30 (Pages 114 to 117)

eb2827ab-6285-4fb1-b765-9962caa2bd64

Janice L. Stevenson                                                    09/07/2006

---

Page 118

12:37:11 1    A. So if I sleep three to four different
12:37:13 2    places, you want all those places?
12:37:15 3    Q. Let's start with the place you slept last
12:37:17 4    night.
12:37:17 5    A. I'm not sure.
12:37:18 6    Q. You don't remember where you slept last
12:37:19 7    night?
12:37:19 8    A. I just answered the question three -- You
12:37:23 9    know you're going to catch me at either one?  What,
12:37:2510    where, what?
12:37:2511    Q. Do you understand the question when I ask
12:37:2912    you where did you sleep last night?
12:37:2913    A. (No verbal response)
12:37:4214    Q. Do you understand the question?
12:37:4215    A. I think I've answered the question.
12:37:4216    Q. That's not what I asked you.  Your job here,
12:37:4217    as I just pointed out to you when I showed you this
12:37:4218    rule, is merely to respond to my questions.  Do you
12:37:4319    understand that?
12:37:4320    A. I've responded.  I think I've given you an
12:37:4521    adequate response.
12:37:4622    Q. So again, you're going to refuse to give me
12:37:4923    further information?
12:37:4924    A. I've given you all I can give you with

---

Page 119

12:37:52 1    certainty.
12:37:53 2    Q. I'm not asking for certainty.  I'm asking
12:37:59 3    for your memory.
12:38:01 4    A. I can't recall.
12:38:01 5    Q. You don't recall whether the building you
12:38:03 6    slept in last night is on Mass. Avenue, that's what
12:38:06 7    you're telling me?
12:38:07 8    A. Yes, sir.
12:38:07 9    Q. And you don't know whether there's a
12:38:1010    building to which you customarily and regularly
12:38:1211    return to sleep at night, that's your testimony?
12:38:1512    A. No, sir.
12:38:1713    Q. What's your testimony on that point?
12:38:1814    A. I said I'm not sure.
12:38:2415    Q. You're not sure?
12:38:2516    A. I can't recall.  I'm not certain.
12:38:2617    Q. And how is that different than what I said?
12:38:3018    A. Because my answer is longer.
12:38:3219    Q. All right.  So is it your testimony that you
12:38:4220    have no memory as to whether or not --
12:38:4421    A. I know I sleep at night.
12:38:4822    Q. Do you know that you customarily and
12:38:5023    regularly return to the same place to sleep at
12:38:5124    night?

---

Page 120

12:38:52 1    A. (No verbal response)
12:38:56 2    Q. Do you understand the question?
12:38:57 3    A. I've answered it.
12:38:59 4    Q. You have not answered it.
12:39:00 5    A. Yes, sir.
12:39:02 6    Q. So you're going to refuse to answer it
12:39:03 7    further?
12:39:05 8    A. I didn't say I refused.  I answered it.  Can
12:39:08 9    we just let what's on the record stand?
12:39:1010    Q. No, I'm not going to let what's on the
12:39:1211    record stand.
12:39:1312    A. Are you striking my answer?
12:39:1413    Q. I have not moved to strike your answer,
12:39:1614    though it's within my ability to do that.  What I'm
12:39:2015    asking you to do is to give a substantive response
12:39:2216    to the question rather than an evasive one.
12:39:2517    A. Something that satisfies you?
12:39:2618    Q. No.  Something that's responsive.  I'll be
12:39:2919    perfectly satisfied if you answer the question.
12:39:3120    The question is, is there a place to
12:39:3221    which you customarily and regularly return to sleep
12:39:3622    at night?
12:39:3623    A. (No verbal response)
12:39:4424    Q. Do you understand the question?

---

Page 121

12:39:45 1    A. I was just thinking, I had this weird
12:39:49 2    dream --
12:39:49 3    Q. That's not going to be responsive to my
12:39:51 4    question.  Your job is just to respond to my
12:39:53 5    questions.
12:39:55 6    A. But I'm not sure.
12:39:56 7    Q. You don't know if you have a home, is that
12:39:59 8    what you're telling me?
12:39:59 9    A. I don't have a home.
12:40:0310    Q. You don't have a home, that's your
12:40:0611    testimony.  Okay.  So there's no place to which you
12:40:0912    customarily and regularly return to sleep at night?
12:40:1213    A. (No verbal response)
12:40:1314    Q. Is that the answer?
12:40:1415    A. I've been several places.
12:40:1616    Q. Through the course of your life?
12:40:1717    A. Within Massachusetts.
12:40:2118    Q. In the last three months is there anyplace
12:40:3419    that you've customarily and regularly returned to
12:40:3720    sleep at night in the last three months?
12:40:3921    A. I've answered your question.
12:40:4122    Q. You certainly have not.  And if you believe
12:40:4323    you have, there's certainly no harm for you
12:40:4624    answering it again.  So I'll ask you again --

31 (Pages 118 to 121)

eb2827ab-6285-4fb1-b765-9962caa2bd64

Janice L. Stevenson                                      09/07/2006

---

Page 122

12:40:48 1    A. I've given you 647 Massachusetts Avenue.
12:40:51 2    Q. And you've told me that's not your
12:40:54 3 residence, right?
12:40:54 4    A. But you asked for an address.
12:40:57 5    Q. I asked for a physical address and then I
12:40:59 6 asked for your residence. So you're not going to
12:41:02 7 give me your residential address, that's what you're
12:41:05 8 telling me; is that right?
12:41:07 9    A. No, sir. I'm just saying I've given you an
12:41:10 10 address. But if you really want to contact me --
12:41:15 11    Q. I'm not asking about contact information.
12:41:17 12 I'm asking where you live.
12:41:18 13    A. You want to know where I am. Those are the
12:41:21 14 addresses.
12:41:22 15    Q. So you're not going to give me your
12:41:25 16 residential address; is that right?
12:41:26 17    A. I've answered the question, sir.
12:41:29 18    Q. You certainly have not.
12:41:35 19       Will you now give me your Social
12:41:36 20 Security number in light of the rule that I've shown
12:41:38 21 you?
12:41:38 22    A. Sir, I really think I can't. Out of all the
12:41:44 23 things I've read about misuse of Social Security
12:41:47 24 numbers, I can't in good conscience do that.

---

Page 123

12:41:51 1    Q. So you're going to continue to refuse to
12:41:53 2 answer the question?
12:41:53 3    A. It's not a refusal. I can't in good
12:41:57 4 conscience.
12:41:57 5    Q. You certainly know your Social Security
12:41:59 6 number, don't you?
12:41:59 7    A. I believe I do.
12:42:00 8    Q. And you could tell it to me if you wanted
12:42:02 9 to?
12:42:03 10    A. I guess I could.
12:42:04 11    Q. But you're not going to, is that your
12:42:07 12 testimony?
12:42:07 13    A. I could not do that because I think I would
12:42:10 14 violate what the people who control identity thefts
12:42:20 15 says, don't give your ID out. If it has nothing to
12:42:23 16 do --
12:42:24 17    Q. Are you telling me you think it's illegal
12:42:26 18 for you to give me my Social Security number?
12:42:28 19    A. I think it would not be beneficial to me.
12:42:30 20    Q. I'm not asking you whether it would be
12:42:31 21 beneficial to you.
12:42:32 22    A. I'm taking the Fifth.
12:42:35 23    Q. So you believe that by giving me your Social
12:42:37 24 Security number you would be implicated in a crime?

---

Page 124

12:42:40 1 Is that what you're telling me?
12:42:43 2    A. I'm taking the Fifth.
12:42:43 3    Q. Do you understand what the Fifth Amendment
12:42:44 4 is?
12:42:45 5    A. I don't have to incriminate myself.
12:42:46 6    Q. So is it your testimony that by giving your
12:42:48 7 Social Security number you believe you would be
12:42:50 8 implicating yourself in a crime?
12:42:51 9    A. I believe if I gave my Social Security
12:42:54 10 number I would be putting it out there in the public
12:43:00 11 domain somewhere for anybody to pick up.
12:43:02 12    Q. And what does that have to do with your
12:43:05 13 guilt or innocence of a crime?
12:43:06 14    A. And then it could lead to identity theft.
12:43:11 15    Q. What does that have to do with your guilt or
12:43:13 16 innocence of a crime?
12:43:15 17    A. Somebody is going to think I've done
12:43:17 18 something with that number because it's my number.
12:43:19 19    Q. Well, you understand that the Fifth
12:43:21 20 Amendment applies only to crimes that you have
12:43:24 21 already committed. And so your assertion of the
12:43:26 22 Fifth Amendment --
12:43:28 23    A. No. I think it applies to information that
12:43:31 24 you don't want to give that could probably cause

---

Page 125

12:43:34 1 further problems down the road.
12:43:35 2    Q. Well, I'll represent to you -- and we've
12:43:38 3 established that you don't have a law degree -- that
12:43:40 4 that is not the scope of --
12:43:41 5    A. I don't have a law degree, this is true.
12:43:43 6    Q. I'm not your lawyer. I can't advise you on
12:43:45 7 the scope of the Fifth Amendment and --
12:43:49 8    A. But you can tell me not to use it?
12:43:50 9    Q. Let me get the statement out. All I can
12:43:53 10 tell you is I believe that to be a categorically
12:43:55 11 inappropriate assertion of the Fifth Amendment. And
12:43:58 12 we will reserve our rights as to that question and
12:44:00 13 any other question that you assert the Fifth
12:44:02 14 Amendment to seek relief from the court.
12:44:04 15       And that relief from the court would
12:44:05 16 include either an order compelling you to disclose
12:44:08 17 the information or an adverse inference, meaning
12:44:11 18 that the jury or the finder of fact could infer from
12:44:14 19 your assertion of the Fifth Amendment that you had
12:44:18 20 done something wrong or the evidence that you're
12:44:19 21 withholding is somehow not favorable to you. Do you
12:44:22 22 understand that?
12:44:22 23    A. Okay.
12:44:22 24    Q. And we reserve our rights to seek that

---

32 (Pages 122 to 125)

eb2827ab-6285-4fb1-b765-9962caa2bd64

Janice L. Stevenson                                    09/07/2006

---

Page 126

12:44:24 1    relief.
12:44:25 2        A. It goes both ways.
12:44:26 3        Q. What do you mean by that?
12:44:27 4        A. The same things you're going to object or
12:44:34 5    state to the court, I can do the same thing, too.
12:44:36 6        Q. So you're just saying that you reserve the
12:44:38 7    right to seek whatever relief you want from the
12:44:40 8    court?
12:44:40 9        A. Yes, sir.
12:44:41 10       Q. Certainly. Will you now tell me whether or
12:44:45 11   not you're presently married?
12:44:46 12       A. Fifth.
12:44:47 13       Q. You're going to plead the Fifth as to
12:44:50 14   whether you're presently married?
12:44:51 15       A. Fifth.
12:44:51 16       Q. Could you explain to me how that relates to
12:44:54 17   your commission of a crime?
12:44:55 18       A. I can't. I don't have a degree.
12:44:59 19       Q. But do you believe that your marital status
12:45:01 20   in some way implicates you in a crime?
12:45:03 21       A. I'm not going to answer that. Fifth.
12:45:08 22       Q. You're pleading the Fifth as to whether your
12:45:11 23   marital status --
12:45:11 24       A. And the Fourteenth.

---

Page 127

12:45:12 1        Q. What about the Fourteenth Amendment would
12:45:14 2    apply to that?
12:45:15 3        A. I'm pleading, pleading.
12:45:19 4        Q. So you're just refusing to answer, and you
12:45:22 5    believe there's some Constitutional protection; is
12:45:25 6    that a fair representation?
12:45:26 7        A. Yes, sir.
12:45:26 8        Q. And you're not going to tell me if you're
12:45:29 9    presently married; is that right?
12:45:30 10       A. (No verbal response)
12:45:33 11       Q. Is that correct?
12:45:34 12       A. I have some Constitutional protections. I
12:45:39 13   plead them.
12:45:40 14       Q. And you're not going to answer them?
12:45:41 15       A. Under my Constitutional right, no.
12:45:44 16       Q. Will you tell me if you've ever been
12:45:46 17   married?
12:45:46 18       A. Fifth.
12:45:47 19       Q. Will you tell me if you've ever been
12:45:49 20   divorced?
12:45:49 21       A. Fifth.
12:45:50 22       Q. Will you tell me if you've ever had
12:45:52 23   children?
12:45:52 24       A. Fifth.

---

Page 128

12:45:53 1        Q. Will you tell me the name of the high school
12:45:55 2    that you attended?
12:45:56 3        A. Fifth.
12:45:56 4        Q. Okay. We talked about -- I'm picking up the
12:46:15 5    background on your education that we were talking
12:46:18 6    about before we broke. Okay?
12:46:21 7            You've told me that you took college
12:46:24 8    courses at Grambling, Louisiana and at Collin County
12:46:29 9    Community College. Did you take any other formal
12:46:30 10   educational courses after graduating from Grambling
12:46:33 11   and receiving your bachelor's degree?
12:46:36 12       A. I don't know. I guess those are the ones.
12:46:52 13   I think that's it. I think.
12:46:54 14       Q. You believe that the only course work you've
12:46:56 15   done after finishing your college in business
12:46:59 16   administration were the courses at Collin Community
12:47:02 17   College and the other courses that you took at
12:47:04 18   Grambling, is that your testimony?
12:47:05 19       A. There are probably some more. I just -- I
12:47:13 20   remember taking some out at Denton, but I don't
12:47:16 21   know.
12:47:16 22       Q. Where is Denton?
12:47:17 23       A. In Texas.
12:47:18 24       Q. And what institution is there?

---

Page 129

12:47:19 1        A. Hmm?
12:47:21 2        Q. What institution is there?
12:47:22 3        A. Denton.
12:47:23 4        Q. Denton is the institution?
12:47:25 5        A. Uh-hmm.
12:47:25 6        Q. Where is it?
12:47:26 7        A. Denton.
12:47:26 8        Q. So is it the University of Denton or Denton
12:47:30 9    College?
12:47:30 10       A. Yes. I don't know. It's in Denton. I
12:47:37 11   think it's the only one.
12:47:39 12       Q. Is it a community college or a university?
12:47:39 13       A. Probably a university. I don't know.
12:47:42 14           I think that completes my education. I
12:47:45 15   think.
12:47:45 16       Q. What courses did you take at Denton?
12:47:46 17       A. I took some online courses.
12:47:48 18       Q. Are you now talking about the courses you
12:47:50 19   took at Denton, or is that separate?
12:47:53 20       A. Are we still on my education?
12:47:56 21       Q. Right. And you've told me you took courses
12:47:59 22   at Denton.
12:47:59 23       A. A course.
12:48:00 24       Q. What was the course you took at Denton?

---

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

eb2827ab-6285-4fb1-b765-9962caa2bd64

Janice L. Stevenson                                    09/07/2006

---

**Page 130**

12:48:02 1    A. It was a computer course.

12:48:03 2    Q. What kind of computer course?

12:48:04 3    A. I don't know. A business course, I believe.

12:48:11 4    Q. So the use of computers in business, that

12:48:13 5    sort of thing?

12:48:13 6    A. I don't know. We did a lot of reading about

12:48:18 7    businesses, so I guess it's a business course.

12:48:22 8    Q. Did it involve computers as well?

12:48:24 9    A. No. Just reading.

12:48:27 10    Q. So it wasn't a computer course. It was a

12:48:29 11    business course?

12:48:29 12    A. It was a business course.

12:48:30 13    Q. Do you remember what aspect of business it

12:48:33 14    concerned?

12:48:33 15    A. No.

12:48:33 16    Q. When did you take that course?

12:48:36 17    A. I don't know the year.

12:48:39 18    Q. Do you know the decade?

12:48:40 19    A. When I was in Texas, before I came here. I

12:48:46 20    came here in -- I guess in the '90s.

12:48:51 21    Q. And you were about to say you came here in

12:48:56 22    2000 what? Do you remember what year you moved to

12:48:58 23    Massachusetts?

12:48:59 24    A. Fifth.

---

**Page 131**

12:49:03 1    Q. You're going to plead the Fifth as to what

12:49:06 2    year you moved to Massachusetts. And do you believe

12:49:08 3    that implicates you in a crime or --

12:49:11 4    A. Fifth.

12:49:11 5    Q. You mentioned online courses. Were those

12:49:22 6    the same course you took at Denton, or are those

12:49:25 7    separate from what you've testified about so far?

12:49:28 8    A. I still take courses online in regard to

12:49:32 9    Microsoft and spreadsheeting and charting and

12:49:41 10    presentations, different stuff you take online, but

12:49:46 11    they don't lead to anything. I don't know. You

12:49:52 12    just take them.

12:49:52 13    Q. And through what institution do you take

12:49:55 14    those courses?

12:49:56 15    A. Just online. Like HP learning, HP.

12:49:58 16    Q. So this isn't a formal program?

12:50:00 17    A. No. Just something you log on. It's free.

12:50:05 18    It was free.

12:50:06 19    Q. Do you remember receiving any other formal

12:50:13 20    education than what we've talked about in

12:50:17 21    terms of your bachelor's degree at Grambling, the

12:50:20 22    advanced courses you took at Grambling, courses you

12:50:22 23    took at Collin County Community College, courses you

12:50:26 24    took in Denton and online courses?

---

**Page 132**

12:50:33 1    A. I've done some self-study courses.

12:50:47 2    Q. Like what?

12:50:47 3    A. Purchasing courses.

12:50:48 4    Q. When did you take a self-study purchasing

12:50:51 5    course?

12:50:51 6    A. In the '90s.

12:50:54 7    Q. And was that in association with any other

12:50:57 8    educational institution?

12:50:58 9    A. No.

12:50:58 10    Q. So did you purchase a study program and you

12:51:02 11    did it on your own?

12:51:03 12    A. No. I borrowed a -- I borrowed someone's

12:51:08 13    book. I borrowed a study guide, and I just studied

12:51:10 14    from that.

12:51:11 15    Q. Did you take some sort of test?

12:51:13 16    A. Yes.

12:51:13 17    Q. And what was that?

12:51:15 18    A. The purchasing test.

12:51:22 19    Q. Did you pass it?

12:51:23 20    A. Yes.

12:51:24 21    Q. And what certification did you receive?

12:51:26 22    A. CPM.

12:51:28 23    Q. What does that stand for?

12:51:30 24    A. Certified purchasing manager.

---

**Page 133**

12:51:32 1    Q. And does that serve as any sort of license

12:51:41 2    that would allow you to do something you wouldn't

12:51:44 3    otherwise be allowed to do?

12:51:45 4    A. It's more of -- I guess it's certification

12:51:54 5    to the purchase field that you understand purchasing

12:51:58 6    policies, procedures, you have a good knowledge of

12:52:03 7    it. I don't know how to relate it to -- Once you

12:52:07 8    get the JD, that's it? That's the ultimate in law,

12:52:10 9    right?

12:52:11 10    Q. Can be.

12:52:11 11    A. I don't know what the other certifications

12:52:15 12    are in law. I guess to accounting you can be a CPA.

12:52:19 13    Even though you can have a master's in accounting,

12:52:23 14    you can take some certifications in accounting. And

12:52:26 15    it just kind of tells people I've taken a

12:52:28 16    certification, I'm kind of grounded in my theory.

12:52:32 17    Q. You have certain qualifications?

12:52:34 18    A. Yes.

12:52:35 19    Q. And those are qualifications that would be

12:52:37 20    advanced sort of among the general populous?

12:52:40 21    A. Yes, sir. Who are in that particular field,

12:52:42 22    because it's just to purchasing.

12:52:46 23    Q. So you would be more qualified to do

12:52:47 24    purchasing than someone who didn't have that

---

34 (Pages 130 to 133)

eb2827ab-6285-4fb1-b765-9962caa2bd64

Janice L. Stevenson                                      09/07/2006

## Page 154

01:15:56  1  that's going on somewhere in the United States
01:15:57  2  because you can't take that course online.
01:16:02  3      If you sign up for a virtual course and
01:16:05  4  a virtual test, you want a thousand-plus dollars.
01:16:09  5  And it was just --
01:16:10  6      Q.  So what's the name of the organization?
01:16:13  7      A.  WorldatWork Society of Professionals.
01:16:16  8  WorldatWork.
01:16:17  9      Q.  And what's the name of the certification
01:16:18 10  that you're studying for?
01:16:20 11      A.  It was a CBP, certified benefits
01:16:23 12  professional.
01:16:23 13      Q.  Okay.  And are you finished with that course
01:16:25 14  of study?
01:16:26 15      A.  Oh, my goodness.  I haven't started.  I keep
01:16:29 16  looking at the prices.  It's killing me.
01:16:31 17      Q.  Okay.  Do you believe that your
01:16:34 18  experience -- your work experience and your
01:16:36 19  background would give you a jump start in the skill?
01:16:38 20      A.  It is because it gives you -- they give
01:16:42 21  you -- they test your knowledge on the Website.  And
01:16:46 22  you go under benefits.  It's all most stuff you
01:16:49 23  know.
01:16:50 24      Say, for instance, if you get sick,

## Page 155

01:16:52  1  which kicks in first, long-term disability or Social
01:16:56  2  Security?  And they ask you the month it takes.  And
01:16:59  3  most people know that, generally.
01:17:01  4      Q.  People who have experience in the field?
01:17:02  5      A.  Yeah.  Even at work you know that if you
01:17:06  6  became disabled and you had taken long-term
01:17:09  7  disability and you had to take off from your job,
01:17:11  8  that doesn't kick in until the 91st day.  And that's
01:17:16  9  your long-term disability.
01:17:21 10      When can you apply for Social Security?
01:17:24 11  You've been away from your job long enough.  You
01:17:27 12  would know within five months.  This is the kind of
01:17:33 13  stuff you know.
01:17:33 14      Q.  As an employee?
01:17:34 15      A.  Yeah.
01:17:35 16      Q.  And do you think that you know that better
01:17:36 17  than the average layman from your experience?
01:17:39 18      A.  As a layman, from working you know that.
01:17:42 19      Q.  But you personally, do you think you know it
01:17:44 20  better than the average layman, having worked in the
01:17:46 21  human resources field, or do you just consider
01:17:48 22  yourself on par with everybody else?
01:17:50 23      A.  On par with everybody else.
01:17:51 24      Q.  Okay.  Because you haven't done the studying

## Page 156

01:17:54  1  yet?
01:17:54  2      A.  I haven't done the studying yet.
01:17:56  3      Q.  Okay.  And we talked about accounts
01:17:58  4  receivable and accounts payable.  Do you have any
01:18:00  5  other sort of training or education in the finance
01:18:02  6  field?
01:18:02  7      A.  No.
01:18:03  8      Q.  Nothing at all?
01:18:04  9      A.  No.
01:18:04 10      Q.  We're almost done with education.  Is there
01:18:11 11  any other education you can remember in your life
01:18:13 12  that we haven't talked about?
01:18:15 13      A.  Oh, my goodness.
01:18:16 14      Q.  Take a minute.
01:18:29 15      A.  No.  I worked on most every clerical bill I
01:18:33 16  can think of.  Right now the big difference of me
01:18:35 17  working from back when I got out of school until now
01:18:39 18  is there's so many certifications.  And what's
01:18:42 19  moving -- That's the reason I want to do benefits,
01:18:46 20  because we have an Asian society.  Benefits is the
01:18:49 21  big buzz word now.  I want to specialize so I can
01:18:52 22  stay employed.
01:18:55 23      Q.  Okay.
01:18:56 24      A.  I hope that answers that question.

## Page 157

01:18:59  1      Q.  Yeah.  Let me know if you need to take a
01:19:04  2  break at any time.  I'm trying to get through this
01:19:09  3  best as I can.
01:19:09  4      That segues to where we're going next,
01:19:12  5  which is your current employment.  Are you currently
01:19:15  6  employed?
01:19:15  7      A.  Let me see.  Yes.  I do temporary
01:19:20  8  employment.  I've been there about -- That's as far
01:19:29  9  as I'll go.
01:19:29 10      Q.  Through what agency do you do temporary
01:19:33 11  employment?
01:19:33 12      A.  ASG.
01:19:34 13      Q.  And what kind of temporary employment do you
01:19:37 14  do with them?
01:19:37 15      A.  Well, for this one I cover for HR jobs.
01:19:44 16      Q.  An HR generalist job?
01:19:46 17      A.  Recruiting.  Normally looking over
01:19:48 18  applications, determining if their skill-set fits
01:19:54 19  the job.  If it does, bring them back in and take
01:19:59 20  them through the enrollment process and then put
01:20:02 21  them into the payroll system.
01:20:05 22      Q.  Does the studying you did for the HR program
01:20:09 23  help you do that kind of work?
01:20:10 24      A.  It does.

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

eb2827ab-6285-4fb1-b765-9962caa2bd64

Janice L. Stevenson                                    09/07/2006

---

**Page 174**

01:37:10 1    Q. With the DUA?

01:37:11 2    A. The DUA. The reason it stuck on my mind,

01:37:14 3    because there was no wages anywhere.

01:37:18 4    Q. You mean, DUA had no record of wages?

01:37:21 5    A. No record of wages. I was shocked.

01:37:23 6    Q. From Ace, Ajilon or NHCS?

01:37:26 7    A. Right.

01:37:26 8    Q. So what documents did you submit to DUA?

01:37:28 9    A. I had to find check stubs.

01:37:33 10    Q. That's what you submitted?

01:37:34 11    A. Yes, sir.

01:37:34 12    Q. From all three of those companies?

01:37:36 13    A. Yes. And some tax forms.

01:37:43 14    Q. 1099s and --

01:37:46 15    A. W-2s, something like that.

01:37:47 16    Q. Were they all W-2s or something like that?

01:37:50 17    A. Either they wanted W-2s, but I hadn't

01:37:54 18    done -- For Ace I believe -- I hadn't done anything

01:38:00 19    for Ace. So I had to find check stubs for Ace and

01:38:04 20    Ajilon and tax forms for NHCS.

01:38:08 21    Q. And you submitted all of that to DUA?

01:38:11 22    A. I did.

01:38:12 23    Q. Do you have copies of what you submitted?

01:38:16 24    A. I got copies of the folder at the hearing.

---

**Page 175**

01:38:23 1    Q. What hearing is this? Are we talking about

01:38:26 2    a hearing held by DUA?

01:38:27 3    A. Yes.

01:38:28 4    Q. When was that?

01:38:28 5    A. In May or June, remember?

01:38:32 6    Q. I wasn't there.

01:38:34 7    A. No. That's right. Nobody came.

01:38:37 8    Q. So in May or June there was a hearing held

01:38:39 9    by DUA that you attended and no one attended on

01:38:42 10    behalf of NHCS?

01:38:44 11    A. That's right.

01:38:44 12    Q. And you don't know the specific date?

01:38:46 13    A. I want to say the 25th of May because the

01:38:50 14    first one was cancelled. I think it was May. There

01:38:57 15    was something in -- Was there something in June?

01:39:02 16    It's a blur.

01:39:03 17    Q. Okay. So the question was, did you retain

01:39:05 18    copies of everything that you submitted to DUA?

01:39:08 19    A. I don't think so, but when I got the folder

01:39:10 20    I got all that. See, when you go to a hearing they

01:39:17 21    give you a file. And everything I submitted was

01:39:21 22    supposed to be in that file.

01:39:22 23    Q. And was it?

01:39:23 24    A. Yes.

---

**Page 176**

01:39:24 1    Q. Okay. So you got it back from DUA?

01:39:27 2    A. I got it back and I made copies.

01:39:28 3    Q. And you still have those copies?

01:39:30 4    A. I still have those copies probably in

01:39:36 5    some -- I guess they're in the house somewhere.

01:39:38 6    Q. What house is that?

01:39:39 7    A. The place sometimes I store stuff at.

01:39:42 8    Q. And where is that?

01:39:43 9    A. It depends.

01:39:46 10    Q. The house moves?

01:39:49 11    A. No. The Fifth.

01:39:51 12    Q. You're going to plead the Fifth as to where

01:39:52 13    you keep your documents?

01:39:53 14    A. Yeah.

01:39:54 15    Q. Okay. We've talked about the three

01:39:58 16    employment agencies, we talked about Massport. And

01:40:01 17    those are employments you've had since your contract

01:40:03 18    with NHCS was terminated?

01:40:05 19    A. Uh-hmm.

01:40:06 20    Q. Have you performed services for any other

01:40:07 21    company since your contract with NHCS was terminated

01:40:12 22    outside the employment context?

01:40:13 23    A. Not that I can remember. Have you got

01:40:18 24    something in mind?

---

**Page 177**

01:40:19 1    Q. No. It's an open-ended question.

01:40:24 2    A. No. That's all my employment for money. I

01:40:27 3    work for money.

01:40:28 4    Q. Have you received compensation from any

01:40:33 5    organization other than Massport, PSG, Ajilon or Ace

01:40:41 6    since June of 2005?

01:40:43 7    A. Department of Unemployment.

01:40:43 8    Q. Any other source of income?

01:40:45 9    A. I don't think so. Unemployment and, of

01:40:51 10    course, what I'm working now.

01:40:54 11    Q. And that came from PSG?

01:40:55 12    A. PSG.

01:40:56 13    Q. So the answer to the question is? Have you

01:40:59 14    received income from any other source than Massport,

01:41:03 15    PSG, Ajilon and Ace, the answer is?

01:41:07 16    A. No, not that I know of.

01:41:08 17    Q. Again, if you remember anything as we

01:41:14 18    proceed, let me know.

01:41:17 19    MR. MILLER: I think we should take a

01:41:19 20    break. Okay.

01:41:19 21    (Recess taken)

02:00:09 22    (Exhibit Number 3

02:00:09 23    marked for identification)

02:00:09 24    Q. Ms. Stevenson, I'm showing you a document

---

45  (Pages 174 to 177)

eb2827ab-6285-4fb1-b765-9962caa2bd64

Janice L. Stevenson                                    09/07/2006

---

Page 178

02:00:12 1    that has been marked as Exhibit 3. Do you recognize
02:00:14 2    that document?
02:00:26 3        A. I guess it's an application.
02:00:27 4        Q. Is it an application or resume?
02:00:29 5        A. I'm sorry. It's a resume.
02:00:31 6        Q. Did you prepare this document?
02:00:32 7        A. I guess I did.
02:00:34 8        Q. Did you have any help preparing it?
02:00:36 9        A. I don't remember.
02:00:37 10       Q. Is it your practice to keep an updated
02:00:41 11    resume?
02:00:42 12       A. No. Now I have none.
02:00:48 13       Q. You don't even have a copy of that one
02:00:51 14    anymore?
02:00:51 15       A. No.
02:00:51 16       Q. What happened to it?
02:00:53 17       A. I deleted them.
02:00:54 18       Q. You deleted them from your computer?
02:00:56 19       A. If I don't use it anymore, I don't just keep
02:01:01 20    them.
02:01:01 21       Q. So the answer is yes, you deleted it from
02:01:03 22    your computer?
02:01:04 23       A. I don't have it. I don't have any up-to-
02:01:06 24    date resumes. I think that was your question.

Page 179

02:01:08 1        Q. I asked you if you had it. You said you
02:01:10 2    deleted it.
02:01:11 3        A. I don't have it.
02:01:12 4        Q. So do you know if you deleted it from your
02:01:16 5    computer?
02:01:16 6        A. I don't have it.
02:01:17 7        Q. That's not what I asked you.
02:01:18 8        A. How old is this?
02:01:19 9        Q. I'll ask the questions.
02:01:21 10       A. Okay.
02:01:21 11       Q. The question is, do you know if you deleted
02:01:24 12    this document from your computer?
02:01:25 13       A. I know I don't have it.
02:01:26 14       Q. Do you know if you had it on your computer
02:01:28 15    at one time?
02:01:28 16       A. I probably did this at NHCS.
02:01:34 17       Q. So you did it on the NHCS computer
02:01:38 18    maintained at the school?
02:01:39 19       A. Yes.
02:01:39 20       Q. Did you ever have a resume on your home
02:01:41 21    computer?
02:01:41 22       A. I don't know.
02:01:47 23       Q. You don't know if you ever had a resume?
02:01:49 24       A. I'm not sure. I don't have it now.

Page 180

02:01:51 1        Q. Do you have a computer at home?
02:01:53 2        A. I have a computer at home.
02:01:55 3        Q. What kind of computer is it?
02:01:57 4        A. It's a computer.
02:02:00 5        Q. Is it a desktop or a laptop?
02:02:02 6        A. It's on top of a desk. Is that a desktop?
02:02:07 7        Q. Do you know what the difference between a
02:02:09 8    desktop and laptop is?
02:02:11 9        A. Yeah.
02:02:11 10       Q. Is it a desktop or laptop?
02:02:13 11       A. I guess it's a laptop.
02:02:19 12       Q. Like the one Ms. Keegan has?
02:02:21 13       A. Yeah. Hers is nicer.
02:02:23 14       Q. What brand is yours?
02:02:24 15       A. I think it's a Dell.
02:02:30 16       Q. When did you purchase it?
02:02:31 17       A. I didn't.
02:02:31 18       Q. Where did you get it?
02:02:34 19       A. It was given to me.
02:02:35 20       Q. By whom?
02:02:36 21       A. Somebody I know.
02:02:38 22       Q. What is that person's name?
02:02:40 23       A. Just a person.
02:02:44 24       Q. That's not what I asked you. What's that

Page 181

02:02:47 1    person's name?
02:02:47 2        A. You know.
02:02:48 3        Q. I don't know. That's why I asked you. What
02:02:51 4    is the person's name?
02:02:51 5        A. The person's name is John.
02:02:54 6        Q. What's the person's last name?
02:02:56 7        A. Stevenson.
02:02:57 8        Q. Is this your husband, former husband?
02:03:01 9        A. (No verbal response)
02:03:05 10       Q. Do you understand the question?
02:03:06 11       A. Fifth.
02:03:07 12       Q. You're going to plead the Fifth as to
02:03:10 13    whether this person, John Stevenson, is or was ever
02:03:12 14    married to you?
02:03:13 15       A. Yes, sir.
02:03:13 16       Q. And you understand from what I've told you
02:03:17 17    thus far that it's our position that that's an
02:03:20 18    inappropriate assertion of the Fifth Amendment?
02:03:22 19       A. Yes, sir.
02:03:23 20       Q. And you nonetheless intend to assert that
02:03:28 21    ostensible privilege?
02:03:29 22       A. I don't know. Constitution infringement or
02:03:33 23    something like that.
02:03:33 24       Q. You're refusing to answer the question; is

46 (Pages 178 to 181)

eb2827ab-6285-4fb1-b765-9962caa2bd64

Janice L. Stevenson                                    09/07/2006

## Page 182

02:03:40 1    that right?
02:03:40 2        A. I've answered all I know, sir.
02:03:46 3        Q. Well, no, that's not true. You know whether
02:03:49 4    or not John --
02:03:49 5        A. To the best of my ability.
02:03:51 6        Q. Do you know whether or not John Stevenson is
02:03:54 7    or was your husband?
02:03:55 8        A. (No verbal response)
02:03:58 9        Q. Do you understand that question?
02:03:59 10        A. I'm not sure.
02:04:07 11        Q. You don't know if you understand the
02:04:08 12    question I asked, which is --
02:04:10 13        A. I'm taking the Fifth. I'm not responding.
02:04:13 14        Q. That's what I asked you. You're not going
02:04:15 15    to respond to the question?
02:04:16 16        A. On the Fifth.
02:04:19 17        Q. When did John Stevenson give you this
02:04:21 18    computer?
02:04:22 19        A. I don't remember the month.
02:04:27 20        Q. Do you remember the year?
02:04:28 21        A. I don't think so.
02:04:30 22        Q. Was it before 2004?
02:04:35 23        A. I'm not sure.
02:04:38 24        Q. Was it before 2000?

## Page 183

02:04:41 1        A. I don't know.
02:04:41 2        Q. Was it before 1985?
02:04:45 3        A. I don't know.
02:04:47 4        Q. So it's your testimony that you have no
02:04:50 5    memory as to when he gave you this laptop computer?
02:04:54 6        A. I don't remember.
02:04:54 7        Q. You don't remember specifically. What I'm
02:04:56 8    asking for is your best memory. You have absolutely
02:05:00 9    no recollection when in your life John Stevenson
02:05:03 10    gave you this laptop computer?
02:05:05 11        A. I don't remember when.
02:05:07 12        Q. Can you narrow it down to a decade?
02:05:09 13        A. During the 2000 period.
02:05:12 14        Q. So from 2000 to date?
02:05:14 15        A. Well, yeah.
02:05:17 16        Q. So sometime after January 1, 2000?
02:05:21 17        A. Yeah.
02:05:22 18        Q. Was it before you started providing services
02:05:28 19    to NHCS?
02:05:29 20        A. I don't know.
02:05:32 21        Q. Did you have the computer at the time you
02:05:34 22    performed services for NHCS?
02:05:36 23        A. I don't know. I don't know. I really don't
02:05:44 24    know.

## Page 184

02:05:44 1        Q. Did you have a computer at the time you
02:05:46 2    performed services for NHCS?
02:05:48 3        A. I had computer access.
02:05:51 4        Q. Did you have a computer at home?
02:05:53 5        A. When I was at NHCS, I don't remember.
02:05:59 6        Q. You testified earlier today you occasionally
02:06:01 7    took the payroll documents home and accessed the
02:06:06 8    school's payroll system via the Web; is that right?
02:06:08 9        A. Yes, but you can have access within a
02:06:11 10    building that will let you -- that has a community
02:06:12 11    computer room.
02:06:13 12        Q. Is that what you did, you accessed it
02:06:15 13    through the community computer room?
02:06:17 14        A. Well, I had computer access.
02:06:18 15        Q. What type of access did you have?
02:06:19 16        A. You know, you get on the Web.
02:06:23 17        Q. Where? Where did you go to use a computer?
02:06:28 18        A. Mainly in Cambridge, in Porter Square.
02:06:32 19        Q. What building?
02:06:34 20        A. Probably either in the computer room at
02:06:50 21    Leslie or the women's center in Cambridge or you can
02:07:01 22    use the Y's community.
02:07:04 23        Q. Earlier you specifically said that you would
02:07:06 24    access the Web at home. Did you have computer

## Page 185

02:07:09 1    access in your home during the period of time that
02:07:11 2    you performed services for NHCS?
02:07:12 3        A. When you say "home," are you talking about,
02:07:15 4    like, a private residence, or is it -- home is
02:07:18 5    wherever I'm sleeping at night?
02:07:20 6        Q. We'll take it one at a time. Did you have
02:07:22 7    computer --
02:07:24 8        A. That's it.
02:07:25 9        Q. Let me get the question out. Did you have
02:07:27 10    computer access in your residence during the time
02:07:29 11    that you performed services for NHCS?
02:07:33 12        A. No, not all the time.
02:07:35 13        Q. Did you sometimes?
02:07:36 14        A. I've always had computer access.
02:07:42 15        Q. The question is, did you have computer
02:07:44 16    access at your residence?
02:07:45 17        A. Not all the time. Sometimes the computers
02:07:47 18    didn't work.
02:07:48 19        Q. But they were there?
02:07:49 20        A. They were there.
02:07:49 21        Q. And where was that?
02:07:51 22        A. Either Porter Square or the women's center
02:07:59 23    or the Y.
02:07:59 24        Q. We're talking about your residence now.

47 (Pages 182 to 185)

eb2827ab-6285-4fb1-b765-9962caa2bd64

Janice L. Stevenson                                    09/07/2006

---

**Page 186**

02:08:01 1  During the period of time that you had Internet
02:08:04 2  access at your residence, where were you living?
02:08:06 3      A. It depends. It could have been several
02:08:17 4  places.
02:08:19 5      Q. Name them for me.
02:08:20 6      A. I just told you either the Y --
02:08:22 7      Q. That was your residence for some period of
02:08:24 8  time?
02:08:24 9      A. Or at --
02:08:26 10     Q. Hold on. Just answer that question.
02:08:27 11     A. Or in the computer room.
02:08:29 12     Q. At?
02:08:30 13     A. Leslie University in Porter.
02:08:33 14     Q. Did you live at Leslie University at any
02:08:35 15  period of time?
02:08:35 16     A. Computer access.
02:08:38 17     Q. I understand we're talking about computer
02:08:40 18  access, Ms. Stevenson. The question is much more
02:08:43 19  specific than that.
02:08:43 20     A. That's right. You referred back to payroll.
02:08:48 21     Q. Don't worry about prior questions.
02:08:53 22     A. Accessing the Web.
02:08:54 23     Q. You told me you'd gone to various places to
02:08:56 24  access the Web. During the period of time that you

**Page 187**

02:08:58 1  worked for NHCS, did you ever have computer access
02:09:02 2  at your residence?
02:09:02 3      A. Sometimes.
02:09:05 4      Q. Okay. Where were you living when you had
02:09:07 5  computer access at your residence? Do you
02:09:15 6  understand the question?
02:09:15 7      A. Fifth.
02:09:17 8      Q. So you're going to plead the Fifth as to
02:09:20 9  where you lived when you had computer access at your
02:09:23 10  residence?
02:09:23 11     A. Computer access within several community
02:09:27 12  buildings, yes.
02:09:28 13     Q. We've talked about that. Now we are just
02:09:31 14  talking about your residence. You're not going to
02:09:34 15  tell me where you lived when you had computer access
02:09:37 16  at your residence, right?
02:09:38 17     A. Fifth.
02:09:38 18     Q. You're not going to tell me that even though
02:09:40 19  you've already told me you used computer access to
02:09:43 20  perform computer services for the school.
02:09:46 21     A. On the weekends.
02:09:46 22     Q. Did you do that from your residence?
02:09:49 23     A. "Residence" is a broad term. It's where I'd
02:09:53 24  use the computer.

**Page 188**

02:09:53 1      Q. I understand that you were using a computer
02:09:58 2  to access the payroll records. The question is, was
02:10:00 3  that computer in your residence?
02:10:01 4      A. There was community computers there.
02:10:10 5      Q. That's not what I asked you.
02:10:12 6      A. Yeah. If it's community computers, there's
02:10:14 7  a computer there.
02:10:16 8      Q. Computer where?
02:10:17 9      A. Where I accessed the Web for the payroll.
02:10:21 10     Q. Was that at your residence?
02:10:23 11     A. The Fifth.
02:10:26 12     Q. You're going to plead the Fifth as to
02:10:29 13  whether you ever accessed the school's computer
02:10:32 14  payroll system from your residence?
02:10:33 15     A. Well, the school's computer system was on
02:10:42 16  Ceridian's computer.
02:10:43 17     Q. I understand. You're telling me you're
02:10:46 18  going to --
02:10:46 19     A. Any way in the world you can access this
02:10:51 20  payroll window is specifically for Neighborhood
02:10:54 21  House.
02:10:54 22     Q. And you did that, in fact, right?
02:10:56 23     A. If I'm out -- I'm somewhere that has
02:11:00 24  computer access on the weekends, late or early or

**Page 189**

02:11:04 1  whenever, I can put it in.
02:11:07 2      Q. I understand. You've told me that you
02:11:10 3  accessed the Ceridian payroll system on behalf of --
02:11:14 4      A. That's all I can say, sir. Sir, that's all
02:11:17 5  I can say.
02:11:17 6      Q. Why is that all you can say?
02:11:19 7      A. Because my recollection is going to get
02:11:24 8  clouded with this headache that's coming on.
02:11:27 9      Q. Did you ever access the Ceridian payroll
02:11:29 10  system that related to NHCS from your residence? Do
02:11:42 11  you understand the question?
02:11:43 12     A. Fifth.
02:11:43 13     Q. And you understand that you claim to be
02:11:46 14  performing services for NHCS by accessing this
02:11:50 15  payroll system, right?
02:11:50 16     A. Yeah.
02:11:53 17     Q. And you're not going to tell me where you
02:11:53 18  accessed it from or whether you accessed it from
02:11:56 19  your residence?
02:11:57 20     A. They didn't care. Why do you?
02:11:58 21     Q. It's not fair to pick apart my questions.
02:12:03 22     A. They didn't care.
02:12:05 23     Q. That's not the question on the table. We
02:12:07 24  discussed this several times. Your job is not to

48 (Pages 186 to 189)

eb2827ab-6285-4fb1-b765-9962caa2bd64

Janice L. Stevenson                                    09/07/2006

### Page 190

02:12:10 1    analyze my questions, not to judge my questions.
02:12:12 2    It's to answer my questions.
02:12:13 3         The question is, did you ever during the
02:12:16 4    period of time that you were performing services for
02:12:17 5    NHCS access the Ceridian payroll system that NHCS
02:12:22 6    maintained from your residence?
02:12:24 7         A. Fifth.
02:12:24 8         Q. Referring you back to the resume that we've
02:12:37 9    marked as Exhibit 3, you testified that you prepared
02:12:40 10   that document, correct?
02:12:41 11        A. Yes, sir.
02:12:42 12        Q. Do you know when you prepared -- Strike
02:12:44 13   that.
02:12:45 14        Do you know when you completed the
02:12:46 15   document?
02:12:46 16        A. No, I don't remember when.
02:12:47 17        Q. Do you have a guess as to the -- Strike
02:12:49 18   that.
02:12:50 19        Can you tell me the decade in which you
02:12:52 20   prepared it?
02:12:52 21        A. Well, the last date says 2003. Where did
02:13:01 22   you get it from?
02:13:02 23        Q. I'm not here to answer your questions. If
02:13:04 24   the last date says 2003, does that cause you to

### Page 191

02:13:07 1    question your earlier speculation that you prepared
02:13:09 2    it at NHCS?
02:13:10 3         A. No, because I was at NHCS in 2004.
02:13:22 4         Q. And you didn't put any position on this
02:13:23 5    resume that related to NHCS, did you?
02:13:26 6         A. No, because I normally put the position I'm
02:13:29 7    applying for. You use past experiences.
02:13:31 8         Q. So is it your testimony that you prepared
02:13:33 9    this resume to apply for a position with NHCS?
02:13:36 10        A. I guess. I don't remember what I've given
02:13:40 11   them.
02:13:40 12        Q. So if you prepared this resume to apply for
02:13:43 13   a position at NHCS, you wouldn't have prepared it at
02:13:46 14   NHCS, would you?
02:13:48 15        A. Yeah, I would have.
02:13:48 16        Q. How would that have come about?
02:13:50 17        A. Because when I went to NHCS, I was in the
02:13:54 18   development office, and there was a computer.
02:13:58 19        Q. So are you talking now about the period of
02:14:00 20   time that you provided services to NHCS through Ace
02:14:04 21   employment agency?
02:14:05 22        A. Yes.
02:14:05 23        Q. So your best recollection is you prepared
02:14:07 24   this document during that period of time when you

### Page 192

02:14:10 1    were providing services to NHCS through Ace
02:14:13 2    employment agency?
02:14:14 3         A. Yeah, I was on the computer.
02:14:16 4         Q. So that is your recollection, that is when
02:14:17 5    you prepared this document?
02:14:18 6         A. I guess. That's the best I can guess.
02:14:20 7         Q. I don't want you to guess. I want you to
02:14:22 8    tell me if you have a memory.
02:14:23 9         A. I don't know where or when I prepared it.
02:14:27 10        Q. You have no memory?
02:14:27 11        A. Yeah. But if you have it, it must have been
02:14:30 12   associated with Neighborhood House.
02:14:31 13        Q. But you're just speculating there? Your
02:14:34 14   only basis for believing you prepared that at NHCS
02:14:37 15   is that I just handed it to you?
02:14:38 16        A. Yes, sir.
02:14:39 17        Q. Do you know if you prepared this resume for
02:14:43 18   any specific purpose?
02:14:45 19        A. A job.
02:14:48 20        Q. Do you know which job?
02:14:49 21        A. I guess the job I was working at -- I wanted
02:14:57 22   to go work in, the finance office.
02:14:59 23        Q. Within NHCS?
02:15:00 24        A. Yes, sir.

### Page 193

02:15:01 1         Q. And is that speculation, again, based on the
02:15:03 2    fact that I'm the person that just handed you the
02:15:05 3    document?
02:15:06 4         A. Yes.
02:15:06 5         Q. You have no other basis?
02:15:07 6         A. Where did you get it from? I'm asking you a
02:15:10 7    question.
02:15:10 8         Q. I'm not here to answer your questions.
02:15:12 9         A. I only have to guess. If you don't want me
02:15:14 10   to guess, I'll have to say I don't know.
02:15:16 11        Q. That's a perfectly acceptable response.
02:15:18 12        A. I asked you where did you get it. You said
02:15:21 13   you're not going to answer the question. I have the
02:15:23 14   P.O. box.
02:15:24 15        Q. When did you open that P.O. box?
02:15:26 16        A. I'm not sure.
02:15:27 17        Q. What is your best recollection?
02:15:29 18        A. I don't know. I'd have to guess.
02:15:32 19        Q. Do you know if you opened it after 2000?
02:15:35 20        A. I guess so.
02:15:45 21        Q. Do you believe --
02:15:47 22        A. I guess I don't know. I don't know. Do you
02:15:50 23   have a record?
02:15:51 24        Q. You have absolutely no memory of when you

49 (Pages 190 to 193)

## Page 194

02:15:53 1  opened the P.O. box?
02:15:54 2      A. I don't know exactly when I opened this.
02:15:56 3      Q. I'm not asking you for exactly. I just want
02:15:59 4  your best memory.
02:16:00 5      A. I don't have a best memory.
02:16:02 6      Q. You have no memory of when you opened it?
02:16:04 7      A. I can't answer your question without
02:16:06 8  guessing.
02:16:06 9      Q. Okay. When you looked at that document you
02:16:09 10  said you had the P.O. box as if that would give you
02:16:12 11  some indication as to when the document was
02:16:14 12  prepared.
02:16:15 13     A. Yeah. And I see 2003. I know Boston.
02:16:25 14  Normally you turn in resumes to apply for a job.
02:16:32 15     Q. But you've already testified that you don't
02:16:34 16  have any specific memory.
02:16:37 17     A. I don't.
02:16:37 18     Q. Do you believe it was accurate at the time
02:16:39 19  you prepared it?
02:16:39 20     A. Yeah, I believe so.
02:16:49 21     Q. Is it your practice to prepare resumes that
02:16:52 22  are accurate?
02:16:52 23     A. It's a very good practice because people can
02:16:57 24  check this.

## Page 195

02:16:57 1      Q. And is it, in fact, your practice to do
02:17:00 2  that?
02:17:00 3      A. Normally, yes. Most people do.
02:17:06 4      Q. Do you have any other copies of your
02:17:08 5  resume --
02:17:08 6      A. No.
02:17:08 7      Q. -- in hard copy or electronic form?
02:17:11 8      A. No.
02:17:11 9      Q. If you'll look at the bottom under
02:17:21 10  "Education and Certification," starting at the
02:17:25 11  bottom you have Collin County Community College. Is
02:17:29 12  that an indication that these aren't in chronologic
02:17:32 13  order?
02:17:36 14          To put that another way, the first
02:17:38 15  institution you attended on this list is Grambling
02:17:41 16  State University; is that right?
02:17:42 17     A. Yeah.
02:17:42 18     Q. And then Collin County Community College?
02:17:49 19     A. I think so, yeah.
02:17:49 20     Q. And University of North Texas; is that
02:17:53 21  right?
02:17:53 22     A. Yeah.
02:17:53 23     Q. And you'll see that with respect to the
02:17:59 24  entry for the University of North Texas, you list

## Page 196

02:18:02 1  MIS course work. Can you tell me what that refers
02:18:05 2  to?
02:18:05 3      A. I guess courses relating to information
02:18:12 4  systems.
02:18:13 5      Q. Do you know what MIS stands for?
02:18:15 6      A. Yeah. Masters of information systems.
02:18:19 7      Q. So did you, in fact, receive a masters in
02:18:23 8  information systems?
02:18:24 9      A. No.
02:18:24 10     Q. So this resume is, in fact, not accurate?
02:18:27 11     A. It doesn't say I have a degree.
02:18:31 12     Q. I see. So you list MIS course work to
02:18:34 13  indicate that you were working towards a master's in
02:18:38 14  information systems?
02:18:38 15     A. The problem is, I've taken course work in
02:18:41 16  information systems, whether it was toward a degree
02:18:44 17  or not, because I think courses are open to be
02:18:46 18  taken.
02:18:46 19     Q. But you list MIS, what you're telling me
02:18:49 20  stands for master of information systems, right?
02:18:52 21     A. Yes. It's -- What's a master's in
02:18:58 22  accounting? If I had taken an advanced accounting
02:19:01 23  course and I said, Well, I've taken advanced
02:19:05 24  accounting courses under the master's of accounting

## Page 197

02:19:09 1  program, but that doesn't mean I'm going for a
02:19:16 2  master's of accounting degree.
02:19:18 3          Sometimes it's specific courses you want
02:19:20 4  to take without completing the course work --
02:19:23 5  without achieving this degree.
02:19:25 6      Q. So does this indicate that you did some work
02:19:28 7  in a program that if you'd finished it would have
02:19:31 8  resulted in a MIS?
02:19:33 9      A. Probably so if I had finished it.
02:19:35 10     Q. That's what you're indicating here?
02:19:36 11     A. Yeah. Some graduate courses, that's what it
02:19:39 12  says.
02:19:39 13     Q. For the record, what it says is "MIS course
02:19:44 14  work," right?
02:19:44 15     A. Yes, course work under that program.
02:19:46 16     Q. Gotcha. And then under Grambling State
02:19:51 17  University it lists BS. Does that refresh your
02:19:54 18  recollection as to what the nature of the degree you
02:19:58 19  got from Grambling was?
02:19:59 20     A. What did I tell you?
02:20:01 21     Q. The record will reflect whatever you said.
02:20:03 22     A. Okay. That's what I said.
02:20:05 23     Q. Did you, in fact, get a bachelor's of
02:20:07 24  science from Grambling?

eb2827ab-6285-4fb1-b765-9962caa2bd64

Janice L. Stevenson                                          09/07/2006

## Page 198

02:20:08 1    A. Yeah. I thought I told you that.
02:20:10 2    Q. That's fine. And that bachelor's of science
02:20:13 3  was in business administration; is that right?
02:20:14 4    A. Specialty of office administration.
02:20:19 5    Q. Both are true. It was a business
02:20:21 6  administration degree with a specialization in
02:20:23 7  office administration; is that right?
02:20:25 8    A. I guess we're saying the same thing.
02:20:27 9    Q. So what I said was accurate?
02:20:28 10    A. I guess we're saying the same thing, I
02:20:30 11  guess.
02:20:30 12    Q. And then you list Collin County Community
02:20:35 13  College. And in addition to your CPM license, which
02:20:38 14  was this certification we talked about before,
02:20:40 15  right?
02:20:40 16    A. Uh-hmm.
02:20:41 17    Q. You also list CNWT software certificate. Do
02:20:45 18  you know what that means?
02:20:46 19    A. Not at the moment.
02:20:48 20    Q. You have no memory of what that refers to?
02:20:51 21    A. No. CNWT? No.
02:21:01 22         Do you?
02:21:01 23    Q. I'll take that back.
02:21:17 24         Okay. You began performing services

## Page 199

02:21:19 1  initially for NHCS through Ace employment agency; is
02:21:22 2  that right?
02:21:22 3    A. Uh-hmm. Yes, sir.
02:21:24 4    Q. And when was that? When did you begin
02:21:26 5  performing those services?
02:21:27 6    A. 2004.
02:21:33 7    Q. Do you know the month?
02:21:34 8    A. Summer.
02:21:36 9    Q. Do you know if it was the beginning of
02:21:40 10  summer or end of summer?
02:21:41 11    A. No.
02:21:43 12    Q. Do you know how long you performed services
02:21:47 13  for NHCS through Ace before your role changed?
02:21:52 14    A. Four months, five months.
02:21:54 15    Q. And you testified previously that that was
02:21:57 16  in the development office; is that right?
02:21:58 17    A. The development office? The development
02:22:03 18  office.
02:22:03 19    Q. That's right, yes?
02:22:06 20    A. Yes.
02:22:06 21    Q. I just want the record to be clear.
02:22:08 22    A. Okay.
02:22:08 23    Q. So prior to August of 2004 when you began
02:22:15 24  providing services to NHCS through Ace employment

## Page 200

02:22:18 1  agency, what was your position -- what employment
02:22:22 2  did you hold immediately prior to providing services
02:22:25 3  to NHCS through Ace employment agency?
02:22:29 4    A. Prior to August of 2004?
02:22:31 5    Q. Right. What was the job you had immediately
02:22:33 6  before you began providing services to NHCS through
02:22:36 7  Ace?
02:22:36 8    A. Another position with Ace.
02:22:44 9    Q. Do you know what it was?
02:22:45 10    A. No, sir.
02:22:46 11    Q. Do you know what organization you provided
02:22:50 12  employment -- Strike that.
02:22:51 13         Do you know what organization you
02:22:52 14  provided services to through Ace?
02:22:53 15    A. No.
02:22:54 16    Q. Do you know how long the assignment lasted?
02:22:56 17    A. No.
02:22:57 18    Q. Do you know the nature of the assignment?
02:22:59 19    A. Clerical. Ace is clerical.
02:23:03 20    Q. And so was the work you did in NHCS's
02:23:09 21  development office in the summer of 2004 also
02:23:11 22  clerical?
02:23:11 23    A. Just clerical.
02:23:11 24    Q. What was the last regular employment

## Page 201

02:23:22 1  position you held before you began providing
02:23:26 2  services to NHCS through Ace? And to clarify, by
02:23:31 3  "regular employment," I mean a job other than
02:23:33 4  through a temporary agency. Do you understand?
02:23:35 5    A. I've always worked through temporary
02:23:41 6  agencies.
02:23:42 7    Q. So you've never had a job other than through
02:23:44 8  a temporary agency?
02:23:45 9    A. It was a job. That's permanent employment.
02:23:47 10    Q. Right. I'm excluding that from my question
02:23:50 11  for purposes --
02:23:51 12    A. It is.
02:23:52 13    Q. I understand. There's no reason to quibble
02:23:54 14  about the questions. Other than jobs you've had
02:23:56 15  through employment agencies.
02:23:57 16    A. I was an employee of a temporary agency.
02:24:00 17    Q. And you didn't in that capacity provide
02:24:02 18  services to some other company? You provided
02:24:07 19  services directly to the employment agency, is that
02:24:09 20  what you're telling me?
02:24:10 21    A. Okay. I worked for Ace. They send me on
02:24:17 22  five or six or seven assignments. And I worked for
02:24:20 23  them for three years. I'm an employee of Ace.
02:24:24 24    Q. Okay. I don't think we're understanding

51 (Pages 198 to 201)

eb2827ab-6285-4fb1-b765-9962caa2bd64

Janice L. Stevenson                                      09/07/2006

## Page 282

04:00:00 1    A. I guess, yeah.
04:00:00 2    Q. Skipping over the line, "That's true,
04:00:05 3    Janice, but there's a gray area here" --
04:00:05 4    A. Yes.
04:00:06 5    Q. And it's your testimony under oath here that
04:00:08 6    the reason that you did that, the reason you didn't
04:00:09 7    include that one line of this 18-line message, was
04:00:13 8    that you wanted to emphasize the other 18 lines?
04:00:16 9    A. Yes, with emphasis.
04:00:21 10   Q. That's not responsive to my question. It is
04:00:24 11   a yes or no question. Your testimony under oath is
04:00:26 12   the reason that you prepared this exhibit in such a
04:00:29 13   way as it excludes one line from an 18-line message
04:00:32 14   is that you wanted to emphasize the other 17 lines?
04:00:35 15   A. Yes, that's the emphasis of my motion.
04:01:01 16   Q. We have determined previously that you
04:01:06 17   provided services to NHCS through TuckNT, which
04:01:11 18   we've talked about, from a period that began in the
04:01:13 19   last week of August, 2004, right?
04:01:18 20   A. If you say so.
04:01:19 21   Q. Is that consistent with your memory?
04:01:21 22   A. Right now I don't have a memory. Whatever
04:01:22 23   you tell me. I was there for 15 total months, part
04:01:29 24   as Ace and part as a common law employee under

## Page 283

04:01:34 1    TuckNT, whatever you want to call it. When it
04:01:38 2    started, August, September, what's the difference?
04:01:40 3    It started.
04:01:42 4    Q. We're not here to quibble about what's
04:01:43 5    relevant and what's not. I'm just asking you
04:01:45 6    factual questions. Your only job is to answer them.
04:01:48 7        So your best memory is that you began
04:01:50 8    providing services to NHCS through TuckNT in
04:01:55 9    September -- I'm sorry -- in August or September of
04:01:58 10   2004; is that right?
04:01:58 11   A. Yes.
04:01:59 12   Q. And you did that through the month of May
04:02:02 13   2005, correct?
04:02:03 14   A. June.
04:02:04 15   Q. Did you perform services for NHCS during the
04:02:08 16   month of June 2005?
04:02:09 17   A. June 3rd was my last day.
04:02:12 18   Q. June 3rd was your last day?
04:02:14 19   A. Yes.
04:02:14 20   Q. So you performed services for NHCS three
04:02:17 21   days in June?
04:02:18 22   A. Yes.
04:02:18 23   Q. So the period of concern to the next few
04:02:22 24   questions I'm going to ask you is that period of

## Page 284

04:02:24 1    time that you were performing services for NHCS
04:02:26 2    through TuckNT. And we can agree that ran from
04:02:30 3    about late August 2004 to very early June 2005; is
04:02:34 4    that right?
04:02:34 5    A. Yes.
04:02:37 6    Q. You've told me previously today that you did
04:02:48 7    on occasion provide services to NHCS from your home;
04:02:54 8    is that right?
04:02:54 9    A. Off site.
04:02:56 10   Q. Off site. Where did you perform those
04:03:00 11   services?
04:03:00 12   A. Probably at community computer centers or
04:03:11 13   computer rooms, computer centers that's open to the
04:03:14 14   public.
04:03:14 15   Q. Okay. Did you have keys to the NHCS
04:03:17 16   facility?
04:03:17 17   A. I had a key to my office. I don't think I
04:03:21 18   had a key to the door. I probably had a key to open
04:03:24 19   most of the doors, but you got in with a buzzer.
04:03:27 20   Q. So if you wanted to go to the facility on
04:03:29 21   the weekends, could you have?
04:03:32 22   A. I could have, but I didn't like going up
04:03:34 23   there on the weekends.
04:03:34 24   Q. And you say you performed services off site,

## Page 285

04:03:38 1    including places where computers are publicly
04:03:42 2    available. And previously you asserted the Fifth
04:03:45 3    when I asked you whether or not you provided those
04:03:47 4    services from your residence; is that right?
04:03:49 5    A. Yes.
04:03:49 6    Q. And are you still going to decline to answer
04:03:51 7    that question?
04:03:51 8    A. Yeah.
04:03:52 9    Q. And what's the basis of that?
04:03:54 10   A. What does it matter?
04:03:58 11   Q. So that's -- The sole basis is you believe
04:04:01 12   it not to be relevant where you perform the services
04:04:05 13   that you now seek to recover money for?
04:04:05 14   A. Your client didn't care as long as the work
04:04:11 15   got done, and they never questioned it prior to now,
04:04:11 16   and they never questioned, Do you have a residence?
04:04:14 17   Do you stay in a certain place? Do you have this or
04:04:18 18   do you have that? I didn't have to have.
04:04:20 19   Q. You didn't file a lawsuit against the
04:04:22 20   company at that time.
04:04:23 21   A. I didn't have to have my own equipment.
04:04:26 22   That's not relevant now. Come on, that's after the
04:04:28 23   fact. The work has been done. I've done it.
04:04:30 24   Q. You hadn't filed a lawsuit against the

72 (Pages 282 to 285)

eb2827ab-6285-4fb1-b765-9962caa2bd64

Page 286

04:04:32 1    company at the time, had you?
04:04:33 2        A. (No verbal response)
04:04:34 3        Q. You understand that by filing a lawsuit, the
04:04:37 4    areas of inquiry that an employer might be
04:04:39 5    interested in will expand, right?
04:04:41 6        A. Yeah, but, you know, it's difficult to show,
04:04:45 7    Hey, she did the work. You didn't question it then.
04:04:49 8    You didn't have no stipulations then. You didn't
04:04:52 9    have your brilliant attorney then.
04:04:54 10        Q. So your refusal to answer my question as to
04:04:56 11    whether or not you performed services for NHC --
04:05:00 12        A. I did perform those services. I won't be
04:05:02 13    called a liar.
04:05:03 14        Q. We've made the agreement several times
04:05:05 15    you're going to let me get the questions out, and
04:05:09 16    I'll let you get your answers out.
04:05:12 17        A. These are inceniary.
04:05:13 18        Q. What's the word you're trying to use? You
04:05:17 19    mean, incendiary?
04:05:19 20        A. Yeah, those, too. Both of them. You're
04:05:23 21    doing both of them.
04:05:24 22        Q. You're still going to refuse to answer my
04:05:27 23    question as to whether or not you performed services
04:05:32 24    for NHCS from your residence on the grounds that you

Page 287

04:05:35 1    believe that to be irrelevant?
04:05:37 2        A. I believe that if I was sitting in Starbucks
04:05:43 3    or if I went to FedEx Kinkos and I plugged in and I
04:05:47 4    paid up to get on and I performed services for NHCS,
04:05:55 5    they wouldn't have cared.
04:05:56 6        Q. That's not at all responsive to what I asked
04:05:58 7    you.
04:05:59 8        A. They wouldn't have cared where I did the
04:06:01 9    work.
04:06:02 10        Q. That's not responsive to what I asked you.
04:06:03 11    What I asked you was --
04:06:05 12        A. I plead the Fifth.
04:06:08 13        Q. You still won't answer the question?
04:06:10 14        A. That's right.
04:06:10 15        Q. And the grounds are you believe it not to be
04:06:13 16    relevant?
04:06:13 17        A. That's correct.
04:06:13 18        Q. I'll represent to you, on behalf of NHCS, I
04:06:16 19    certainly do believe it to be relevant. Do you
04:06:18 20    understand that?
04:06:18 21        A. Yes, sir.
04:06:19 22        Q. And you're still going to refuse to answer
04:06:21 23    the question; is that right?
04:06:23 24        A. Yes, sir.

Page 288

04:06:28 1        Q. So we've established that you performed
04:06:31 2    certain services for NHCS, as you term it, off site,
04:06:36 3    right?
04:06:36 4        A. Yes, off site or after hours.
04:06:39 5        Q. Well, if you performed work after hours,
04:06:41 6    were you doing it at NHCS or off site?
04:06:43 7        A. Off site was different than after hours.
04:06:46 8        Q. So there were certain times when you
04:06:49 9    provided services to NHCS when you were actually
04:06:51 10    physically in the school building?
04:06:54 11        A. Yes.
04:06:54 12        Q. That's what you're calling after hours?
04:06:56 13        A. Yes.
04:06:56 14        Q. And then there were other times when you
04:06:58 15    provided services to the school from some other
04:06:59 16    location?
04:07:00 17        A. Yes.
04:07:00 18        Q. And that's what you're calling off site?
04:07:02 19        A. Yes.
04:07:02 20        Q. And we've covered the types of work that you
04:07:07 21    did when you were off site -- Let me get the
04:07:12 22    question out. We've covered the types of work that
04:07:14 23    you did, as you term it, off site. And you've
04:07:16 24    described to me the payroll-related functions that

Page 289

04:07:19 1    you did via the Internet and you've described to me
04:07:22 2    the grant payment applications. Is that the only
04:07:27 3    work that you did for NHCS from off site?
04:07:29 4        A. It was related to payroll, either time or
04:07:33 5    attendance payroll, or grants.
04:07:38 6        Q. Okay. And that's all?
04:07:40 7        A. Come on, give me a break.
04:07:43 8        Q. You need to respond to my question.
04:07:45 9        A. Yes, sir, that's all I can remember now.
04:07:48 10    Those are the main -- I could not do accounts
04:07:51 11    payable off site. It was after hours. I could
04:07:55 12    not -- If it was not Internet-based, I couldn't do
04:07:58 13    it. If it was something I couldn't electronically
04:08:00 14    or physically carry to update, I couldn't do it.
04:08:03 15        And accounts payable, accounts
04:08:05 16    receivable, were two I had to do on site after
04:08:13 17    hours. You know, the other two were some things --
04:08:16 18    If it was bad weather and I wanted to go home and I
04:08:18 19    knew I could do this later, I did it.
04:08:21 20        Q. Did you maintain an office in your residence
04:08:27 21    at the time you performed services for NHCS through
04:08:30 22    TuckNT?
04:08:31 23        A. No. I have no home office.
04:08:37 24        Q. Did you have a fax machine in your residence

73 (Pages 286 to 289)

eb2827ab-6285-4fb1-b765-9962caa2bd64

Janice L. Stevenson                                    09/07/2006

---

**Page 290**

04:08:44 1  at the time you performed services to TuckNT?
04:08:46 2      A. It's like if I send you a fax. You
04:08:49 3  subscribe to a software on the Internet. You take a
04:08:53 4  document on flash drive or out of my e-mail. It
04:09:02 5  posts as a document, and you fax it, and it scans.
04:09:07 6  I don't know. Thank God it can do it.
04:09:08 7      Q. Your testimony is you didn't need a fax
04:09:11 8  machine because you had this service?
04:09:16 9      A. Internet software, Internet fax, jFax.
04:09:16 10     Q. So your testimony is, so it's clear that
04:09:21 11 you've responded to my question --
04:09:21 12     A. Yes, sir.
04:09:21 13     Q. Let me get the question out. Your answer
04:09:23 14 is, you didn't need a fax machine because you had
04:09:24 15 this Internet service?
04:09:25 16     A. Yes, sir.
04:09:26 17     Q. And did you actually use that to perform
04:09:31 18 services for NHCS?
04:09:32 19     A. Yes. See, I don't know if I actually faxed
04:09:42 20 anything from my fax for NHCS. I can't remember
04:09:45 21 that specifically.
04:09:45 22     Q. But you may have?
04:09:46 23     A. I may have.
04:09:47 24     Q. Do you know if you received any faxes

---

**Page 291**

04:09:49 1  through your Internet fax accounts that related to
04:09:53 2  services you performed for NHCS?
04:09:55 3      A. No, because I'm going to have to
04:09:57 4  specifically give that number. All the numbers I
04:10:00 5  gave out were school numbers.
04:10:01 6      Q. And I asked you earlier whether you
04:10:08 7  maintained a computer in your home during the period
04:10:10 8  of time that you provided services to NHCS, and your
04:10:13 9  testimony at that point was that you didn't
04:10:15 10 remember. Do you still not remember whether or not
04:10:17 11 you --
04:10:17 12     A. I don't maintain them. If they're
04:10:19 13 downstairs in a computer room, I don't maintain
04:10:24 14 them. It's not mine.
04:10:26 15     Q. You didn't possess a computer during the
04:10:28 16 period of time that you provided services to NHCS;
04:10:32 17 is that right? Is that your testimony?
04:10:33 18     A. (No verbal response)
04:10:37 19     Q. Do you understand the question?
04:10:37 20     A. I have because you've asked it several
04:10:40 21 times.
04:10:41 22     Q. Well, you haven't answered it yet.
04:10:42 23     A. Not the way you want me to.
04:10:44 24     Q. You haven't answered it yet at all.

---

**Page 292**

04:10:46 1      A. I have. Didn't I just say if I was
04:10:50 2  downstairs -- Wait. Community computers.
04:10:56 3      Q. You've told me that you used community
04:10:58 4  computers. We've established that.
04:11:00 5      A. Yes.
04:11:00 6      Q. And you've refused to tell me whether or not
04:11:02 7  you provided services via the Internet to NHCS from
04:11:07 8  your residence, but you haven't told me whether or
04:11:09 9  not you maintained a computer in your residence
04:11:12 10 during the period of time from August 2004 to June
04:11:15 11 2005. So I'll ask you now, did you maintain a
04:11:19 12 computer in your residence between August 2004 and
04:11:23 13 June 2005?
04:11:24 14     A. (No verbal response)
04:11:30 15     Q. Do you understand the question?
04:11:31 16     A. Fifth.
04:11:32 17     Q. You're going to plead the Fifth as to
04:11:34 18 whether you possessed a computer?
04:11:36 19     A. As long as you leave me alone.
04:11:37 20     Q. I'm not going to leave you alone.
04:11:39 21     A. I will Fifth the rest of the deposition.
04:11:41 22     Q. Okay. As you've pointed out, there's
04:11:44 23 nothing I can do to compel you to respond. All I
04:11:47 24 can do is ask you whether you will. You've told me

---

**Page 293**

04:11:50 1  you're not going to answer that question.
04:11:52 2          Did you maintain a copy machine in your
04:11:55 3  residence at the time you performed services?
04:11:57 4      A. Oh, my God. No.
04:11:58 5      Q. Did you have a printer in your residence?
04:12:00 6      A. No.
04:12:01 7      Q. Let me get that whole question out so the
04:12:04 8  record is clear.
04:12:04 9      A. Yes.
04:12:05 10     Q. Did you maintain a printer in your residence
04:12:07 11 during the period of time that you performed
04:12:09 12 services for NHCS?
04:12:10 13     A. No. I wish I had a printer today because --
04:12:12 14 You know what I have to do to go to a printer? I
04:12:15 15 have to walk over to a computer and print it or I
04:12:19 16 have to go to FedEx Kinkos and print it. I need a
04:12:23 17 printer. I need some icky dicky printer.
04:12:29 18     Q. Just for your personal purposes?
04:12:30 19     A. For my personal purposes. For this lawsuit
04:12:32 20 purpose.
04:12:33 21     Q. Okay. Go ahead.
04:12:37 22     A. I need to ask you a question.
04:12:41 23     Q. You've tried that several times, and I've
04:12:43 24 told you that I'm not here to respond to your

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

eb2827ab-6285-4fb1-b765-9962caa2bd64

Page 408

VOLUME: II

PAGES: 408 to 786

EXHIBITS: See Index


UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

JANICE STEVENSON

        Plaintiff       Civil Action

    v.                No. 05-CV-11584-DPW


NEIGHBORHOOD HOUSE CHARTER SCHOOL

        Defendant

- - - - - - - - - - - - - - - - - - x


CONTINUED DEPOSITION of JANICE L. STEVENSON

Thursday, September 14, 2006

10:37 a.m.

Seyfarth Shaw LLP

Two Seaport Lane

Boston, Massachusetts


Michelle Keegan, Court Reporter

6f17292b-b5fb-4467-9523-0d9097f86c8a

Page 441

11:11:14 1    whatever objections you want -- Do you remember that
11:11:16 2    we marked a copy of Rule 30?
11:11:17 3        A. Uh-hmm.
11:11:18 4        Q. And that your testimony is to be taken
11:11:20 5    subject to those objections, correct?
11:11:21 6        A. Uh-hmm.
11:11:22 7        Q. You understand that to be the rule?
11:11:23 8        A. Uh-hmm.
11:11:24 9        Q. And you understand that you have no basis to
11:11:26 10   withhold testimony on these points?
11:11:27 11       A. My basis is, I'm not going to answer.
11:11:29 12       Q. That's not a basis. That's your intention.
11:11:33 13       A. My intention. I'm not going to answer.
11:11:35 14   It's not my intention. I'm not going to answer
11:11:37 15   bankruptcy questions on an overtime wage claim.
11:11:40 16       Q. What's the basis for that?
11:11:41 17       A. Because I don't think they even have
11:11:42 18   anything to do with one another.
11:11:44 19       Q. It's not for you to decide.
11:11:46 20       A. It is for me to decide. I'm sitting here.
11:11:48 21       Q. The record will reflect that you are
11:11:49 22   refusing to answer questions related to your
11:11:51 23   bankruptcy.
11:11:52 24       A. Good. We can move on to another subject.

Page 442

11:11:54 1        Q. I'll decide what subjects we're going to
11:11:56 2    cover. The record will reflect --
11:11:57 3        A. Of course I understand that.
11:11:58 4        Q. You're refusing to answer questions about
11:12:00 5    your bankruptcy?
11:12:00 6        A. Yes.
11:12:01 7        Q. On what basis?
11:12:02 8        A. Because I'm not going to answer something
11:12:03 9    that has to do with you not paying me my money.
11:12:07 10           By the way, where is my money for my
11:12:09 11   vacation wages?
11:12:10 12           MR. MILLER: Will you mark that as the
11:12:12 13   next in order, please.
11:12:14 14           (Exhibit Number 18
11:12:14 15           marked for identification)
11:12:36 16       Q. Ms. Stevenson, I'm showing you a document
11:12:38 17   marked as Exhibit 18. Do you recognize that?
11:12:40 18       A. Is this more bankruptcy?
11:12:47 19       Q. I'm asking you if you recognize the
11:12:49 20   document, Ms. Stevenson.
11:12:49 21       A. I'm not answering anything else on
11:12:51 22   bankruptcy. Come on.
11:12:52 23       Q. You testified that you filed only one
11:12:54 24   bankruptcy filing. I'll represent to you that this

Page 443

11:12:56 1    document, in fact, represents another bankruptcy
11:12:58 2    filing that you filed in the state of Louisiana; is
11:13:01 3    that correct?
11:13:01 4        A. I'm not answering any questions on
11:13:09 5    bankruptcy.
11:13:10 6        Q. You're refusing to answer my question on
11:13:13 7    whether you filed for bankruptcy in the state of
11:13:15 8    Louisiana?
11:13:15 9        A. No more bankruptcies.
11:13:17 10       Q. So you're refusing to answer my questions?
11:13:19 11       A. No more questions on bankruptcy. Let's move
11:13:21 12   on to my claim against your client.
11:13:23 13       Q. Absolutely not, Ms. Stevenson. I'm not
11:13:25 14   going to let you control the scope of this
11:13:26 15   deposition.
11:13:26 16       A. You know what, I assumed this deposition was
11:13:29 17   to establish -- You're claiming I'm exempt. I'm
11:13:34 18   saying I'm not exempt. You haven't asked me one
11:13:37 19   question about that claim.
11:13:38 20       Q. The questions I ask are mine to choose.
11:13:41 21       A. No.
11:13:42 22       Q. Yes, Ms. Stevenson.
11:13:45 23       A. They're in regard to a wage claim. You're
11:13:47 24   not going to sit here in a deposition -- And I don't

Page 444

11:13:47 1    think you have a question in regard to that.
11:13:50 2        Q. Ms. Stevenson, I'm going to ask the
11:13:51 3    questions.
11:13:51 4        A. I don't think you have anything in regard to
11:13:53 5    the claim I have for the court.
11:13:57 6        Q. What you think is irrelevant. Your job here
11:14:00 7    is to answer my questions.
11:14:02 8        A. If it's not in regard to my wage claim in
11:14:05 9    front of the court, don't ask me another question.
11:14:07 10       Q. Don't tell me what questions to ask you.
11:14:09 11       A. Don't ask me another question.
11:14:12 12       Q. Have you reported the pendency of this case,
11:14:14 13   your claim against NHCS, to the bankruptcy trustee
11:14:17 14   in the case that we've marked as Exhibit 14?
11:14:19 15       A. (No verbal response)
11:14:23 16       Q. Do you understand the question?
11:14:24 17       A. (No verbal response)
11:14:32 18       Q. Do you understand the question,
11:14:33 19   Ms. Stevenson?
11:14:34 20       A. (No verbal response)
11:14:37 21       Q. I'll repeat it. Have you reported the
11:14:39 22   pendency of this claim against NHCS to the
11:14:41 23   bankruptcy trustee in the open case you have in the
11:14:44 24   bankruptcy court for Massachusetts?

10 (Pages 441 to 444)

Janice L. Stevenson, Vol. 2                    09/14/2006

---

Page 445

11:14:45 1      A. (No verbal response)
11:14:48 2      Q. Do you understand the question?
11:14:48 3      A. (No verbal response)
11:14:53 4      Q. Are you going to refuse to answer that
11:14:55 5  question?
11:14:58 6          MR. MILLER: For the record,
11:14:59 7  Ms. Stevenson has not given a verbal response.
11:15:03 8      Q. Have you reported to the bankruptcy trustee
11:15:06 9  in your Massachusetts bankruptcy case your claim
11:15:12 10 that Neighborhood House Charter School owes you
11:15:14 11 overtime wages?
11:15:15 12     A. (No verbal response)
11:15:21 13     Q. Do you understand that question?
11:15:24 14     A. (No verbal response)
11:15:31 15     Q. For the record, you've given no verbal
11:15:32 16 response, so I'll repeat the question. Have you
11:15:34 17 reported your claim that you are owed overtime wages
11:15:37 18 by Neighborhood House Charter School to the
11:15:40 19 Massachusetts bankruptcy court or to the trustee in
11:15:43 20 that proceeding?
11:15:44 21     A. (No verbal response)
11:15:50 22         MR. MILLER: For the record,
11:15:50 23 Ms. Stevenson has not responded and has elected to
11:15:54 24 play with the flashlight and magnifying glass that

---

Page 446

11:15:56 1  I've given her instead.
11:16:01 2      Q. Ms. Stevenson, last time, for the first
11:16:03 3  session of your deposition, you'll recall we
11:16:06 4  discussed another wage claim that you asserted
11:16:09 5  against Massport; is that correct?
11:16:11 6      A. (No verbal response)
11:16:16 7      Q. Do you understand the question,
11:16:16 8  Ms. Stevenson?
11:16:17 9      A. (No verbal response)
11:16:32 10         MR. MILLER: For the record,
11:16:33 11 Ms. Stevenson has given no verbal response, so I'll
11:16:36 12 repeat the question.
11:16:37 13     Q. During the first session of your deposition
11:16:39 14 we discussed a wage claim that you asserted against
11:16:41 15 Massport. Do you recall that?
11:16:42 16     A. (No verbal response)
11:16:47 17     Q. Do you understand the question?
11:16:48 18     A. (No verbal response)
11:16:58 19         MR. MILLER: For the record,
11:16:59 20 Ms. Stevenson has continued not to give a verbal
11:17:01 21 response and has elected to play with the flashlight
11:17:05 22 and magnifying glass that I've made available to her
11:17:08 23 to review the exhibits.
11:17:16 24     Q. Do you understand, Ms. Stevenson, that as a

---

Page 447

11:17:20 1  debtor in an open bankruptcy proceeding, you have an
11:17:22 2  obligation to report to the court and to the
11:17:24 3  bankruptcy trustee any property to which you become
11:17:28 4  entitled during the pendency of the case?
11:17:30 5      A. (No verbal response)
11:17:36 6      Q. Do you understand the question?
11:17:36 7      A. (No verbal response)
11:17:43 8      Q. Ms. Stevenson, may I have the magnifying
11:17:46 9  glass, please.
11:17:50 10         Do you understand the question I asked
11:17:51 11 you?
11:17:51 12     A. (No verbal response)
11:17:56 13     Q. For the record, you gave me the magnifying
11:17:58 14 glass back, so I assume you can hear me; is that
11:18:02 15 correct?
11:18:02 16     A. (No verbal response)
11:18:06 17     Q. Are you going to refuse to participate in
11:18:07 18 this deposition?
11:18:08 19     A. (No verbal response)
11:18:12 20     Q. Do you understand the question?
11:18:12 21     A. (No verbal response)
11:18:19 22     Q. Are you going to refuse to participate in
11:18:20 23 this deposition?
11:18:21 24     A. (No verbal response)

---

Page 448

11:18:28 1          MR. MILLER: For the record,
11:18:28 2  Ms. Stevenson has not responded to the question.
11:18:37 3      Q. Ms. Stevenson, we certainly intend to go to
11:18:39 4  the court and seek relief for your failure and
11:18:41 5  refusal to participate in this deposition.
11:18:44 6          I understand that you've stated your
11:18:46 7  refusal to answer questions that are in any way
11:18:48 8  connected to your bankruptcy, apparently even when
11:18:51 9  those questions also relate to your claims against
11:18:53 10 NHCS; is that correct?
11:18:54 11     A. (No verbal response)
11:18:58 12     Q. Do you understand the question?
11:18:58 13     A. (No verbal response)
11:19:02 14         MR. MILLER: For the record,
11:19:03 15 Ms. Stevenson has given no verbal response.
11:19:31 16         Can we mark that as 19, please.
11:19:34 17         (Exhibit Number 19
11:19:34 18         marked for identification)
11:19:34 19     Q. Ms. Stevenson, I'm now showing you a
11:19:36 20 document marked as Exhibit 19. For your
11:19:39 21 convenience, I'll give the magnifying glass back to
11:19:41 22 you.
11:19:41 23     A. Is it in regards to the bankruptcy?
11:19:43 24     Q. Would you read the document. I provided you

---

11 (Pages 445 to 448)

6f17292b-b5fb-4467-9523-0d9097f86c8a

Janice L. Stevenson, Vol. 2                                    09/14/2006

---

Page 449

11:19:47 1 the magnifying glass. I'd invite you to look at it
11:19:51 2 and identify it for me, please.
11:20:09 3        Can you identify that document?
11:20:10 4    A. No. What is it?
11:20:14 5    Q. Does that document refresh your memory as to
11:20:16 6 any other legal proceeding as to which you may have
11:20:18 7 been a party?
11:20:19 8    A. (No verbal response)
11:20:27 9    Q. Did you understand the question?
11:20:30 10   A. (No verbal response)
11:20:41 11   Q. Do you need more time?
11:20:42 12   A. (No verbal response)
11:20:44 13   Q. I didn't ask you for the document back. My
11:20:47 14 question is --
11:20:48 15   A. I have no idea.
11:20:48 16   Q. That document does not refresh your
11:20:50 17 recollection as another proceeding --
11:20:52 18   A. No, no, no.
11:20:53 19   Q. Well, I'll point out to you that at the top
11:20:55 20 it states "Janice Wilson Stevenson v. Commissioner
11:20:58 21 of International Revenue." Do you see that?
11:21:00 22   A. No.
11:21:00 23   Q. Will you look at the document, please.
11:21:02 24   A. No.

Page 450

11:21:02 1    Q. You're refusing to look at the document I've
11:21:06 2 marked?
11:21:06 3    A. It doesn't refresh any memories.
11:21:09 4    Q. I'm asking you what the document says. Do
11:21:12 5 you see that the document says --
11:21:12 6    A. No, because I cannot see it.
11:21:12 7    Q. I've provided you with the magnifying glass.
11:21:16 8 You told me before that that aided you as well as
11:21:19 9 you can see with the glasses. I'm asking you to
11:21:21 10 look at the document --
11:21:22 11   A. I'm not going to look at it.
11:21:23 12   Q. You're refusing to look at the document?
11:21:25 13   A. I'm not going to answer questions that don't
11:21:28 14 specifically relate to my duties at NHCS in order to
11:21:32 15 establish whether I was exempt or nonexempt. That's
11:21:36 16 what we need to move on to.
11:21:37 17   Q. You're refusing to look at this document?
11:21:39 18   A. Your firm is saying I was exempt. You need
11:21:43 19 to ask me questions -- You need to ask me questions
11:21:47 20 in regard to that. Let's move on.
11:21:49 21   Q. Ms. Stevenson, the scope of this deposition
11:21:51 22 is not within your control.
11:21:52 23   A. Let's move on.
11:21:53 24   Q. I will not move on.

Page 451

11:21:54 1    A. You're not going to get anywhere.
11:21:56 2    Q. You're refusing to answer questions relating
11:21:58 3 to this document?
11:21:59 4    A. No. It's not with the court.
11:22:03 5    Q. I can --
11:22:05 6    A. You can file what you want with the court.
11:22:06 7 You can expand your defense.
11:22:08 8    Q. Don't interrupt me, please.
11:22:10 9    A. I'm not answering.
11:22:10 10   Q. You're not answering -- Strike that.
11:22:13 11        You're not answering questions related
11:22:15 12 to this document?
11:22:15 13   A. I'm not answering questions related to
11:22:18 14 bankruptcies not in front of the court.
11:22:19 15   Q. This is not a bankruptcy case. I'm asking
11:22:21 16 you a question.
11:22:22 17   A. I saw the word "bankruptcy" on it.
11:22:24 18   Q. Show me where you see the word "bankruptcy."
11:22:27 19   A. On one of the pages.
11:22:28 20   Q. Show me.
11:22:28 21        (Pause)
11:22:53 22   A. It was on one of the pages.
11:22:54 23   Q. I invite you to take as much time as you
11:22:56 24 need and show me.

Page 452

11:23:15 1    A. I don't see it now, but I saw it.
11:23:18 2    Q. So you're now telling me that you don't see
11:23:20 3 the word "bankruptcy" in Exhibit 19; is that right?
11:23:22 4    A. I saw it. I don't see it now.
11:23:25 5    Q. Well, you've taken time to review it, and
11:23:27 6 you can't find the word "bankruptcy" in that
11:23:29 7 document; is that right?
11:23:30 8    A. Yeah. It was on one of the pages.
11:23:34 9    Q. Show me. If you believe it's in there, you
11:23:36 10 show me.
11:23:37 11   A. It is in there. That's why you handed it to
11:23:40 12 me.
11:23:40 13   Q. It's not your job to guess as to why I'm
11:23:44 14 going to hand you a document. Your job is only to
11:23:46 15 respond to the questions I ask you.
11:23:47 16   A. Here it is, "Docket entry."
11:23:56 17   Q. And I'm asking you where, in fact, you see
11:24:00 18 the word "bankruptcy."
11:24:01 19   A. What does it say? February -- 2/10 of 2003.
11:24:09 20 Don't you see the word "bankruptcy" in there? Do
11:24:11 21 you need this?
11:24:12 22   Q. I do not see the word "bankruptcy" up there.
11:24:14 23 Will you show it to me, please.
11:24:26 24   A. Right there.

12 (Pages 449 to 452)

6f17292b-b5fb-4467-9523-0d9097f86c8a

| Page 457 | Page 459 |
|---|---|

**Page 457**

11:27:23 1    Q. I'll ask you the questions that I see fit.

11:27:25 2    A. No. I just told you, don't waste your time.

11:27:27 3    Q. Ms. Stevenson, you're the one that's wasting

11:27:30 4  everyone's time by making these speeches. If you

11:27:32 5  just respond to the questions in a fair and

11:27:34 6  substantive way, we'll get --

11:27:36 7    A. I thought that was fair and substantive.

11:27:38 8    Q. That wasn't even responsive.

11:27:39 9    A. There's a block of questions you have in

11:27:41 10  regard to this. I don't remember it. You can slash

11:27:44 11  through it because I can't give you specific

11:27:46 12  answers.

11:27:46 13    Q. You need to let me ask the questions one at

11:27:49 14  a time and respond one at a time. You don't know

11:27:51 15  what I'm about to ask you.

11:27:53 16    So the record is clear, you have no

11:27:55 17  memory of any proceedings involving the IRS or the

11:27:58 18  commissioner of revenue; is that right?

11:27:59 19    A. I don't remember the specifics.

11:28:01 20    Q. I'm not asking you the specifics. Do you

11:28:04 21  remember anything about --

11:28:04 22    A. No.

11:28:05 23    Q. You remember absolutely nothing about

11:28:06 24  litigation with the IRS or --

**Page 458**

11:28:08 1    A. No. Do you remember a lawsuit you was in

11:28:12 2  five years ago, the specifics of it?

11:28:14 3    Q. Ms. Stevenson, your job is not to ask me

11:28:16 4  questions here.

11:28:17 5    A. Well, you're not going to unfairly present

11:28:19 6  to me -- represent that I remember everything I've

11:28:23 7  done.

11:28:23 8    Q. I'm making no representations about you.

11:28:25 9    A. Yes, you are.

11:28:26 10    Q. I'm asking you questions. That's all I'm

11:28:28 11  doing.

11:28:28 12    A. And you're representing that I remember all

11:28:30 13  this stuff that you've gone and downloaded.

11:28:33 14    Q. I'm making no representations about your

11:28:35 15  memory. I'm trying to ask you questions and have

11:28:38 16  you tell me what you remember.

11:28:39 17    A. I just told you, I don't remember specifics.

11:28:40 18    Q. Understood. Let's move on.

11:28:43 19    MR. MILLER: Can you mark that as the

11:28:44 20  next in order, please.

11:29:03 21    (Exhibit Number 20

11:29:03 22    marked for identification)

11:29:04 23    Q. When is our trial date; do you know?

11:29:06 24    A. We don't have one.

**Page 459**

11:29:07 1    Q. I'm showing you a document that's marked as

11:29:09 2  Exhibit 20.

11:29:10 3    A. What is this?

11:29:11 4    Q. Ms. Stevenson, I'll ask the questions.

11:29:13 5  Please take a look at that document.

11:29:15 6    A. Does it relate to --

11:29:16 7    Q. Ms. Stevenson, please take a look at the

11:29:18 8  document.

11:29:21 9    A. Does it relate to the wage claim?

11:29:23 10    Q. I'm not going to answer your questions.

11:29:25 11  It's not my job to answer questions here. Please

11:29:27 12  look at the document.

11:29:28 13    A. No.

11:29:28 14    Q. You're refusing to answer the questions?

11:29:30 15    A. Does it relate to the claim?

11:29:32 16    Q. The best way to figure that out would be for

11:29:34 17  you to look at it.

11:29:35 18    A. What is it?

11:29:36 19    Q. Look at it. I'm asking you what it is.

11:29:38 20    A. You gave it to me.

11:29:39 21    Q. Exactly. I'm asking you to identify it.

11:29:41 22    A. I have no idea what it is.

11:29:42 23    Q. You haven't looked at the document; is that

11:29:44 24  correct, Ms. Stevenson?

**Page 460**

11:29:44 1    A. No, I haven't, because I came here with the

11:29:47 2  intent of answering what did you do and what duties

11:29:49 3  did you do and your client says you did this, about

11:29:52 4  wages.

11:29:53 5    Q. Your intent is irrelevant. I ask the

11:29:55 6  questions.

11:29:55 7    A. My intent -- I filed the claim in court.

11:29:58 8    Q. Exactly. You can take whatever discovery

11:30:00 9  you want. I'll take whatever discovery I deem

11:30:04 10  necessary to defend the school. I will determine

11:30:05 11  the scope of this deposition.

11:30:07 12    I've marked a document as Exhibit 20.

11:30:09 13  I'm asking you to take a look at it.

11:30:11 14    A. You have interfered with my employment.

11:30:13 15    Q. What do you mean by that?

11:30:14 16    A. Because this is a waste of my time. I don't

11:30:16 17  get paid sitting in front of you for you to ask me

11:30:21 18  lamebrain questions.

11:30:23 19    Q. You filed a lawsuit. As a plaintiff in a

11:30:26 20  lawsuit, you take on certain obligations. Those

11:30:30 21  obligations include responding to discovery. Do you

11:30:30 22  understand that?

11:30:30 23    A. I don't think I have to.

11:30:30 24    Q. You don't think you have to respond to

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

6f17292b-b5fb-4467-9523-0d9097f86c8a

Page 461

11:30:32 1    discovery?
11:30:32 2        A. I don't think I have to file discovery that
11:30:34 3    has no bearing in front of a jury as to my wages.
11:30:38 4        Q. Ms. Stevenson, you're refusing even to look
11:30:40 5    at the document; is that right?
11:30:41 6        A. Because I don't know what it is and you
11:30:43 7    don't know what it is. If you don't know and I
11:30:45 8    don't know, two people in the room don't know.
11:30:46 9        Q. You haven't looked at it. How do you know
11:30:48 10   you don't know what it is?
11:30:49 11       A. You need to tell me what it says.
11:30:50 12       Q. Ms. Stevenson, I'm not going to make
11:30:52 13   representations to you on the record.
11:30:54 14       A. I'll tell you representations. You just
11:30:56 15   read it.
11:30:57 16       Q. Your job is to read it. You're the witness
11:31:00 17   here.
11:31:00 18       A. No.
11:31:00 19       Q. You're not the witness; is that your
11:31:02 20   understanding?
11:31:02 21       A. You read it to me. It's your document.
11:31:07 22       Q. I'm setting in front of you a document
11:31:08 23   marked as Exhibit 20. I'll represent to you that
11:31:08 24   it's a report of a case captioned "Janice W.

Page 462

11:31:11 1    Stevenson v. United States of America and Paul
11:31:14 2    Brown, U.S. District Judge." Do you see that?
11:31:16 3        A. No.
11:31:17 4        Q. Will you look at the document?
11:31:18 5        A. (No verbal response)
11:31:23 6        Q. I've asked you to look at the document and
11:31:25 7    I've provided you a magnifying glass for that
11:31:28 8    purpose.
11:31:28 9        A. Okay. I looked at the document. I'm not
11:31:31 10   going to read any of the specifics.
11:31:32 11       Q. It's a one-page document, Ms. Stevenson. Do
11:31:36 12   you see that it's captioned "Janice W. Stevenson v.
11:31:38 13   United States of America"?
11:31:39 14       A. Okay. What does that mean?
11:31:40 15       Q. It's not your job to ask me questions. Your
11:31:43 16   job is to answer my questions. Do you see that the
11:31:45 17   document is captioned Janice W. --
11:31:47 18       A. I haven't seen it. I haven't read it. And
11:31:49 19   I'm not particularly interested in reading it.
11:31:51 20       Q. Your interest is not relevant. Your job is
11:31:53 21   to answer my questions.
11:31:54 22       A. I'm not going to read it.
11:31:56 23       Q. You're refusing to --
11:31:57 24       A. Whatever it is, I have no specific memory of

Page 463

11:31:59 1    it. And reading it ain't going to bring it to
11:32:02 2    memory.
11:32:03 3        Q. I haven't asked you anything about your
11:32:04 4    memory yet. I'm asking you to look at the document.
11:32:06 5        A. You asked me about the tax thing. You know
11:32:08 6    what, I don't remember these.
11:32:09 7        Q. You don't even know what it is. You won't
11:32:10 8    even look at the document.
11:32:11 9        A. I can't remember what I don't know.
11:32:13 10       Q. Ms. Stevenson, please look at the document.
11:32:15 11       A. No, I'm not.
11:32:16 12       Q. You're going to refuse to look at the
11:32:18 13   document?
11:32:18 14       A. Move on. What's the next thing you're going
11:32:19 15   to show me?
11:32:20 16       Q. I'm not going to allow you to control the
11:32:23 17   scope of this deposition.
11:32:24 18       A. I'm not answering if it's not about my
11:32:26 19   money.
11:32:26 20       Q. Ms. Stevenson, do you recall --
11:32:28 21       A. Did you hear me?
11:32:29 22       Q. Ms. Stevenson --
11:32:30 23       A. Did you hear me?
11:32:30 24       Q. I heard you. For the record, you've stated

Page 464

11:32:33 1    you're going to refuse to answer questions about
11:32:35 2    this document, right?
11:32:37 3        A. Unless it is regarding my money.
11:32:39 4        Q. Within your opinion.
11:32:40 5        A. My money.
11:32:41 6        Q. You're not going to answer if in your
11:32:43 7    opinion the question I ask you --
11:32:45 8        A. If it doesn't help resolve the issue of my
11:32:49 9    money.
11:32:49 10       Q. In your opinion.
11:32:50 11       A. My money.
11:32:51 12       Q. What you're telling me is if I ask you a
11:32:53 13   question and in your opinion it does not relate to
11:32:54 14   your claim for wages, you're not going to answer it?
11:32:57 15       A. Ask me questions that relates to a claim
11:33:00 16   about my money.
11:33:01 17       Q. That's not responsive to what I just asked
11:33:03 18   you. I'm asking your position here. You're
11:33:05 19   refusing to answer questions. You're being
11:33:07 20   extremely stubborn.
11:33:08 21           Now, I'm asking you, are you going to
11:33:09 22   refuse to answer questions that you deem to be --
11:33:12 23       A. I want to resolve this case. Ask me
11:33:14 24   questions about my money.

15 (Pages 461 to 464)

6f17292b-b5fb-4467-9523-0d9097f86c8a

Janice L. Stevenson, Vol. 2                                    09/14/2006

Page 465

| | |
|---|---|
| 11:33:15 1 | Q. Ms. Stevenson, are you going to refuse to |
| 11:33:17 2 | answer questions? |
| 11:33:19 3 | A. Ask me questions about -- |
| 11:33:21 4 | Q. You will not -- |
| 11:33:22 5 | A. Ask me questions about my time at |
| 11:33:24 6 | Neighborhood House Charter School. |
| 11:33:25 7 | Q. Ms. Stevenson, you will not tell me what |
| 11:33:28 8 | questions to ask. I will ask the questions that I |
| 11:33:30 9 | deem relevant. |
| 11:33:31 10 | A. I want to resolve. |
| 11:33:32 11 | Q. You're here to -- |
| 11:33:33 12 | A. No. I want to resolve this case and move |
| 11:33:35 13 | on. |
| 11:33:38 14 | Q. What you want is not material. You're here |
| 11:33:38 15 | to respond as a party in litigation to a valid |
| 11:33:40 16 | discovery request. |
| 11:33:41 17 | A. Seyfarth Shaw doesn't want to resolve this |
| 11:33:44 18 | case. You just want to fight. That's what you want |
| 11:33:46 19 | to do. |
| 11:33:47 20 | Q. Are you done making speeches? |
| 11:33:48 21 | A. It's not a speech. |
| 11:33:49 22 | Q. What is it? |
| 11:33:50 23 | A. Observation. That's what the last attorney |
| 11:33:52 24 | said. |

Page 466

| | |
|---|---|
| 11:33:52 1 | Q. That's -- |
| 11:33:53 2 | A. That's your reputation. So if you just want |
| 11:33:56 3 | to fight this out, don't bring me in here and waste |
| 11:34:00 4 | my time. I've lost a job behind you. You're |
| 11:34:03 5 | interfering with my employment relationships. I'm |
| 11:34:05 6 | going to sue you. |
| 11:34:06 7 | Q. Ms. Stevenson, you understand that I've |
| 11:34:08 8 | marked as Exhibit 20 a document? |
| 11:34:13 9 | A. I don't think this deposition is going |
| 11:34:13 10 | anywhere. |
| 11:34:15 11 | Q. Ms. Stevenson, the reason it's not going |
| 11:34:15 12 | anywhere is because you refuse to answer my |
| 11:34:18 13 | questions. |
| 11:34:18 14 | A. Your questions that have nothing to do with |
| 11:34:19 15 | my claim. |
| 11:34:20 16 | Q. You understand that as a party to litigation |
| 11:34:22 17 | you have to respond to my questions. That's your |
| 11:34:24 18 | obligation. Do you understand that? |
| 11:34:25 19 | A. I'm taking the Fifth. |
| 11:34:29 20 | Q. You're taking the Fifth as to what? There's |
| 11:34:32 21 | no question on the table. |
| 11:34:33 22 | A. You objected last time, too. Just put the |
| 11:34:36 23 | Fifth out there. |
| 11:34:38 24 | Q. You're pleading the Fifth as to what? |

Page 467

| | |
|---|---|
| 11:34:40 1 | A. I'm not answering that question. And the |
| 11:34:42 2 | Fourteenth and the Seventh and the Ninth. |
| 11:34:44 3 | Q. What question are you refusing to answer? |
| 11:34:46 4 | A. Nonwage-related questions. |
| 11:34:48 5 | Q. Well, if you're going to assert an |
| 11:34:51 6 | objection, you need to assert it to a specific |
| 11:34:53 7 | question. |
| 11:34:53 8 | A. End, end, end. |
| 11:34:56 9 | Q. So for the record, you're going to refuse to |
| 11:34:58 10 | answer questions about a document marked as Exhibit |
| 11:35:00 11 | 20; is that right? |
| 11:35:00 12 | A. How can I answer questions if I don't |
| 11:35:04 13 | remember it? |
| 11:35:06 14 | Q. I'm inviting you to take a look at the |
| 11:35:08 15 | document. |
| 11:35:09 16 | A. You want me to read it to you? |
| 11:35:10 17 | Q. I'm asking you to look at it and read it to |
| 11:35:13 18 | yourself. |
| 11:35:13 19 | A. If I'm looking at a document and I can't |
| 11:35:16 20 | recall it, what -- |
| 11:35:17 21 | Q. Because I asked you to read it. That's your |
| 11:35:19 22 | obligation as a witness. |
| 11:35:20 23 | A. I'm not going to read it. |
| 11:35:21 24 | Q. I've asked you to read a one-page document, |

Page 468

| | |
|---|---|
| 11:35:24 1 | and you're going to refuse? |
| 11:35:25 2 | A. Have you read it? |
| 11:35:26 3 | Q. I'm not going to answer your questions. |
| 11:35:28 4 | Your job here is not to debate with me. It's to |
| 11:35:31 5 | answer questions. Will you read the document, |
| 11:35:32 6 | please. |
| 11:35:33 7 | A. I don't remember the document. |
| 11:35:33 8 | Q. You haven't looked at it yet. I'm asking |
| 11:35:36 9 | you to read it to yourself. Ms. Stevenson, I'm |
| 11:35:38 10 | asking you to read the document to determine what |
| 11:35:40 11 | questions are appropriate to ask you. |
| 11:35:42 12 | A. Okay. Ask me the questions. |
| 11:35:43 13 | Q. I'm asking you to read the document to |
| 11:35:45 14 | yourself first. |
| 11:35:46 15 | A. But I don't remember it. |
| 11:35:48 16 | Q. How can you know you don't remember it if |
| 11:35:51 17 | you've refused to look at it? |
| 11:35:52 18 | A. Because you told me what it was. |
| 11:35:53 19 | Q. When did I tell you what it was? |
| 11:35:55 20 | A. You said it's something about me versus the |
| 11:35:57 21 | United States and something about Paul. Paul |
| 11:36:00 22 | Revere. |
| 11:36:01 23 | Q. For the record, the case is captioned "Paul |
| 11:36:03 24 | Brown, U.S. District Judge." |

16 (Pages 465 to 468)

6f17292b-b5fb-4467-9523-0d9097f86c8a

Janice L. Stevenson, Vol. 2                                    09/14/2006

## Page 477

11:43:35 1  Hartford?
11:43:36 2      A. No.
11:43:36 3      Q. Do you have any recollection of
11:43:37 4  participating in any litigation to which your minor
11:43:41 5  children were a party?
11:43:41 6      A. What part of no didn't you get?
11:43:45 7      Q. It's a separate question.
11:43:47 8      A. It's the same case.
11:43:48 9      Q. So your answer is no, you have no
11:43:50 10 recollection of participating in any litigation to
11:43:52 11 which your children were a party?
11:43:53 12     A. Nothing specific.
11:43:54 13     Q. I'm not asking you for specifics. You can't
11:43:57 14 avoid my questions because --
11:44:01 15     A. I don't know the details of this case.
11:44:02 16     Q. I'm not asking for details. I'm asking you
11:44:05 17 very general questions.
11:44:05 18     A. No, I have no general knowledge. I have no
11:44:08 19 specific knowledge. I can't answer general
11:44:11 20 questions. I can't answer specific questions.
11:44:14 21     Q. Okay. Well, let me ask the questions and
11:44:17 22 then you can respond to them. You also --
11:44:18 23     A. A blanket no.
11:44:19 24     Q. You also initiated this lawsuit against two

## Page 478

11:44:24 1  individuals named Michael Guryel and Sevi Guryel.
11:44:30 2  Do you recall participating in litigation against
11:44:31 3  those individuals?
11:44:32 4      A. Didn't I tell you no?
11:44:35 5      Q. That's your answer, no?
11:44:37 6      A. No in regard to -- What document -- What
11:44:41 7  exhibit is this? Exhibit Number 21, I can't answer
11:44:46 8  any questions on this.
11:44:47 9      Q. I'm asking you a question that's not related
11:44:50 10 to the document now. I'm asking you if you have any
11:44:52 11 memory of ever participating in litigation in any
11:44:54 12 case against Michael Guryel or Sevi Guryel. Do you
11:44:59 13 have any such recollection?
11:45:00 14     A. Is it this case?
11:45:02 15     Q. I'm asking you a very simple question. I'm
11:45:05 16 asking you, do you have any --
11:45:06 17     A. I don't recall the names.
11:45:08 18     Q. You have no memory of initiating a lawsuit
11:45:10 19 against these two people?
11:45:11 20     A. Didn't I just say no?
11:45:12 21     Q. Okay.
11:45:43 22        (Exhibit Number 22
11:45:43 23        marked for identification)
11:45:43 24     Q. Ms. Stevenson, I'm now showing you a

## Page 479

11:45:45 1  document marked as Exhibit 22. Would you take a
11:45:48 2  look at it, please.
11:45:59 3      A. Okay. What about it?
11:46:03 4      Q. First I'd ask you to turn to the last page.
11:46:05 5  There are several exhibits, but there's a signature
11:46:08 6  page on pages 14 and 15. They're numbered at the
11:46:12 7  bottom.
11:46:15 8          You're now looking at the attachments to
11:46:17 9  the document. If you'll back up, you'll see the
11:46:19 10 pages are numbered. I'll ask you to look at the
11:46:21 11 page numbered 14. Is that your signature?
11:46:23 12     A. (No verbal response)
11:46:43 13     Q. Ms. Stevenson, I'm asking you now just about
11:46:45 14 page 14. Is that your signature?
11:46:46 15     A. I don't remember anything about this case.
11:46:48 16     Q. I'm not asking you about your memory right
11:46:50 17 now. I'm asking you if the signature on page 14 is
11:46:53 18 your signature.
11:46:53 19     A. I don't remember anything about that case.
11:46:55 20     Q. That's not the question.
11:46:56 21     A. I can't answer about the document.
11:46:58 22     Q. You can't verify your own signature?
11:47:00 23     A. I can't answer about that document.
11:47:01 24     Q. Why?

## Page 480

11:47:02 1      A. Because I don't remember anything specific
11:47:04 2  about it.
11:47:05 3      Q. That's not -- I'm not asking you for any
11:47:07 4  memory whatsoever.
11:47:08 5      A. Yes, you are.
11:47:09 6      Q. Don't tell me what I'm asking you. Let me
11:47:11 7  get the questions out, please.
11:47:13 8      A. I said I can't answer questions at all.
11:47:15 9      Q. You saw a signature on page 14, did you not?
11:47:18 10     A. I can't answer your questions.
11:47:20 11     Q. Why? I'm not asking you for your memory
11:47:23 12 now. I'm asking you to look at a document that's
11:47:25 13 before you right this minute.
11:47:27 14     A. I said I can't answer.
11:47:29 15     Q. Why?
11:47:30 16     A. I can't.
11:47:30 17     Q. Why?
11:47:31 18     A. I can't remember anything about this case.
11:47:32 19     Q. I'm not asking you anything about your
11:47:34 20 memory. I'm asking you to look at a document that's
11:47:36 21 before you presently.
11:47:37 22     A. No. I can't answer anything about this.
11:47:38 23     Q. Why?
11:47:39 24     A. I can't verify anything. I can't answer

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

6f17292b-b5fb-4467-9523-0d9097f86c8a

Page 481

specific, general or broad questions. I can't.
Q. I'm not asking you anything about your memory; do you understand that? I'm --
A. I cannot verify anything. I can't verify anything on this.
Q. Please let me get the questions out.
A. I cannot verify anything.
Q. I'm asking about a document --
A. Thank you.
Q. I'm asking about a document --
A. This is the end of 22.
May I see that again, please?
Q. That's, for the record, the document marked as Exhibit 22.
A. I can't answer anything on 22.
Q. I'm not asking for your memory, you understand that? Do you understand that, Ms. Stevenson?
A. Sorry.
Q. Do you understand that I'm not asking for your memory?
A. I can't answer anything specific about this document.
Q. You can't verify your own signature on the

Page 482

document?
A. I can't answer anything specific about this document.
Q. Why?
A. Because I just told you I can't.
Q. That's not a why. That's a blanket statement that you're refusing to answer a question about the document.
A. It's not a refusal.
Q. Why is it that you can't verify your own signature on the document?
A. Because then I would have to have some specific memory.
Q. You can't recognize your own signature?
A. Then I'm going to have to have a specific memory.
Q. I'm not asking you for your memory of the case.
A. No, I can't.
Q. You can't recognize your own signature?
A. I can't answer anything about this document.
Q. In general. If I ask you to identify your own signature, you're not capable of doing that; is that what you're telling me?

Page 483

A. I can't answer anything about this case.
Q. I just told you that has nothing to do with the document that's in front of you. I'm asking you a general question.
A. You know what, you gave me a lot of stuff today I didn't recall and I don't remember. That's all I can tell you. Come on.
Q. Ms. Stevenson, you have to respond to the questions that I ask you.
A. I just did, sir.
Q. You certainly did not.
A. Sir, sir, I'm not answering the way you want me to.
Q. I'm not asking you for your memory. I'm not asking you anything about the case. I'm asking you a very simple question.
A. When we started this you said will I do my best to remember, will I do my best to recall. Do you remember all that peripheries you brought in to this deposition? Okay. I'm doing it. I'm doing my best. I can't.
Q. Okay. The question I'm about to ask you, for the record, is not about your memory.
A. But this is how I look at it. This is how I

Page 484

see it. If I don't know the document, how can I verify a point on it?
Q. I'm asking you if you're able to recognize --
A. Did you hear me?
Q. I'm not going to answer your questions. Your job is to answer my questions.
A. There has to be some reason here. Be reasonable.
Q. I'm being perfectly reasonable, Ms. Stevenson.
A. No, you're not.
Q. You have to let me get my questions out.
A. You have never been reasonable. You have sat over there and been very unreasonable.
Q. Are you done?
A. You have picked on me.
Q. Are you done?
A. With Exhibit 22, yes, we are.
Q. I'm not talking about the document. I was asking you if you're done making speeches. Have you said what you have to say?
A. We're finished with Exhibit 22.
Q. We'll be finished when I say we're finished.

6f17292b-b5fb-4467-9523-0d9097f86c8a

Janice L. Stevenson, Vol. 2                                    09/14/2006

---

Page 489

11:54:24  1      Q. So I'm going to ask you a question. And I
11:54:28  2  will take Exhibit 22 from you so it's clear that I'm
11:54:30  3  not asking you about this document or about this
11:54:32  4  lawsuit. Okay?
11:54:33  5      A. Okay.
11:54:33  6      Q. This is a question, very general and very
11:54:36  7  simple. Is it your testimony that you cannot
11:54:38  8  identify your own signature on a piece of paper?
11:54:40  9      A. I think I can recognize -- I think I can
11:54:47 10  recognize my signature, but if it's -- I can
11:54:58 11  recognize my signature, but if it's on something I
11:55:12 12  don't remember, I can't truthfully say I remember
11:55:15 13  doing that.
11:55:16 14      Q. You can't say that you remember signing it
11:55:18 15  if you don't remember the document; is that what
11:55:19 16  you're saying?
11:55:20 17      A. All right. That's perfectly fair.
11:55:22 18      Q. Now I'm going to show you Exhibit 22 again
11:55:26 19  and I'm going to show you page 14, which we
11:55:28 20  discussed before. There's a signature on that page.
11:55:30 21  Do you see it?
11:55:31 22      A. Okay.
11:55:34 23      Q. Without regard to whether you remember
11:55:38 24  specifically the act of signing this document, I

---

Page 490

11:55:40  1  want you to tell me whether or not you believe that
11:55:42  2  to be your signature.
11:55:46  3      A. I cannot state I believe that. I cannot
11:55:52  4  state that. I can't.
11:55:55  5      Q. Is it your belief that that is, in fact, not
11:55:58  6  your signature?
11:55:58  7      A. I can't even state that.
11:56:00  8      Q. You just have no perception one way or
11:56:04  9  another as to whether that might be your signature?
11:56:06 10      A. I can't even answer that. I just -- Because
11:56:15 11  of the context it's in. I can't fairly, truthfully,
11:56:21 12  with the oath I've taken, answer that.
11:56:23 13      Q. Well, you testified just a minute ago that
11:56:25 14  while you may not remember a specific document and
11:56:28 15  the act of signing a specific document, that you can
11:56:30 16  recognize your signature; is that right?
11:56:32 17      A. No. I said if I had to verify a document
11:56:40 18  and I didn't remember it and then you turn to a page
11:56:42 19  and you have a specific point in a document I don't
11:56:46 20  remember and you want me to -- in the context of
11:56:50 21  that unknown document verify one point on it, I
11:56:56 22  can't.
11:56:56 23      Q. Okay. So you can't recognize this as your
11:56:59 24  signature. Does it look like your signature in a

---

Page 491

11:57:02  1  general way?
11:57:03  2      A. Sir, I can't even answer that.
11:57:07  3      Q. You can't tell me whether the signature on
11:57:08  4  that page looks like your own signature in a general
11:57:11  5  way?
11:57:11  6      A. Sir, I can't even do that because there's
11:57:16  7  some testimony I've given on documents I don't even
11:57:18  8  remember authoring, like a resume. Like the resume
11:57:24  9  you showed me last time, I didn't even remember
11:57:26 10  authoring that, but I guess it was mine.
11:57:27 11      Q. I'm not asking you anything about documents
11:57:29 12  you authored.
11:57:30 13      A. I can't. I got to go back -- When I get
11:57:34 14  this last transcript I'm going to go back and undo
11:57:36 15  that because if I don't remember authoring it or
11:57:39 16  writing it, can I fairly say it's mine? Can I
11:57:43 17  truthfully say it's mine if there's doubt?
11:57:46 18      Q. Well, what I'm asking you for in any of
11:57:48 19  these cases --
11:57:49 20      A. I can't. There's doubt.
11:57:50 21      Q. Ms. Stevenson, you can't interrupt me. What
11:57:52 22  I'm asking you for in any of these cases, as with
11:57:56 23  any of these documents, I'm asking you for your best
11:57:59 24  memory. I'm not asking you to be 100 percent

---

Page 492

11:58:02  1  certain.
11:58:02  2      A. But you want me to be truthful.
11:58:04  3      Q. I want you to give me your best memory.
11:58:07  4      A. But if it verges on not being truthful, then
11:58:11  5  I've violated my oath. You'd be the first one to
11:58:15  6  prosecute me on lying.
11:58:16  7      Q. Ms. Stevenson, all I'm asking you for each
11:58:18  8  time is your memory.
11:58:19  9      A. The truth of my best memory is I can't
11:58:22 10  answer that.
11:58:23 11      Q. And you understand, as we discussed before,
11:58:25 12  that when I ask you to give your best memory, you
11:58:28 13  can't just give me whatever happens to be at the
11:58:30 14  forefront of your mind. You have to endeavor to try
11:58:32 15  to remember.
11:58:33 16      A. I'm endeavoring. I can't remember.
11:58:35 17      Q. I want you to take some time with this
11:58:37 18  document and look at it as long as you can, as long
11:58:39 19  as you need to, and tell me whether it refreshes
11:58:42 20  your recollection as to a lawsuit you may have
11:58:44 21  participated in.
11:58:44 22      A. Sir, with all honesty within me, with all
11:58:49 23  honesty within me, I cannot truthfully answer that.
11:58:53 24      Q. I'm asking you to look at the document and

---

22 (Pages 489 to 492)

6f17292b-b5fb-4467-9523-0d9097f86c8a

Janice L. Stevenson, Vol. 2                          09/14/2006

---

Page 501

12:08:48 1    not asking you anything about your memory.
12:08:49 2        A. You asked me if I recall --
12:08:52 3        Q. That question has been asked. We've moved
12:08:55 4    on.
12:08:55 5        A. Answered.
12:08:56 6        Q. Your answer was you don't recall
12:08:57 7    participating in that litigation, correct?
12:08:59 8        A. That's right.
12:09:00 9        Q. So now I'm asking you no nothing about your
12:09:03 10   memory of the litigation. I'm asking you about the
12:09:04 11   document that's sitting in front of you. I've
12:09:07 12   turned it to the second page, and I've represented
12:09:09 13   to you that that reflects that you are the plaintiff
12:09:13 14   in that case, right?
12:09:14 15       A. Is that your representation?
12:09:16 16       Q. That's right.
12:09:16 17       A. Then put it on the record.
12:09:18 18       Q. Do you see that in front of you? That's
12:09:20 19   what I'm asking.
12:09:22 20       A. I'm not really looking.
12:09:23 21       Q. I would ask you to look at the document.
12:09:24 22       A. But you know, I don't remember --
12:09:26 23       Q. I'm not asking you for your memory.
12:09:28 24       A. I have no memory.

Page 502

12:09:29 1        Q. I'm asking you to look at a document that is
12:09:31 2    presently before you right now.
12:09:32 3        A. But I have no memory of it in general.
12:09:34 4        Q. That's not what I'm asking you.
12:09:36 5        A. You know what, you've taken it out of
12:09:38 6    context.
12:09:39 7        Q. I'm not asking you the context. I'm asking
12:09:42 8    you if that's your name on the paper.
12:09:46 9        A. If I have no memory of it -- I don't care if
12:09:49 10   my name begins or ends this document. I have no
12:09:52 11   memory.
12:09:52 12       Q. I'm not asking your memory. I'm asking
12:09:55 13   you --
12:09:55 14       A. I cannot answer truthfully.
12:09:57 15       Q. You can't answer the question as to whether
12:09:59 16   your name appears on this document?
12:10:01 17       A. You think it's my name?
12:10:04 18       Q. I'm asking the questions, Ms. Stevenson.
12:10:06 19       A. You think it's my name?
12:10:08 20       Q. I'm not going to answer your questions. I'm
12:10:11 21   the one that --
12:10:12 22       A. How many Janice W. Stevensons or Wilson
12:10:15 23   Stevensons did you bring up? How do you know it's
12:10:17 24   all me?

Page 503

12:10:18 1        Q. I'm asking you, Ms. Stevenson, is that your
12:10:21 2    name on this document?
12:10:21 3        A. I can't answer that truthfully.
12:10:26 4        Q. You can't answer truthfully whether that's
12:10:29 5    your name, that's what you're telling me?
12:10:31 6        A. I can't answer truthfully about this
12:10:33 7    document in general.
12:10:34 8        Q. I'm not asking you any questions about the
12:10:36 9    document in general.
12:10:37 10       A. Yes, you are. It's on this document that
12:10:39 11   you asked me do I recall.
12:10:40 12       Q. I didn't ask you anything about your
12:10:42 13   recollection. I asked you what --
12:10:43 14       A. I have no memory.
12:10:44 15       Q. I'm not asking you for your memory.
12:10:46 16       A. I can't truthfully answer that.
12:10:47 17       Q. You can't truthfully answer whether --
12:10:49 18       A. Because --
12:10:50 19       Q. Let me get the question out. You are
12:10:53 20   telling me you can't truthfully answer whether a
12:10:55 21   document that's in front of you as we speak, that's
12:10:57 22   been marked as Exhibit 24, has your name on it?
12:11:01 23   That's your testimony?
12:11:02 24       A. I've answered in regard to Exhibit 24.

Page 504

12:11:09 1            We were supposed to have a break at the
12:11:10 2    end of 23.
12:11:11 3        Q. We can take a break at the end of this one.
12:11:15 4    How about that?
12:11:15 5        A. Would this be the end?
12:11:15 6        Q. Not even close. I'm asking you --
12:11:22 7        A. You promised we would be out of here early.
12:11:22 8        Q. If you answer my questions we can get
12:11:24 9    through this very quickly.
12:11:25 10       A. I can't just answer and not be truthful. I
12:11:27 11   could say yes to everything.
12:11:29 12       Q. You're arguing with me right now. This is
12:11:31 13   not productive.
12:11:31 14       A. I'm not arguing with you. I'm not arguing
12:11:34 15   with you. I'm not arguing with you.
12:11:35 16       Q. What are you doing, contradicting me?
12:11:37 17       A. I'm not contradicting you.
12:11:39 18       Q. What did you just do?
12:11:40 19       A. I'm just following your instructions given
12:11:43 20   to me at the beginning of this deposition.
12:11:44 21       Q. My instructions to you at the beginning of
12:11:47 22   this deposition were not to go off on side colloquy
12:11:50 23   and not to debate with me. My instructions to you
12:11:53 24   were to answer the questions that I ask you

---

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

6f17292b-b5fb-4467-9523-0d9097f86c8a

Janice L. Stevenson, Vol. 2                    09/14/2006

---

Page 505

12:11:55 1    truthfully and succinctly. You haven't done that
12:11:58 2    once. I'm asking you --
12:11:59 3        A. Maybe I'm being truthful. Have you ever
12:12:04 4    thought about that? Maybe she's being truthful.
12:12:07 5    Maybe this person never remembers anything she has
12:12:10 6    done in the past because you forget what's behind
12:12:12 7    you and you move on.
12:12:14 8        Q. Let's focus on that for a moment. Are you
12:12:16 9    aware of any disorders you have with respect to your
12:12:19 10   memory?
12:12:20 11       A. None that's diagnosed.
12:12:21 12       Q. Do you believe that you have problems with
12:12:23 13   your memory?
12:12:23 14       A. I think I have -- like your keys or
12:12:33 15   something, you forget to grab something before you
12:12:36 16   leave the house, but most people do.
12:12:37 17       Q. Exactly. Do you believe that you have some
12:12:40 18   sort of disorder with respect to your memory?
12:12:41 19       A. I'm not a physician.
12:12:43 20       Q. I'm not asking you for a diagnosis. I'm
12:12:46 21   asking you what you believe.
12:12:47 22       A. I would not even venture to say that
12:12:52 23   something was wrong with me even if I thought
12:12:55 24   something was wrong with me because no one wants

Page 506

12:12:57 1    anything to be wrong with them. I think I'm just an
12:13:01 2    average person.
12:13:02 3        Q. So your memory is average, that's your
12:13:04 4    testimony?
12:13:04 5        A. Let's put it this way, I'm not good at
12:13:11 6    memory games.
12:13:11 7        Q. I'm not asking about games. I'm asking
12:13:14 8    about your memory in general. Do you believe that
12:13:15 9    your memory is on a par with that of the general
12:13:18 10   population?
12:13:18 11       A. I don't know.
12:13:20 12       Q. Do you believe that --
12:13:22 13       A. Because I don't know what general memory is.
12:13:24 14       Q. Okay. Do you believe that your memory is
12:13:27 15   substantially worse than that of the general
12:13:29 16   population?
12:13:30 17       A. I really feel if there are specific
12:13:36 18   questions like you've asked me and I can't remember
12:13:44 19   because I can't remember because it's -- I don't
12:13:52 20   remember, I guess that's average, right?
12:13:54 21       Q. Okay. So your testimony is you believe your
12:13:56 22   memory to be average?
12:13:58 23       A. No. My testimony is, I've answered
12:14:02 24   truthfully what I remember and what I don't remember

Page 507

12:14:05 1    from things in the past truthfully.
12:14:09 2        Q. I'm going to ask you to look at Exhibit 24
12:14:11 3    again.
12:14:12 4        A. I can't, sir.
12:14:12 5        Q. You can't look at the document?
12:14:13 6        A. I can't answer questions.
12:14:16 7        Q. You can certainly answer questions that
12:14:17 8    don't rely on your memory.
12:14:18 9        A. Because I think you're taking it in
12:14:21 10   context -- you're taking it out of context. You
12:14:23 11   asked me about a document. In that document you
12:14:25 12   want me to verify specific information. I can't,
12:14:28 13   sir.
12:14:28 14       Q. I'm just asking you questions that relate to
12:14:30 15   the document.
12:14:30 16       A. But don't --
12:14:31 17       Q. Let me get the questions out. You can't
12:14:33 18   interrupt me, Ms. Stevenson. Certainly you can
12:14:36 19   answer questions about the document before you
12:14:38 20   whether or not you remember the underlying
12:14:39 21   proceeding. You can verify for me that's a
12:14:43 22   three-page document, can you not?
12:14:44 23       A. Let me count. One page flips up, two --
12:14:53 24   there's a second page and there's a third page. I

Page 508

12:14:57 1    don't know how it's numbered. I count three.
12:15:01 2        Q. You can verify for me there are three pages
12:15:04 3    to the document before you?
12:15:04 4        A. At the top of it it says "Page 1 of 3."
12:15:07 5        Q. Right. And can you verify for me the first
12:15:09 6    line on the first page says "Commonwealth of
12:15:15 7    Massachusetts"?
12:15:15 8        A. That's what it reads, "Commonwealth of
12:15:29 9    Massachusetts."
12:15:29 10       Q. That's all I'm asking you is what the
12:15:31 11   document says. I'm not asking you anything about
12:15:33 12   your memory.
12:15:33 13       A. But is there -- Where is Essex?
12:15:36 14       Q. I'm going to turn to page 2. I want you to
12:15:41 15   look under the party listing where it says "Party
12:15:43 16   involved." Do you see that? Right there. Do you
12:15:51 17   see your name listed there?
12:15:52 18       A. (No verbal response)
12:16:11 19       Q. Do you understand the question?
12:16:11 20       A. I see a name listed there.
12:16:15 21       Q. What name is that?
12:16:16 22       A. I see one, two -- I see two names listed
12:16:32 23   here.
12:16:32 24       Q. What are those two names?

26 (Pages 505 to 508)

6f17292b-b5fb-4467-9523-0d9097f86c8a

Page 509

12:16:34 1    A. (No verbal response)
12:16:39 2    Q. Ms. Stevenson, let's focus on the second
12:16:41 3   page of the document. What are the names you see
12:16:47 4   listed?
12:16:47 5    A. It says "Parties involved. Role:
12:17:08 6   Defendant," and it lists some house. There's no
12:17:15 7   address.
12:17:15 8    Q. You're referring to the line that reads
12:17:19 9   "Lazarus House Ministries, Inc."?
12:17:20 10    A. And it lists --
12:17:21 11    Q. I'm asking you a question. Are you
12:17:22 12   referring to the line that says "Lazarus House
12:17:25 13   Ministries, Inc."?
12:17:29 14    A. Yes.
12:17:29 15    Q. And then --
12:17:31 16    A. Am I reading this document as we go along?
12:17:34 17    Q. Are you trying to tell me this has refreshed
12:17:34 18   your memory in some way?
12:17:35 19    A. No, but I'm reading it.
12:17:37 20    Q. That's fine. That's what I'm asking you.
12:17:39 21    A. Why do I have to read it and answer it? Why
12:17:42 22   can't you just read it into the record?
12:17:43 23    Q. It's not your role.
12:17:44 24    A. No, it's not my role. You're not going to

Page 510

12:17:46 1   give me that role.
12:17:46 2    Q. Ms. Stevenson, you're the one that's under
12:17:47 3   oath. You're the witness here. Your job is to
12:17:50 4   answer questions.
12:17:51 5    A. You're manufacturing my answers.
12:17:52 6    Q. I'm doing no such thing.
12:17:54 7    A. Yes, you are.
12:17:54 8    Q. I'm asking you to read a document into the
12:17:57 9   record.
12:17:57 10    A. Yes, you are.
12:17:58 11    Q. What's the --
12:17:59 12    A. You asked me about did I remember this
12:18:01 13   procedure. Now you want me to read from something I
12:18:04 14   do not recognize or recall.
12:18:06 15    Q. And that's --
12:18:08 16    A. I think it's unfair.
12:18:10 17    Q. Your testimony is --
12:18:11 18    A. You're not architecting my answers.
12:18:14 19    Q. I'm doing no such thing.
12:18:15 20    A. Yes, you are.
12:18:16 21    Q. Ms. Stevenson, you can't interrupt me.
12:18:19 22   Okay? Will you agree not to interrupt me so we can
12:18:21 23   get through this?
12:18:22 24    A. (No verbal response)

Page 511

12:18:25 1    Q. Do you understand what I've asked you?
12:18:26 2    A. You've asked me not to participate in my
12:18:30 3   deposition.
12:18:31 4    Q. I certainly have not. I've asked you that
12:18:33 5   when I ask you a question, you let me get the whole
12:18:37 6   question out and not interrupt.
12:18:38 7    A. You want me to answer questions the way you
12:18:40 8   want it to be on the record. That's wrong. That's
12:18:43 9   manipulative.
12:18:44 10    Q. There's nothing manipulative about what I've
12:18:46 11   asked you. I want you to give me the answer you
12:18:50 12   believe to be truthful.
12:18:51 13    A. I don't believe it to be truthful if I
12:18:53 14   answer it. I don't believe it to be fair. And I
12:18:58 15   don't believe it to go to the core of my claim
12:19:00 16   against your client.
12:19:01 17    Q. That's fine.
12:19:01 18    A. Thank you. That's the end of Exhibit 24.
12:19:03 19    Q. It certainly is not. Ms. Stevenson, you've
12:19:06 20   read the line "Lazarus House Ministries" into the
12:19:08 21   record, and you said that there were two other
12:19:10 22   witnesses -- two other parties listed on that page,
12:19:13 23   correct?
12:19:13 24    A. I don't want to read it.

Page 512

12:19:14 1    Q. I'm not asking you what you want.
12:19:16 2    A. I'm not going to read it.
12:19:17 3    Q. You're going to refuse to read from this
12:19:20 4   document into the record?
12:19:21 5    A. Something I don't recognize, yeah.
12:19:22 6    Q. You're refusing to read the document?
12:19:24 7    A. I don't recognize the document. I have no
12:19:26 8   memory.
12:19:26 9    Q. I'm not asking if you recognize it.
12:19:27 10    A. I cannot truthfully answer your question
12:19:29 11   because I don't believe if I read it it will
12:19:31 12   truthfully reflect -- it will reflect truthfully on
12:19:34 13   the record. I cannot do that to your most honorable
12:19:39 14   deposition.
12:19:40 15    Q. Stop with the speech.
12:19:42 16    A. It is not a speech.
12:19:43 17    Q. I'm not asking you to testify about
12:19:46 18   anything. My question relates to this document
12:19:47 19   that's sitting in front of you right now and what it
12:19:50 20   says. Certainly you can tell me what a document
12:19:51 21   that's sitting right in front of you right now says.
12:19:55 22    A. I don't think it will reflect truthfully on
12:19:58 23   the record.
12:19:58 24    Q. You're going to refuse to read the document?

27 (Pages 509 to 512)

6f17292b-b5fb-4467-9523-0d9097f86c8a

Janice L. Stevenson, Vol. 2                    09/14/2006

Page 513

12:20:00 1    A. I'm not going to be untruthful.
12:20:02 2    Q. I'm not asking you to be untruthful. I'm
12:20:05 3    asking you to read a document truthfully into the
12:20:07 4    record.
12:20:07 5    A. That would be untruthful.
12:20:08 6    Q. How is your reading a document truthfully
12:20:10 7    into the record untruthful?
12:20:10 8    A. Because I just told you on -- What exhibit
12:20:13 9    is this?
12:20:13 10   Q. It's Exhibit 24.
12:20:14 11   A. -- Exhibit 24, I cannot generally,
12:20:17 12   specifically answer questions. I'm not going to
12:20:20 13   read from something that I don't know what it's
12:20:22 14   about.
12:20:23 15   Q. I'm not asking you anything about the
12:20:24 16   proceedings. I'm asking you a very simple question.
12:20:27 17   A. I will not.
12:20:27 18   Q. Let me get the questions out. Just as I
12:20:30 19   asked you how many pages are in this document, you
12:20:33 20   could answer that.
12:20:33 21   A. I don't feel good anymore.
12:20:35 22   Q. I asked you how many parties -- Let me get
12:20:37 23   the questions out. I asked you how many parties
12:20:39 24   there were. You identified for the record that

Page 514

12:20:40 1    there were two.
12:20:41 2        Now all I'm asking you is to truthfully
12:20:44 3    read into the record what is written right in front
12:20:47 4    of you. Will you do that?
12:20:48 5    A. The reading of this record would not reflect
12:20:53 6    a truthful -- I think it will be out of context. I
12:21:04 7    think -- I don't know the word. It wouldn't
12:21:09 8    reflect -- It would be out of context. It would be
12:21:11 9    like taking -- tearing off a piece of a puzzle and
12:21:15 10   putting it in the record. And it's not accurate.
12:21:19 11   Q. What about it is not accurate? I'm asking
12:21:21 12   you only what the document says. I want you to tell
12:21:23 13   me accurately --
12:21:24 14   A. I don't want to do this.
12:21:25 15   Q. I don't care what you want.
12:21:26 16   A. I'm not going to do it.
12:21:27 17   Q. You're refusing to participate? You're
12:21:29 18   refusing to read the document into the record?
12:21:31 19   A. I'm refusing to be dishonest.
12:21:33 20   Q. What about reading a document --
12:21:34 21   A. I'm refusing to be dishonest. I'm refusing
12:21:38 22   to be dishonest. I'm not going to do it.
12:21:41 23   Q. What about reading a document that's sitting
12:21:44 24   in front of you and reading into the record whatever

Page 515

12:21:46 1    you believe it says is dishonest? That's the only
12:21:48 2    question on the table. Do you understand that?
12:21:49 3    A. I cannot do that. I cannot honestly do that
12:21:52 4    in all ethics. I don't believe it's ethical.
12:21:54 5    Q. What is unethical about reading a document?
12:21:57 6    A. I don't think -- It does not reflect well on
12:22:00 7    the record.
12:22:00 8    Q. I don't want you to opine about what
12:22:03 9    reflects well on the record. Your job is just to
12:22:06 10   testify truthfully.
12:22:07 11   A. You're manufacturing this.
12:22:08 12   Q. I'm manufacturing nothing. I've set a
12:22:09 13   document before you --
12:22:11 14   A. You're manufacturing this.
12:22:12 15   Q. I'm manufacturing nothing. You're arguing
12:22:15 16   with me and you're debating.
12:22:16 17   A. You are. I'm ready to move on.
12:22:18 18   Q. We're not going to move on until you answer
12:22:20 19   the questions.
12:22:21 20   A. I can't truthfully answer that question.
12:22:23 21   Q. Are you telling me you're unable to read?
12:22:25 22   A. You made me read them. You're not going to
12:22:28 23   make me read this.
12:22:29 24   Q. You're capable of reading?

Page 516

12:22:31 1    A. I think it's designed to -- for my answer
12:22:38 2    that even though it's on the record, it's going to
12:22:40 3    be untrue.
12:22:41 4    Q. What is untrue? Is it your testimony that
12:22:46 5    your name does not appear on that document?
12:22:48 6    A. (No verbal response)
12:22:49 7    Q. Do you understand the question?
12:22:53 8    A. (No verbal response)
12:22:53 9        MR. MILLER: For the record,
12:22:53 10   Ms. Stevenson hasn't given a verbal response.
12:22:56 11   Q. The question is, is it your testimony that
12:22:58 12   your name does not appear on that document?
12:23:00 13   A. If you think that's my name, then you can go
12:23:03 14   to court and say, I think this is her name.
12:23:05 15   Q. Ms. Stevenson, this is not about what I
12:23:07 16   think. This is about your testimony. And the
12:23:09 17   question is, is it your testimony that your name
12:23:13 18   does not appear on that document?
12:23:14 19   A. I don't think that's truthful.
12:23:17 20   Q. You don't believe your name appears on this
12:23:20 21   document?
12:23:20 22   A. I don't think the answer would be truthful
12:23:24 23   and I don't think what you represented is truthful.
12:23:26 24   Q. I haven't made any representation

28  (Pages 513 to 516)

Page 517

12:23:28 1  whatsoever.
12:23:29 2     A. Yes, you are.
12:23:29 3     Q. I asked you a simple question about a three-
12:23:32 4  page document.
12:23:32 5     A. I told you my objections.
12:23:34 6     Q. You understand that whatever objections you
12:23:36 7  have, your testimony is to give the testimony
12:23:37 8  subject to the objections. We went over that.
12:23:39 9     A. You told me to be truthful.
12:23:4010    Q. That's right.
12:23:4111    A. And I just told you that my answer would
12:23:4312  violate what you stipulated to begin with, that I
12:23:4813  have to be truthful.
12:23:4914    Q. In what respect?
12:23:5015    A. To the best of my recollection.
12:23:5116    Q. In what respect would your answer to the
12:23:5317  question as to whether your name appears in that
12:23:5518  document violates your oath?
12:23:5619    A. Because for some reason you feel it's me and
12:23:5920  you want me to say it's me because -- it's both
12:24:0521  because you think it's supposed to be me. And if I
12:24:0722  said it, it's going to be wrong on the record.
12:24:0923    Q. Your job is not to get behind my answers,
12:24:1224  let me know what I think. Your job is just to

Page 518

12:24:14 1  answer truthfully the questions I ask you.
12:24:16 2     A. If I can't answer truthfully -- I just told
12:24:18 3  you.
12:24:18 4     Q. You can't answer truthfully -- Let me get
12:24:21 5  the questions out. You can't answer truthfully
12:24:23 6  whether your name appears on the three-page document
12:24:25 7  before you?
12:24:25 8     A. Maybe if you said it different. "Is there a
12:24:27 9  name similar to yours on the document?" Why don't
12:24:3010  you ask me that?
12:24:3111    Q. I will ask the questions that I see fit.
12:24:3412    A. Why don't you say, "Is there a name similar
12:24:3613  to yours on the document?"
12:24:3814    Q. I will ask the question.
12:24:3915    A. "Is there a name similar to yours on the
12:24:4216  document?"
12:24:4317    Q. It's not your job to ask yourself questions.
12:24:4518  It's --
12:24:4619    A. If I Google my name, do you know how many
12:24:4920  people has a similar name to mine?
12:24:5121    Q. This speech is not productive.
12:24:5322    A. I can't answer the question because I don't
12:24:5723  want to violate the oath.
12:24:5924    Q. Ms. Stevenson, I'll represent to you that

Page 519

12:25:01 1  you can answer the question any way you want.
12:25:03 2     A. It's answered.
12:25:04 3     Q. Let me ask you the question. You can answer
12:25:09 4  the question any way you want. It's a yes or no
12:25:11 5  question. Either your name appears on the document
12:25:13 6  or it doesn't.
12:25:15 7     A. But you can't ask me a question that will
12:25:20 8  mislead the record.
12:25:21 9     Q. I can ask you any question that I want.
12:25:2310    A. It will be misleading on the record.
12:25:2411    Q. I can ask you any question that I want.
12:25:2812    A. I won't allow it to be untruthful.
12:25:3313    Q. What is untruthful?
12:25:3414    A. I need to go to the bathroom.
12:25:3715    Q. Would you like to take a break?
12:25:3816    A. Then we will move on to 28.
12:25:4017    Q. No, Ms. Stevenson. I'll tell you when we go
12:25:4018  there.
12:25:4019       Does the name Janice Stevenson appear
12:25:4320  anywhere on the document before you? Do you
12:25:4521  understand the question?
12:25:4522    A. I really have to go.
12:25:4723    Q. If you answer the question you can go.
12:25:4924    A. Look, you're refusing to let me go to the

Page 520

12:25:53 1  bathroom.
12:25:53 2     Q. You're arguing with me. You could be out
12:25:56 3  the door already. Just answer the question. Does
12:25:58 4  the name Janice Stevenson appear on the document?
12:26:01 5     A. (No verbal response)
12:26:04 6     Q. Do you understand the question?
12:26:04 7     A. I can't answer that truthfully.
12:26:04 8     Q. You cannot answer truthfully whether the
12:26:06 9  name Janice Stevenson appears in the three-page
12:26:0810  document before you?
12:26:0911    A. Have you verified who that is?
12:26:1012    Q. Ms. Stevenson, your job is not to ask me
12:26:1413  questions.
12:26:1414    A. Yours is to be efficient.
12:26:1615    Q. Your job is to answer questions.
12:26:1816    A. Yours is to be efficient.
12:26:2017    Q. You want to take a break? Take a break.
12:26:2318       MR. MILLER: Off the record.
12:26:2319       (Lunch recess)
20
21
22
23
24

29 (Pages 517 to 520)

6f17292b-b5fb-4467-9523-0d9097f86c8a

Page 529

01:11:16 1  other and it's an open possibility that, in fact,
01:11:19 2  you did file a lawsuit against Lazarus House
01:11:22 3  Ministries, Inc.?
01:11:23 4      A. I don't recall.
01:11:23 5      Q. And when you say that, you're not excluding
01:11:26 6  the possibility that you did so?
01:11:28 7      A. I can't answer until I can truthfully
01:11:33 8  answer. Now, I don't know what umbrella that puts
01:11:36 9  it under because I'm not a lawyer, but hey, I've
01:11:39 10 done the best I could, truthfully.
01:11:43 11     What's number 28?
01:11:43 12     Can I keep this?
01:11:43 13     Q. It's not mine to give you, unfortunately.
01:12:10 14     We've covered, I think, the territory of
01:12:14 15 the various lawsuits in which you're involved,
01:12:17 16 so I want to shift and focus on your education. Do
01:12:21 17 you recall last time I asked you some questions
01:12:23 18 about your education?
01:12:24 19     A. I can't recall your specific questions.
01:12:32 20 What did we talk about?
01:12:34 21     Q. You recall that, in general, we discussed
01:12:36 22 the subject of your education?
01:12:38 23     A. Yeah. We were here. I guess you said so,
01:12:41 24 yeah.

Page 530

01:12:41 1      Q. And do you recall that you told me that you
01:12:45 2  finished the 11th grade?
01:12:46 3      A. Yes.
01:12:46 4      Q. And do you recall you told me that you
01:12:48 5  completed a bachelor's degree at Grambling
01:12:51 6  University?
01:12:51 7      A. Yes.
01:12:52 8      Q. Do you recall that you told me you took some
01:12:55 9  continuing education classes both at Grambling and
01:12:58 10 at Collin County Community College and at the
01:13:00 11 University of North Texas at Denton? Do you recall
01:13:03 12 that?
01:13:03 13     A. Yeah. As best as I could recall, I
01:13:08 14 recalled.
01:13:08 15     Q. You recall that testimony?
01:13:08 16     A. As best as I could remember when you asked
01:13:12 17 me, I recalled. I haven't done any further research
01:13:20 18 on stuff because that was the best of my memory.
01:13:27 19     Q. That's all I'm asking you.
01:13:27 20     And you told me that other than what we
01:13:30 21 just listed, that was the extent of your education?
01:13:33 22     A. As far as I can remember.
01:13:34 23     Q. We discussed the fact that you had conducted
01:13:37 24 a self-study course for the PHR certification, but

Page 531

01:13:40 1  you didn't actually take the exam, right?
01:13:41 2      A. No. I could not pay for that.
01:13:43 3      Q. But you did complete the self-study course?
01:13:45 4      A. Yeah. Something you do at home. Every
01:13:49 5  night I'd look at the books.
01:13:51 6      Q. And you also told me that you had similarly
01:13:53 7  completed a self-study course that related to a
01:13:56 8  certification in payroll-related responsibilities;
01:14:01 9  is that right?
01:14:01 10     A. Yes. The entry level courses were normally
01:14:08 11 for persons who do -- What do they call it? The
01:14:14 12 tactical work, the paperwork.
01:14:19 13     And normally if you get into the
01:14:20 14 advanced certifications you're more into strategy,
01:14:23 15 designing policy.
01:14:26 16     So a lot of times you're not permitted
01:14:30 17 to take certain certifications if you don't have
01:14:34 18 certain levels -- take the exam for a certain level
01:14:38 19 of certification if you don't have that background
01:14:41 20 for at least two or three years.
01:14:43 21     Q. So what you're telling me is that the
01:14:45 22 program of study in which you participated involved
01:14:48 23 first studying for an exam --
01:14:50 24     A. The PHR is, like, the lowest level. You're

Page 532

01:14:54 1  still pushing paper. You're not designing policy
01:14:56 2  or --
01:14:57 3      Q. You're an HR generalist, right?
01:14:59 4      A. Yeah. System or something like that.
01:15:02 5      Q. After you complete the PHR and you have
01:15:04 6  certain responsibilities for some period of time,
01:15:06 7  you can get advanced certifications in various
01:15:08 8  subject matters?
01:15:09 9      A. If you're doing those job duties.
01:15:11 10     Q. Okay. And you told me that, after we'd
01:15:14 11 reviewed the formal education that we just discussed
01:15:16 12 a moment ago and the certifications, that was the
01:15:18 13 extent of your educational credentials, right?
01:15:23 14     A. Other underlying courses you take.
01:15:26 15     Q. But you never took any other advanced
01:15:28 16 graduate courses?
01:15:29 17     A. No.
01:15:30 18     Q. Okay.
01:15:32 19     A. As far as I remember, no, I have not been
01:15:37 20 back in school.
01:15:54 21     (Exhibit Number 25
01:15:54 22     marked for identification)
01:15:54 23     Q. Ms. Stevenson, I'm showing you another
01:15:58 24 document, and I would ask that you take a look at

Janice L. Stevenson, Vol. 2                          09/14/2006

Page 537

01:20:10 1    A. I see that number there.
01:20:11 2    Q. And do you see the same number at the top of
01:20:13 3  Exhibit 26?
01:20:14 4    A. I see that number there and I see the
01:20:18 5  number -- both 25 and 26.
01:20:22 6    Q. You see a caption in the middle of number
01:20:24 7  26? Can you read that into the record?
01:20:26 8    A. It says "Notice of appeal."
01:20:32 9    Q. Could you read the line just below that,
01:20:34 10  please.
01:20:35 11    A. "Plaintiff hereby appeals to the United
01:20:43 12  States Court of Appeals."
01:20:44 13    Q. Keep going, please.
01:20:46 14    A. "For the 1st district from the judgment
01:20:51 15  entered in this action."
01:20:56 16    Q. And the rest of it, please.
01:20:58 17    A. "On May 20th, 2003."
01:20:59 18    Q. Okay. So do you recall filing a notice of
01:21:01 19  appeal?
01:21:02 20    A. I don't recall it.
01:21:02 21    Q. So do you dispute that you, in fact, filed a
01:21:06 22  lawsuit against Massachusetts School of Law?
01:21:08 23    A. Didn't I just say I don't recall it?
01:21:10 24    Q. Is that a no, you don't dispute it?

Page 538

01:21:12 1    A. I don't recall it.
01:21:13 2    Q. Do you dispute that it happened?
01:21:16 3    A. I don't recall it.
01:21:17 4    Q. That's not my question. My question is
01:21:19 5  whether you dispute it.
01:21:19 6    A. I don't recall it. I don't recall it to
01:21:21 7  dispute it.
01:21:22 8    Q. Do you have any specific recollection of not
01:21:24 9  filing a lawsuit against Massachusetts School of
01:21:26 10  Law?
01:21:26 11    A. I don't recall it to even remember doing it
01:21:28 12  or not doing it.
01:21:29 13    Q. So one way or the other, you just don't
01:21:31 14  remember?
01:21:32 15    A. I don't remember.
01:21:32 16    Q. And similarly, you don't recall one way or
01:21:34 17  the other filing an appeal to the 1st Circuit U.S.
01:21:38 18  Court of Appeals in that case?
01:21:39 19    A. I thought we went over this at the first
01:21:42 20  deposition. I thought -- I told you everything I
01:21:46 21  remember.
01:21:47 22    Q. So your answer is no, you have no recall --
01:21:48 23    A. That's right.
01:21:49 24    Q. -- of appealing a judgment entered against

Page 539

01:21:51 1  you in May 2003?
01:21:52 2    A. That's right.
01:22:13 3    (Exhibit Number 27
01:22:13 4    marked for identification)
01:22:15 5    Q. Ms. Stevenson, I'm showing you a document
01:22:18 6  marked as Exhibit Number 27. Would you take a look
01:22:20 7  at that, please.
01:22:26 8    A. Okay. Exhibit Number 27.
01:22:27 9    Q. And is that yet another document that
01:22:30 10  reflects litigation of some sort?
01:22:32 11    A. Is it?
01:22:35 12    Q. I'm asking you.
01:22:37 13    A. Okay. It's my first time seeing it. You've
01:22:40 14  given it to me. Don't you know what you're giving
01:22:42 15  me?
01:22:42 16    Q. Your job here is not to ask me questions.
01:22:45 17    A. But you've given this to me.
01:22:47 18    Q. Your job is not to ask me questions. Your
01:22:49 19  job is to answer my questions.
01:22:51 20    A. Okay. What is it?
01:22:52 21    Q. You see that the first line of this document
01:22:53 22  reads "United States Bankruptcy Court," correct?
01:22:56 23    A. Are we back on the bankruptcy thing again?
01:22:58 24    Q. That's a yes or no question.

Page 540

01:22:59 1    A. Didn't I tell you I'm not answering any more
01:23:01 2  bankruptcy?
01:23:02 3    Q. Is the first line of the document "United
01:23:04 4  States" --
01:23:04 5    A. I don't recall this document.
01:23:05 6    Q. I'm not asking you if you recall it. Does
01:23:08 7  the first line of the document read "United States
01:23:10 8  Bankruptcy Court"?
01:23:11 9    A. Yeah. Are we back on bankruptcy again? I'm
01:23:13 10  not going to do this.
01:23:14 11    Q. Are you the petitioner of this bankruptcy?
01:23:16 12    A. I'm not answering bankruptcy questions.
01:23:18 13    Q. Do you see that this is an adversary
01:23:20 14  proceeding in a bankruptcy involving you?
01:23:22 15    A. I'm not answering bankruptcy questions.
01:23:26 16    Q. Do you recognize Massachusetts School of Law
01:23:30 17  listed among the defendants here?
01:23:31 18    A. I'm not answering any more bankruptcy
01:23:34 19  questions.
01:23:35 20    Q. I'm asking you a question, Ms. Stevenson.
01:23:37 21    A. I'm not answering any more bankruptcy
01:23:39 22  questions.
01:23:40 23    Q. You're refusing to answer my question?
01:23:41 24    A. Ask me about my money.

34  (Pages 537 to 540)

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

6f17292b-b5fb-4467-9523-0d9097f86c8a

Page 541

01:23:43 1    Q. I will decide what needs to be asked.
01:23:45 2    A. Ask me something on the claim before the
01:23:48 3  court.
01:23:48 4    Q. I'm not going to allow you to direct how I
01:23:51 5  defend my case.
01:23:52 6    A. No more bankruptcy questions.
01:23:53 7    Q. I'm not going to accept that limitation on
01:23:56 8  my questioning.
01:23:57 9    A. No more bankruptcy questions.
01:23:58 10    Q. You can say that as many times as you want.
01:24:01 11  It's not going to stop me from asking you questions.
01:24:24 12    (Exhibit Number 28
01:24:24 13    marked for identification)
01:24:25 14    Q. All right. Ms. Stevenson, I'm showing you a
01:24:27 15  document marked as Exhibit 28. Would you take a
01:24:29 16  look at that, please.
01:24:30 17    A. What is it?
01:24:31 18    Q. I'm going to ask you that question. Please
01:24:34 19  take a look at it.
01:24:36 20    A. If you don't know and I don't know --
01:24:37 21    Q. Ms. Stevenson, the point is not for you to
01:24:40 22  probe my memory or my knowledge. The point is for
01:24:42 23  you --
01:24:43 24    A. Is this more bankruptcy? I'm not answering

Page 542

01:24:45 1  bankruptcy cases.
01:24:46 2    Q. Please look at the document.
01:24:49 3    A. Outside of bankruptcy. Is it about
01:24:51 4  bankruptcy?
01:24:52 5    Q. Please look at the document.
01:24:53 6    A. It's Exhibit Number 28. It's about
01:24:56 7  bankruptcy. We're not going there.
01:24:58 8    Q. You're not going to answer questions related
01:25:00 9  to that document?
01:25:01 10    A. Bankruptcy and my money. Come on.
01:25:04 11    Q. Ms. Stevenson, are you going to answer
01:25:06 12  questions related to that document or not?
01:25:08 13    A. I want my money.
01:25:08 14    Q. I'm not going to resolve that with you here
01:25:11 15  today.
01:25:11 16    A. I want my money. In the cases I'm reading,
01:25:16 17  there are certain things the court wants to know to
01:25:19 18  determine eligibility under the overtime law. Okay?
01:25:22 19  That's what I thought we were going to resolve here.
01:25:24 20    Q. We're not going to resolve anything here
01:25:26 21  today, Ms. Stevenson. The purpose of this
01:25:28 22  deposition --
01:25:29 23    A. The purpose of this deposition was never to
01:25:31 24  resolve this.

Page 543

01:25:31 1    Q. The purpose of the deposition is for me to
01:25:33 2  conduct discovery about your claims.
01:25:35 3    A. My claim is about my overtime wages.
01:25:37 4    Q. Ms. Stevenson, I will decide the scope of
01:25:39 5  this deposition.
01:25:40 6    A. It's about my overtime wages. You want to
01:25:43 7  ask me a question about that?
01:25:45 8    Q. I will ask the questions that I see fit.
01:25:47 9    A. I will answer what I feel is not wasting my
01:25:49 10  time and deviating from my time.
01:25:52 11    Q. What wastes time is you making these
01:25:54 12  speeches.
01:25:55 13    A. Move on.
01:25:57 14    Q. So you're refusing on the record to answer
01:25:59 15  the questions?
01:25:59 16    A. I'm not answering questions about
01:26:01 17  bankruptcy.
01:26:01 18    Q. All right.
01:26:02 19    A. Why don't you ask me some questions about
01:26:04 20  overtime.
01:26:04 21    Q. Don't tell me what questions to ask you.
01:26:06 22  I'll --
01:26:07 23    A. I got answers for that.
01:26:08 24    Q. We'll get to it when I decide it's time to

Page 544

01:26:11 1  get to it.
01:26:12 2    I'm showing you Exhibit 28 at page 3.
01:26:16 3  There are several numbered paragraphs under the
01:26:18 4  heading of "Massachusetts School of Law." Will you
01:26:20 5  take a look at that, please.
01:26:23 6    A. Is this on the bankruptcy?
01:26:25 7    Q. I'm asking you to take a look at the
01:26:26 8  document, please.
01:26:27 9    A. No, I'm not answering anything on
01:26:29 10  bankruptcy.
01:26:29 11    Q. Well, the document that I've shown you,
01:26:32 12  which I'll represent to you is a claim that you
01:26:34 13  filed against --
01:26:35 14    A. You know what, you can read this into the
01:26:37 15  record on your own time.
01:26:38 16    Q. Ms. Stevenson, I will make the statements
01:26:40 17  and ask the questions that I see fit. I'm not going
01:26:42 18  to let you control the scope of this deposition.
01:26:44 19    A. Then you make a speech, then.
01:26:46 20    Q. Ms. Stevenson, your job is only to respond
01:26:49 21  to my questions.
01:26:50 22    A. I have no answers for you.
01:26:51 23    Q. You won't let me get the questions out. I'm
01:26:55 24  showing you page 3 of Exhibit 28.

35 (Pages 541 to 544)

6f17292b-b5fb-4467-9523-0d9097f86c8a

Page 545

01:26:56 1     A. No, you're not.
01:26:57 2     Q. What am I showing you?
01:26:59 3     A. I have no idea. I'm not looking at it.
01:27:01 4     Q. You're refusing to look at a document I've
01:27:03 5  placed before you?
01:27:04 6     A. I'm refusing to go along any questions that
01:27:07 7  are not going to define my claim in front of the
01:27:14 8  court. Okay?
01:27:14 9     Q. No, it's not okay. In fact, it's
01:27:17 10 categorically inappropriate. Your job here is just
01:27:20 11 to respond truthfully.
01:27:22 12    A. That's all I can do.
01:27:23 13    Q. It's not all you can do. You're refusing to
01:27:26 14 look at a document I've set in front of you?
01:27:28 15    A. I'm not going to lie. You're not going to
01:27:31 16 architect answers for your record.
01:27:36 17    Q. For the record, Exhibit 28, page 3,
01:27:38 18 paragraph 23, says, "Plaintiff passed admissions
01:27:42 19 test for MSL," MSL being an abbreviation for
01:27:47 20 Massachusetts School of Law. Does that refresh your
01:27:48 21 recollection as to any other training you may have
01:27:50 22 had?
01:27:50 23    A. I just don't remember to give you an
01:27:59 24 accurate answer.

Page 546

01:28:00 1     Q. So it's your testimony that you don't recall
01:28:02 2  whether or not you attended the Massachusetts School
01:28:04 3  of Law?
01:28:04 4     A. I cannot give you a truthful answer on that.
01:28:10 5     Q. You can't truthfully answer the question did
01:28:12 6  you attend the Massachusetts School of Law? That's
01:28:13 7  your testimony?
01:28:14 8     A. You know what, I can't answer anything
01:28:16 9  related to bankruptcy.
01:28:17 10    Q. I haven't asked you anything about
01:28:19 11 bankruptcy. I'm asking you about the Massachusetts
01:28:21 12 School of Law.
01:28:21 13    A. You said this is a bankruptcy document.
01:28:23 14    Q. I made no such representation. But
01:28:25 15 disregard the document. I'm asking you a question.
01:28:27 16 Did you attend the Massachusetts School of Law?
01:28:29 17    A. I've answered -- My answer is on the record.
01:28:34 18 Come on.
01:28:35 19    Q. You offered no response whatsoever to that
01:28:37 20 question.
01:28:37 21    A. Oh, yeah, oh, yeah, oh, yeah. I told you as
01:28:40 22 best as I can remember, I've listed everything I can
01:28:44 23 recall. Thank you.
01:28:44 24    Q. So do you now deny attending the

Page 547

01:28:47 1  Massachusetts School of Law?
01:28:47 2     A. I've given the answer to that. I've
01:28:50 3  answered that.
01:28:50 4     Q. You have not answered that.
01:28:52 5     A. I've answered that.
01:28:53 6     Q. Again, do you deny attending the
01:28:55 7  Massachusetts School of Law?
01:28:55 8     A. I've answered that.
01:28:59 9     Q. You have no recollection of --
01:29:00 10    A. I've answered it.
01:29:01 11    Q. Ms. Stevenson, you can't interrupt me. You
01:29:03 12 have no recollection of attending law school, that's
01:29:06 13 your testimony?
01:29:06 14    A. I've given you truthful answers in regard to
01:29:11 15 my recollection of my education when you asked me.
01:29:14 16 Thank you.
01:29:14 17    Q. And if you look at this document, it states
01:29:16 18 that, in fact, you began law school in the fall
01:29:19 19 semester of 2002. Is that accurate?
01:29:22 20    A. My answer is on the record.
01:29:27 21    Q. Do you deny that you began Massachusetts
01:29:28 22 School of Law in the fall of 2002?
01:29:30 23    A. My answer is on the record.
01:29:31 24    Q. And we've marked two lawsuits that you

Page 548

01:29:34 1  initiated against Massachusetts School of Law
01:29:38 2  relating to your attendance at that institution.
01:29:38 3     A. I can't recall.
01:29:41 4     Q. Let me finish the question. We've marked
01:29:41 5  two documents reflecting two separate lawsuits you
01:29:42 6  initiated against the Massachusetts School of Law
01:29:44 7  relating to your attendance at that institution.
01:29:47 8        And your testimony is despite those
01:29:48 9  documents, despite attending Massachusetts School of
01:29:51 10 Law in the last several years and despite suing them
01:29:53 11 repeatedly, you have no recollection of attending
01:29:56 12 law school? That's your testimony?
01:29:57 13    A. I've answered you truthfully. My answer is
01:29:59 14 on the record.
01:30:17 15       (Exhibit Number 29
01:30:17 16       marked for identification)
01:30:57 17    Q. Ms. Stevenson, I'm now showing you a
01:30:59 18 document I've marked as Exhibit 29. Is that
01:31:01 19 familiar to you?
01:31:01 20    A. No.
01:31:02 21    Q. If I represent to you that that document
01:31:04 22 reflects that you appealed an adverse ruling in the
01:31:07 23 lawsuit we just looked at, would that refresh your
01:31:09 24 memory?

36 (Pages 545 to 548)

6f17292b-b5fb-4467-9523-0d9097f86c8a

Page 561

01:41:12 1   move on.
01:41:12 2       Q. I will not move on.
01:41:14 3       A. I don't recall it. If I couldn't tell you
01:41:16 4   at the last deposition and because --
01:41:18 5       Q. I'm not asking you to recall.
01:41:20 6       A. Yes, you are.
01:41:20 7       Q. I'm asking you about a document sitting in
01:41:23 8   front of you right now.
01:41:24 9       A. It has nothing to do with my overtime claim.
01:41:28 10  I'm not going to look at it.
01:41:29 11      Q. You're refusing to look at the document?
01:41:31 12      A. That's it.
01:41:31 13      Q. I will represent to you that it is yet
01:41:34 14  another lawsuit that you initiated against the
01:41:35 15  Massachusetts School of Law in February of 2004. Do
01:41:37 16  you have any basis to dispute that?
01:41:39 17      A. I don't even remember that.
01:41:40 18      Q. You have no basis to dispute it?
01:41:42 19      A. I don't remember it. Was that a dispute, a
01:41:44 20  denial or omittal? I don't know. I don't remember
01:41:48 21  that.
01:41:48 22      Q. So roughly two years ago you can't tell me
01:41:52 23  whether or not you initiated a lawsuit against
01:41:54 24  Massachusetts School of Law?

Page 562

01:41:55 1       A. I really can't.
01:41:55 2       Q. Okay. So we've now come up with four
01:41:59 3   different lawsuits involving you and the
01:42:02 4   Massachusetts School of Law.
01:42:02 5       A. That you want me to recall. I said -- I
01:42:05 6   told you I couldn't.
01:42:07 7       Q. And even having looked at the documents
01:42:09 8   pertaining to these four lawsuits, you have
01:42:11 9   absolutely no memory of attending the Massachusetts
01:42:14 10  School of Law?
01:42:14 11      A. Didn't I just tell you -- My answer is on
01:42:16 12  the record. Didn't I just tell you?
01:42:18 13      Q. I'm asking you if these documents refresh
01:42:21 14  your memory. Having looked at all the documents
01:42:23 15  I've set in front of you today --
01:42:25 16      A. Nothing refreshes.
01:42:26 17      Q. So you currently have no recollection of
01:42:28 18  attending Massachusetts School of Law; is that
01:42:30 19  right?
01:42:30 20      A. I answered that.
01:42:31 21      Q. Okay. And your answer is no?
01:42:33 22      A. I answered that, but you can answer for me.
01:42:37 23      Q. I'm perfectly happy to have you answer the
01:42:39 24  questions if --

Page 563

01:42:40 1       A. The next exhibit, you need to answer the
01:42:42 2   questions for me.
01:42:42 3       Q. Ms. Stevenson, I'm happy to let you put your
01:42:46 4   own story on the error. I've implored you to do
01:42:48 5   that, and you've refused.
01:42:50 6       A. I tried. You keep saying I'm lying. You
01:42:53 7   keep saying, That's not the answer I want.
01:42:56 8   Obviously, you want me to lie.
01:42:57 9       Q. There's no basis for that. I haven't told
01:42:59 10  you once that's not the answer I want.
01:43:01 11      A. Yes, you have.
01:43:01 12      Q. I have told you many times over and over
01:43:04 13  that I want truthful responses.
01:43:05 14      A. Yes, you have. And the truth I give you
01:43:07 15  isn't what you want to hear.
01:43:09 16      Q. That's because you're evading the questions.
01:43:11 17      A. No. Because you think I'm lying. It's not
01:43:16 18  really nice for you to call someone a liar in the
01:43:21 19  deposition. It really sours the atmosphere here.
01:43:24 20      Q. You've given your testimony thus far. Is it
01:43:43 21  your claim that you recall never taking any law
01:43:46 22  school classes anywhere ever?
01:43:48 23      A. My claim for this deposition is that I was
01:43:52 24  an employee --

Page 564

01:43:54 1       Q. No, Ms. Stevenson. I'm not asking you about
01:43:58 2   the claims in your suit.
01:44:00 3       A. -- at the Neighborhood House Charter School.
01:44:02 4   I worked overtime hours and they did not pay me.
01:44:04 5   But they didn't just not pay me. They didn't pay
01:44:09 6   anyone who worked overtime because they
01:44:10 7   misclassified employees. That's my claim. Ask me a
01:44:13 8   question about my claim.
01:44:15 9       Q. Ms. Stevenson, let me get the question out
01:44:17 10  before you start interrupting me and telling me it's
01:44:22 11  irrelevant, please.
01:44:23 12          The question is, is it your testimony
01:44:24 13  that you have no memory of ever taking a law school
01:44:27 14  class anywhere ever?
01:44:28 15      A. My answer is on the record.
01:44:32 16      Q. It's not, because that's the first time I've
01:44:34 17  asked you the question.
01:44:35 18      A. Yes, it is. You've asked it several ways.
01:44:38 19  Go back and read -- When she finishes this you'll
01:44:43 20  read it and see it several times. I'm not going to
01:44:46 21  keep answering the same question.
01:44:47 22      Q. You haven't answered that question once
01:44:48 23  because I've never asked it to you before.
01:44:51 24      A. It's a memory recall question. I've

40 (Pages 561 to 564)

6f17292b-b5fb-4467-9523-0d9097f86c8a

Janice L. Stevenson, Vol. 2                    09/14/2006

Page 565

01:44:53 1  answered it.
01:44:54 2      Q. So the record is clear, you have no recall
01:44:55 3  of ever attending a law school class?
01:44:57 4      A. I've answered it.
01:44:58 5      Q. You have not.
01:44:59 6      A. Read the transcript. When she transcribes
01:45:02 7  it, read it.
01:45:02 8      Q. This will go much faster if you respond to
01:45:05 9  the questions instead of fighting. You're the one
01:45:08 10 that's wasting time. You can make this go forward
01:45:11 11 with a yes or no answer to a very simple question.
01:45:13 12 It's a yes or no.
01:45:15 13     A. I answered the question.
01:45:15 14     Q. You just interrupted me again.
01:45:17 15     A. It's the same question.
01:45:18 16     Q. It's not the same question. Let's move past
01:45:21 17 that.
01:45:21 18     A. I answered it.
01:45:21 19     Q. We can make this deposition move along if
01:45:23 20 you'll just give me a yes or no response to the --
01:45:25 21     A. Don't tell me how to answer. You want me to
01:45:28 22 answer a certain way. Yes, you do.
01:45:29 23     Q. No, I don't.
01:45:30 24     A. You're trying to architect this record.

Page 566

01:45:32 1  You're trying to design my answers. Stop it.
01:45:35 2      Q. The only impact I have on --
01:45:37 3      A. Stop it.
01:45:38 4      Q. Don't tell me to stop it, Ms. Stevenson. I
01:45:40 5  will ask the questions that I see fit.
01:45:42 6          Now, the only interest I have in
01:45:43 7  effecting your answers is making them simple and
01:45:46 8  truthful. I'm going to ask you the simplest
01:45:49 9  possible question. If you give it a simple answer
01:45:51 10 rather than evading it, we can move on.
01:45:53 11         The simple question is, do you have any
01:45:55 12 recall as you sit here right now as to whether
01:45:57 13 you've ever attended a law school class?
01:45:59 14     A. I've answered it.
01:46:00 15     Q. Answer it again, please.
01:46:01 16     A. I've answered it. It's on the record.
01:46:04 17     Q. It's not. Even assuming you're correct,
01:46:06 18 just answer it again and we can move on. Do you
01:46:08 19 recall ever attending a law school class?
01:46:09 20     A. I have to answer questions, but I don't
01:46:13 21 think I have to repeat a question if I've answered
01:46:17 22 it once. Do you want me to change the answer from
01:46:20 23 my last time?
01:46:20 24     Q. No. I want you to answer it truthfully.

Page 567

01:46:23 1      A. It's on the record. Read it.
01:46:25 2      Q. You're complaining about me wasting your
01:46:27 3  time. We've been sitting here for five minutes
01:46:29 4  debating about whether or not you've answered this
01:46:31 5  very simple question. If you answer the question,
01:46:33 6  we can move on and we can get to other subject
01:46:35 7  matter.
01:46:35 8      A. Well, in my mind I've answered it.
01:46:37 9      Q. Fine. If you believe you've answered it,
01:46:39 10 answer it again.
01:46:40 11     A. No. I don't think I'm compelled to answer
01:46:44 12 twice.
01:46:44 13     Q. All right. Then any complaints you have
01:46:46 14 about this deposition being a waste of your time are
01:46:49 15 going to fall back on you because you're in control
01:46:52 16 of this thing moving forward in an efficient way.
01:46:54 17     A. No. You told me you were.
01:46:56 18     Q. I'm in control of the questions I ask. If
01:46:59 19 you refuse to answer them and you force me to debate
01:47:01 20 you for extended periods of time about whether or
01:47:03 21 not you've answered a very simple question, this is
01:47:05 22 going to take a long time and we're not going to get
01:47:08 23 through it and we're going to be back here for a
01:47:11 24 third day.

Page 568

01:47:12 1      A. This is horrible. This proves nothing.
01:47:15 2  This achieves nothing toward facilitating this case.
01:47:20 3  How could you do that to your own client?
01:47:23 4      Q. Ms. Stevenson, I have no interested in your
01:47:25 5  opinion of my representation of my client. And if
01:47:28 6  you want this thing to move forward and you want to
01:47:30 7  save time, the easiest thing for you to do is
01:47:33 8  cooperate. I'll ask this one last time.
01:47:41 9      A. Why is this happening to me? That's what
01:47:44 10 I'm going to ask. Why is this happening to me?
01:47:47 11     Q. Because in addition to the seven lawsuits
01:47:51 12 we've already marked --
01:47:51 13     A. If the employee paid their employees their
01:47:53 14 wages -- I've asked this. Why can't I just get my
01:47:56 15 money?
01:47:56 16     Q. Because you're not entitled to it.
01:47:58 17     A. In your opinion.
01:47:58 18     Q. Exactly. In my opinion.
01:48:00 19     A. Okay. Fine.
01:48:00 20     Q. And the reason that this is happening to you
01:48:02 21 is because you've initiated a lawsuit. It's
01:48:05 22 actually a question of law.
01:48:06 23     A. No, it's not. It's an issue for --
01:48:11 24     Q. You are sitting here and telling me you have

41 (Pages 565 to 568)

6f17292b-b5fb-4467-9523-0d9097f86c8a

Janice L. Stevenson, Vol. 2                    09/14/2006

---

Page 569

01:48:13 1  no recollection of whether or not you've ever
01:48:15 2  attended a law school class and then you're going to
01:48:17 3  presume to debate with me about a technical legal
01:48:19 4  matter.
01:48:20 5      A. I don't think I have to be a lawyer to have
01:48:21 6  an opinion about my own case. I had an opinion
01:48:23 7  about the settlement you wrote. I thought it was
01:48:25 8  screwy. I don't think you have to go to law school
01:48:29 9  to understand bad writing.
01:48:33 10     Q. I'm going to ask the question one more time.
01:48:35 11     A. Didn't I answer it? I've answered it.
01:48:37 12     Q. You, in fact, have not answered it.
01:48:39 13     A. I answered it.
01:48:40 14     Q. If you want to move on --
01:48:42 15     A. I've answered it.
01:48:43 16     Q. Ms. Stevenson, you've got to let me get the
01:48:45 17  questions out.
01:48:45 18     A. The same questions.
01:48:46 19     Q. If you answer them, we'll move on --
01:48:49 20     A. The same questions.
01:48:50 21     Q. Ms. Stevenson, you got to quit interrupting
01:48:52 22  me or we cannot make progress here. Do you
01:48:55 23  understand that?
01:48:55 24     A. (No verbal response)

---

Page 570

01:48:59 1      Q. Do you understand what I'm explaining to you
01:49:01 2  here? We've got to talk one at a time.
01:49:03 3      A. I've answered the question.
01:49:04 4      Q. You've got to let me get the question out
01:49:06 5  before you can answer the question.
01:49:08 6      A. We've been talking about that one question
01:49:10 7  that you've asked me over and over and over again.
01:49:12 8  You've had several documents on this one thing.
01:49:14 9  I've answered it.
01:49:16 10     Q. You haven't answered it.
01:49:18 11     A. Obviously you want me to answer it the way
01:49:20 12 you want me to, but then I change my answers. I
01:49:23 13 gave you a blanket record. I told you you can put
01:49:26 14 it in. Okay? And you're still not happy. You're
01:49:29 15 an unhappy person.
01:49:30 16     Q. Ms. Stevenson, your job here is only to
01:49:37 17 answer the questions that I ask you.
01:49:38 18     A. I'm funny now.
01:49:40 19     Q. Yeah, that was funny.
01:49:41 20        It's not to critique my defense of my
01:49:42 21 client, it's not to argue with me, it's not to make
01:49:43 22 representations about my personality.
01:49:45 23     A. I don't think it's funny. I need my money.
01:49:48 24 You say I don't deserve my money.

---

Page 571

01:49:52 1      Q. You understand, as we established in the
01:49:53 2  first session of your deposition, that NHCS --
01:49:57 3      A. I don't deserve my money?
01:49:58 4      Q. You're walking all over the record here.
01:50:00 5  You're making a mess of the transcript, and you're
01:50:02 6  preventing us from making progress.
01:50:05 7        You understand, as we discussed at the
01:50:06 8  first session of your deposition, that NHCS's
01:50:08 9  position is you are not owed overtime. You
01:50:11 10 understood that and you said that at the first
01:50:12 11 session of your deposition. Do you now have a
01:50:14 12 different view? Do you not understand that NHCS
01:50:17 13 disputes your entitlement to overtime pay?
01:50:20 14     A. I guess that's why we're in court.
01:50:21 15     Q. Exactly. For the last time, do you recall
01:50:30 16 ever --
01:50:30 17     A. Thank God.
01:50:32 18     Q. -- at any point in your life attending a law
01:50:38 19 school class?
01:50:38 20     A. My answer is already on the record.
01:50:40 21     Q. Well, our position is that you haven't
01:50:43 22 responded to that question. We're definitely going
01:50:46 23 to be going to the judge for relief on a variety of
01:50:49 24 responses that we believe to be improper, and we

---

Page 572

01:50:52 1  will be seeking to compel a response to that, and we
01:50:55 2  will be asking for sanctions in the amount of our
01:50:59 3  legal fees caused by your obstructive conduct at
01:51:02 4  this deposition.
01:51:02 5      A. It's not obstructive. I'm telling you the
01:51:05 6  truth.
01:51:05 7      Q. I understand that's your position. We
01:51:06 8  certainly believe it to be obstructive.
01:51:07 9      A. You got enough witnesses here. Fine. You
01:51:10 10 can make your case. Come on.
01:51:12 11        (Exhibit Number 32
01:51:14 12        marked for identification)
01:51:15 13     A. You can't go for sanctions when we're still
01:51:17 14 sitting here.
01:51:39 15     Q. Ms. Stevenson, I'm showing you a document
01:51:41 16 marked as Exhibit 32. Would you take a look at that
01:51:43 17 for me, please. Ms. Stevenson, would you look at
01:51:52 18 the document, please.
01:51:53 19     A. I'm looking, but I don't see it.
01:51:55 20     Q. Well, I'm asking you to take a close look
01:51:58 21 and use the magnifying glass I've provided you if
01:52:01 22 you need assistance.
01:52:02 23     A. Who is this now?
01:52:03 24     Q. I'm asking you to take a look at that

---

42 (Pages 569 to 572)

6f17292b-b5fb-4467-9523-0d9097f86c8a

Janice L. Stevenson, Vol. 2                                    09/14/2006

---

Page 605

02:21:01 1     A. You want me to familiarize with it. Just
02:21:04 2 because I read it, does that make it familiar to me?
02:21:07 3     Q. Please look at it.
02:21:08 4     A. I've looked at the document.
02:21:09 5     Q. Do you see that --
02:21:10 6     A. No.
02:21:10 7     Q. You're refusing to look at it closely enough
02:21:13 8 to answer questions about it?
02:21:17 9     A. I don't remember seeing that.
02:21:17 10     Q. I haven't asked you whether you remember
02:21:19 11 seeing it. I'm not asking you that now.
02:21:19 12     A. But you asked me about the document.
02:21:22 13     Q. Exactly. Which is sitting in front of you
02:21:23 14 as we speak. The document sitting in front of you
02:21:26 15 as we speak -- keep in mind I'm not asking you any
02:21:30 16 question about your memory or recall -- does that
02:21:32 17 list you as the plaintiff in this lawsuit?
02:21:34 18     A. I wouldn't know.
02:21:34 19     Q. Does your name appear on the first page?
02:21:37 20     A. I don't see it.
02:21:37 21     Q. As I'm pointing to you on the first page, do
02:21:41 22 you see your name?
02:21:41 23     A. No.
02:21:42 24     Q. You don't see your name next to my finger on

Page 606

02:21:44 1 this page?
02:21:44 2     A. No.
02:21:45 3     Q. Would you take a look at it, please.
02:21:47 4     A. Well, no.
02:21:47 5     Q. You're refusing to look at the document?
02:21:49 6     A. Yeah.
02:21:50 7     Q. I'll represent to you that this is another
02:21:53 8 lawsuit that you've commenced this time against the
02:21:56 9 state of New Hampshire in or about February 2003 and
02:22:01 10 that the nature of suit heading reads "Prisoner,"
02:22:05 11 colon, "Civil rights." Does that refresh your
02:22:07 12 recollection as in -- regarding any litigation in
02:22:10 13 which you may have participated?
02:22:12 14     A. No.
02:22:12 15     Q. And again, you don't recall ever being a
02:22:14 16 prisoner?
02:22:15 17     A. I don't recall filing overtime wages in the
02:22:19 18 state of New Hampshire.
02:22:20 19     Q. That's not the question.
02:22:21 20     A. But I do recall filing overtime wages in
02:22:25 21 federal court in Massachusetts.
02:22:26 22     Q. That's not responsive to my question.
02:22:28 23     A. Yes, it is.
02:22:28 24     Q. It certainly is not.

Page 607

02:22:30 1     A. It is.
02:22:31 2     Q. The question is this: Do you recall ever
02:22:33 3 being a prisoner --
02:22:34 4     A. No.
02:22:34 5     Q. You have to let me get the question out.
02:22:36 6     A. I've answered the question. We've gone over
02:22:38 7 this before.
02:22:38 8     Q. You don't recall being a prisoner?
02:22:40 9     A. I've answered this. We've gone over it
02:22:44 10 before.
02:22:44 11     Q. So you're not going to answer the question?
02:22:46 12     A. I've answered it. Refer back to the record.
02:22:48 13     Q. Okay. And again, if I were to represent to
02:22:53 14 you that you appealed an adverse determination in
02:22:55 15 this case to the 1st Circuit Court of Appeals, you
02:22:58 16 have no basis to dispute that?
02:22:59 17     A. No recall. I wouldn't even remember it to
02:23:01 18 dispute it.
02:23:02 19     Q. You wouldn't remember one way or another?
02:23:03 20     A. I wouldn't remember it to dispute it.
02:23:05 21     Q. Okay. And if I were to represent to you
02:23:28 22 that another defendant in the lawsuit pertaining to
02:23:32 23 the document that I just showed you as Exhibit 36
02:23:34 24 was Dartmouth College, would that refresh your

Page 608

02:23:37 1 recollection at all?
02:23:37 2     A. It wouldn't refresh it.
02:23:39 3     Q. So you don't recall any litigation against
02:23:41 4 Dartmouth College?
02:23:42 5     A. (No verbal response)
02:23:46 6     Q. Do you understand the question?
02:23:47 7     A. The same answer. It's on the record.
02:23:52 8     Q. You have a son that attended Dartmouth
02:23:58 9 College; is that right?
02:23:59 10     A. (No verbal response)
02:24:01 11     Q. Do you understand the question?
02:24:02 12     A. I'm not answering that question.
02:24:03 13     Q. Why?
02:24:04 14     A. Because it has nothing to do with my
02:24:06 15 overtime.
02:24:07 16     Q. So you're going to refuse to answer on the
02:24:10 17 grounds of relevance?
02:24:11 18     A. Yeah.
02:24:11 19     Q. I've told you before that's an inappropriate
02:24:14 20 objection.
02:24:14 21     A. You know what, I have not seen any question
02:24:16 22 here that ascertains that your client owes me money.
02:24:21 23 You don't want to resolve it.
02:24:22 24     Q. We've discussed this a number of times.

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

6f17292b-b5fb-4467-9523-0d9097f86c8a

Page 637

03:05:53 1  contention is that had certain withholdings been
03:05:55 2  made that you believe are appropriate, your tax
03:05:58 3  liability overall would be less?
03:05:59 4      A. Yes, sir.
03:05:59 5      Q. Will you turn to page 3 of that document for
03:06:04 6  me, please.
03:06:07 7      A. So is it, like, one, two, three?
03:06:10 8      Q. The third page.
03:06:12 9      A. Not including --
03:06:14 10     Q. You see they're labeled at the top page X of
03:06:18 11 19?
03:06:18 12     A. 3 of 19?
03:06:19 13     Q. Exactly. If you'd look at paragraph 3 of
03:06:21 14 that page for me.
03:06:27 15     A. Three.
03:06:27 16     Q. Could you read that into the record, please.
03:06:29 17     A. "NHCS failed to withhold or pay to the
03:06:32 18 commissioner any sums required to be withheld or
03:06:36 19 paid on my wages of $43,000."
03:06:39 20     Q. What is the source of that $43,000 figure?
03:06:43 21     A. The 17 in 2004 and the 26 in 2005 because
03:06:51 22 I've asked -- well, I did my best to indicate that I
03:06:57 23 want this year and last year in this one hearing.
03:07:05 24     Q. You want to resolve both years at the same

Page 638

03:07:08 1  time?
03:07:08 2      A. Yes.
03:07:10 3      Q. So $43,000 is the total amount paid to
03:07:13 4  TuckNT by NHCS?
03:07:15 5      A. Total wages received, yes.
03:07:17 6      Q. And we're talking about the checks that NHCS
03:07:22 7  issued to TuckNT?
03:07:23 8      A. And the 1099, yes.
03:07:25 9      Q. So if you were to aggregate all the checks
03:07:27 10 that NHCS wrote to TuckNT, it would be $43,000?
03:07:31 11     A. Yeah, more or less. More.
03:07:32 12     Q. How precise is that number?
03:07:33 13     A. It may be four cents off from one of the
03:07:42 14 1099s. And then there was a check I received, but
03:07:45 15 it was more expense instead of wages. One of my
03:07:51 16 things included -- Documentation from NHCS does not
03:07:57 17 include that $400-plus check.
03:07:59 18     Q. $400?
03:08:00 19     A. $400-plus check. It was like 17,000
03:08:06 20 four-something. That's how I compute it, but they
03:08:09 21 reported 17.
03:08:09 22     Q. So is it your testimony that this $43,000
03:08:12 23 figure is accurate within, say, $500?
03:08:14 24     A. It is. It's lower than what I would

Page 639

03:08:20 1  include, but it's accurate within -- Yeah.
03:08:23 2      Q. So the most that NHCS could have paid to
03:08:26 3  TuckNT is $43,500?
03:08:28 4      A. Yeah. Four three four, something like that.
03:08:32 5      Q. But it's something --
03:08:33 6      A. Yes, sir.
03:08:35 7      Q. -- in excess of $43,000?
03:08:37 8      A. Yes, sir. It depends if you count expenses
03:08:39 9  or not.
03:08:39 10     Q. Reimbursed expenses?
03:08:41 11     A. Yes, sir.
03:08:44 12     Q. Well, does this figure include reimbursed
03:08:44 13 expenses?
03:08:45 14     A. No.
03:08:45 15     Q. So this is just the payment for invoices
03:08:47 16 that we marked at the last session of your
03:08:50 17 deposition?
03:08:50 18     A. Yes.
03:08:50 19     Q. And that was for services performed over a
03:08:53 20 period of roughly nine months; is that right?
03:08:54 21     A. From August through June --
03:09:03 22     Q. It's the last week of August, right? The
03:09:05 23 last week of August 2004 through the first week of
03:09:08 24 June 2005. So it's --

Page 640

03:09:11 1      A. We have the invoices. I don't have them to
03:09:14 2  refer back to the first invoice date.
03:09:16 3      Q. The first invoice date I'll represent to you
03:09:19 4  was the last week of August 2004.
03:09:20 5      A. Okay.
03:09:21 6      Q. And you were providing services to the
03:09:24 7  school through the first week of June 2005, right?
03:09:27 8      A. Yes.
03:09:27 9      Q. So we can agree that the period of time that
03:09:30 10 you've provided services for which TuckNT was paid
03:09:32 11 $43,000-plus was roughly nine months?
03:09:35 12     A. Yes.
03:09:35 13     Q. And below there you see "Respectfully
03:09:39 14 submitted" and a signature. Is that your signature?
03:09:41 15     A. Uh-hmm.
03:09:42 16     Q. Is that a yes?
03:09:43 17     A. Yes.
03:09:43 18     Q. Thank you. If you'll turn to attachment 3
03:10:01 19 to me -- 3 for me, which begins on page 17 of 19.
03:10:20 20 Do you see that document?
03:10:20 21     A. Yes.
03:10:20 22     Q. Is that familiar to you?
03:10:22 23     A. Yes. Dated April --
03:10:31 24     Q. Should that be April 15th, 2005?

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

6f17292b-b5fb-4467-9523-0d9097f86c8a

Page 641

03:10:35 1    A. That's when I sent it. I guess they looked
03:10:37 2  at it and says, Oh, she's going to file a year from
03:10:41 3  now.
03:10:41 4    Q. Well, you drafted this letter, right?
03:10:43 5    A. I did draft that letter.
03:10:44 6    Q. And you put at the top "April 15th, 2006,"
03:10:46 7  but you meant to put "April 15th, 2005," right?
03:10:50 8    A. Yes, sir. That's too bad because I said
03:10:53 9  November.
03:10:55 10   Q. And this is a document in which you asked
03:10:58 11 the commissioner of revenue to investigate
03:11:00 12 Neighborhood House Charter School, right?
03:11:02 13   A. Well, you know what, this is the letter I
03:11:06 14 sent with my petition.
03:11:10 15   Q. Your abatement?
03:11:11 16   A. No. Appellate Court thing.
03:11:15 17   Q. The Appellate Tax Board filing?
03:11:16 18   A. Yes. So it must have been this year.
03:11:18 19   Q. So the date is accurate?
03:11:20 20   A. The date is accurate.
03:11:21 21   Q. And in this letter you're asking the
03:11:23 22 commissioner of revenue to investigate Neighborhood
03:11:26 23 House Charter School, correct?
03:11:27 24   A. Yes.

Page 642

03:11:27 1    Q. And in fact, the first line of the letter
03:11:29 2  says, "Please investigate Neighborhood House Charter
03:11:31 3  School," correct?
03:11:32 4    A. Yes.
03:11:32 5    Q. So you understand that this document is
03:11:34 6  responsive to our document requests? We've
03:11:37 7  discussed the fact that our document requests for
03:11:39 8  purposes of your review in compiling documents
03:11:42 9  includes any document that has the word
03:11:44 10 "Neighborhood House Charter School" in it, right?
03:11:47 11   A. But you knew about this.
03:11:51 12   Q. Ms. Stevenson, there's no point for us to
03:11:54 13 debate it. The only point is for you to answer the
03:11:56 14 question. Okay?
03:11:56 15   A. I thought you had this.
03:11:58 16   Q. I'll represent to you I had never seen this
03:12:00 17 before yesterday. Now, you understand that
03:12:03 18 documents like this are responsive to our document
03:12:05 19 requests?
03:12:06 20   A. Okay. But --
03:12:07 21   Q. I'm asking you a question. Do you
03:12:09 22 understand that?
03:12:09 23   A. Yes, but haven't I given you a copy of my --
03:12:13 24 You had to have known about this. We knew about it

Page 643

03:12:15 1  when we stood up in court.
03:12:16 2    Q. You represented to the court -- and I'll
03:12:18 3  just give you our understanding of the events --
03:12:21 4  that you had initiated proceedings with the
03:12:23 5  Appellate Tax Board, and I apprised the court at
03:12:25 6  that time that we had no notice of any such filing.
03:12:28 7  You might remember that Judge Woodlock asked me
03:12:31 8  about it specifically. I told him that we hadn't.
03:12:33 9    A. I thought that was the ERISA.
03:12:36 10   Q. So you understand my representation that we
03:12:38 11 haven't seen these documents before?
03:12:40 12   A. Okay. But I'm almost sure you knew about
03:12:46 13 it.
03:12:47 14   Q. I'm just asking you if you understand.
03:12:49 15   A. If you gave it to -- If I had given it to
03:12:53 16 someone else at the school, would they have given it
03:12:55 17 to you?
03:12:55 18   Q. You can't count on that. Your obligation in
03:12:57 19 responding to our discovery requests is to send all
03:13:01 20 the responsive documents to me. Okay?
03:13:02 21   A. Okay.
03:13:03 22   Q. Again, I'm going to ask you to look through
03:13:05 23 your files. Anything that contains the words
03:13:07 24 "Neighborhood House Charter School" or pertains to

Page 644

03:13:09 1  revenue that you or TuckNT received from
03:13:12 2  Neighborhood House Charter School is responsive to
03:13:14 3  our requests. Okay?
03:13:15 4    A. Okay. But, you know, in my mind I thought
03:13:17 5  you had this.
03:13:18 6    Q. Okay. In responding to our supplemental
03:13:21 7  request, I ask that you go back and produce more
03:13:23 8  documents. If there's any doubt in your mind as to
03:13:27 9  whether or not I have a document, just produce it
03:13:28 10 again. Okay?
03:13:29 11   A. Okay.
03:13:29 12   Q. And we marked and I'll send to you or I have
03:13:32 13 sent to you copies of the few documents that you
03:13:34 14 produced. We marked those as exhibits to the last
03:13:38 15 session of your deposition. Do you recall that?
03:13:40 16   A. You said you sent it to me. Yeah.
03:13:43 17   Q. You recall seeing them?
03:13:44 18   A. I haven't gotten them.
03:13:45 19   Q. But you recall seeing them at the last
03:13:46 20 session of your deposition?
03:13:47 21   A. Yeah, all the exhibits you showed me.
03:13:50 22   Q. Right. So unless it's included in the
03:13:51 23 exhibits that we've marked, you should assume that I
03:13:54 24 don't have it. Okay?

60 (Pages 641 to 644)

6f17292b-b5fb-4467-9523-0d9097f86c8a

Janice L. Stevenson, Vol. 2                    09/14/2006

---

Page 661

03:30:42 1    A. You know, the health provider.
03:30:43 2    Q. At what entity?
03:30:44 3    A. Is it Harvard Pilgrim? Whatever the health
03:30:50 4  plan was.
03:30:50 5    Q. You called the administrator of the health
03:30:52 6  plan?
03:30:52 7    A. I called that office, customer service,
03:30:54 8  yeah.
03:30:54 9    Q. And you figured out how to put somebody on
03:30:5710  the COBRA rolls?
03:30:5911    A. I know we had to process them out from the
03:31:0112  regular, and there was a change in there. It just
03:31:0613  told you. They didn't really train you. They just
03:31:0914  told you, You have to go in and look at the codes
03:31:1315  and figure out which one is most appropriate and get
03:31:1516  it to take.
03:31:1617    Q. You're talking about codes in NHCS's
03:31:1918  accounting system?
03:31:2019    A. Codes in -- We had a Web porter to the
03:31:2520  database for this help provider, for the insurance
03:31:2921  company. They gave you access to it.
03:31:3222       So you go in and you change your
03:31:3523  employee to a COBRA person. That's how they're
03:31:3724  coded. So you have a list of people -- You have a

---

Page 662

03:31:41 1  bill under COBRA.
03:31:42 2    Q. You have a what?
03:31:43 3    A. You get a different -- You get a premium
03:31:45 4  under COBRA and then you get the regular employees.
03:31:49 5  So you got two notices. We paid them in one bill.
03:31:56 6    Q. When you say you got two notices, you mean
03:31:58 7  NHCS received two notices?
03:31:59 8    A. Yes, sir.
03:32:00 9    Q. You set it up so NHCS could pay those in a
03:32:0410  collective way?
03:32:0411    A. Yes. COBRA people pay us.
03:32:0612    Q. You mean, people who are on COBRA?
03:32:0813    A. Yes, sir. And we just paid the one premium.
03:32:1114  They're going to bill us regardless of how the
03:32:1315  person is classified. They're going to keep the
03:32:1616  same premium.
03:32:1717       We just had one bill, but we separated
03:32:1918  it because you billed the person who was COBRA and
03:32:2419  they sent you a check and you had to receive it in,
03:32:2820  you know, as accounts receivable. You had to --
03:32:3121    Q. And you figured out how to do all the --
03:32:3322    A. I didn't know how to do accounts payable in
03:32:3923  QuickBooks, how the dean processed it.
03:32:4024    Q. You were the person who split it up into two

---

Page 663

03:32:43 1  separate --
03:32:43 2    A. Because of the system. The health care
03:32:46 3  database is how you -- I had to do it. It's not
03:32:50 4  because I wanted to. You had to in that system.
03:32:53 5    Q. Meaning, you had to go into the database
03:32:55 6  provided by the benefits-providing agency to switch
03:33:00 7  this person over to COBRA?
03:33:01 8    A. Yes, sir. It was a different code.
03:33:02 9    Q. And the benefits company sent NHCS a bill
03:33:0610  for all of the employment benefits, and you had to
03:33:0811  figure out a way to split out the people who were on
03:33:1112  COBRA for bookkeeping purposes?
03:33:1213    A. For bookkeeping and for accounts receivable,
03:33:1514  because you had to indicate to them each year --
03:33:1815  each month how much it cost. They would get a bill.
03:33:2216  If they had an e-mail, I would send it to them by
03:33:2617  e-mail. They'd get a bill, then I'd receive it.
03:33:2718  I'd go to QuickBooks against that invoice, received
03:33:3019  the amount. It had to be all fancydancy.
03:33:3320    Q. You had to figure out a way to meet all the
03:33:3521  complications?
03:33:3622    A. Yes. To reach the -- What was it,
03:33:3923  compliance, account, general convoy, something,
03:33:4324  blah, blah, blah. It was a headache.

---

Page 664

03:33:45 1    Q. Talking about the generally accepted
03:33:47 2  accounting principles?
03:33:48 3    A. Yeah.
03:33:48 4    Q. So you had to figure out a way to reconcile
03:33:51 5  this COBRA problem with the generally accepted
03:33:54 6  accounting principles?
03:33:55 7    A. Yes, on the QuickBooks.
03:33:56 8    Q. How did you do that?
03:33:57 9    A. Internet Google.
03:33:5810    Q. So you just did Internet research on how to,
03:34:0211  consistent with GAAP, record these payments and
03:34:0612  split them out in a way that was compliant?
03:34:0813    A. And with COBRA. COBRA says, What is
03:34:1014  accounts receivable, how do you do it in the system?
03:34:1315       And it was a code process for me because
03:34:1916  I never done it before, but if I had to process it
03:34:1917  in QuickBooks and Genevieve had to do the
03:34:2518  reconciling, it had to make sense. You couldn't,
03:34:2719  like -- You had to record it.
03:34:2920       I wanted to have a record of monies that
03:34:3121  came in because from that record the dean would run
03:34:3722  out reports for the board.
03:34:3823    Q. Okay. And was it two things you had to
03:34:4224  resolve? Did you have to resolve the requirements

---

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

6f17292b-b5fb-4467-9523-0d9097f86c8a

Page 665

03:34:44 1  of COBRA with the GAAP?  Is that what you're telling
03:34:47 2  me?
03:34:47 3      A.  Yes.  I had to make sure it was generally
03:34:50 4  acceptable accounting principles.  I wasn't an
03:34:53 5  accountant.
03:34:53 6      Q.  But you also had to look at the requirements
03:34:55 7  of the COBRA statute?
03:34:57 8      A.  Yes.
03:34:57 9      Q.  You had to bring those two things together?
03:34:58 10     A.  Yes.
03:34:59 11     Q.  And that had never been done before, so you
03:35:01 12  had to figure it out?
03:35:02 13     A.  I hadn't done it before.
03:35:03 14     Q.  It hadn't been done before at NHCS?
03:35:06 15     A.  No, because they would just bring it
03:35:08 16  in-house.  If we were ever audited, I didn't want them
03:35:16 17  looking bad.
03:35:16 18     Q.  So you had to make sure that whatever
03:35:18 19  process was set up to take in and pay out COBRA
03:35:23 20  benefits was compliant with all of the relevant laws
03:35:27 21  and would withstand audit?
03:35:30 22     A.  Yes, sir.
03:35:30 23     Q.  How long did that take you?
03:35:31 24     A.  You had to learn it.  I don't know.

Page 666

03:35:38 1      Q.  What's your best memory of how long it took
03:35:40 2  you?
03:35:40 3      A.  A week, two, three.  You had to get it down
03:35:45 4  because after Sylvia elected to do it, there was
03:35:47 5  another gentleman who elected to do it.
03:35:52 6      Q.  So this came up more than once?
03:35:53 7      A.  I had, like, two or three people at COBRA.
03:35:56 8      Q.  Was it the same each time?
03:35:57 9      A.  No.  One was -- No.  Some got dental, some
03:36:06 10  got family, some got family dental.
03:36:09 11     Q.  So any of those complications, those
03:36:10 12  add-ons, you had to figure out how to reconcile with
03:36:13 13  GAAP, with COBRA, with all that stuff?
03:36:15 14     A.  Each person did it differently.  You had
03:36:18 15  access to those databases, and you had to change
03:36:24 16  them within the system.
03:36:27 17         My biggest headache was coming up to all
03:36:29 18  those new teachers coming in.  How do you do a group
03:36:32 19  enrollment without clicking 15 times and entering --
03:36:36 20  I think there was a group way you could do it, but I
03:36:40 21  was gone by then.  It wasn't my headache.
03:36:41 22     Q.  You were trying to figure out the most
03:36:43 23  efficient way to do it?
03:36:44 24     A.  You could put a group in and it all got

Page 667

03:36:47 1  sucked in at one time.
03:36:47 2      Q.  And you never, in fact, figured out how to
03:36:49 3  do it, or you just never got around to it?
03:36:50 4      A.  I had figured it out, but I was terminated
03:36:53 5  by then.  This was whoever came behind me.
03:36:57 6      Q.  When NHCS carried people on payroll, do you
03:36:59 7  know if it charged a premium above the amount
03:37:01 8  actually charged by the benefits provider?
03:37:03 9      A.  No, sir.  Whatever we would charge was the
03:37:07 10  check we issued.
03:37:08 11     Q.  So the people who were on the COBRA rolls
03:37:10 12  were paying the exact amount of the premiums charged
03:37:14 13  by the provider?
03:37:14 14     A.  Yes.
03:37:17 15     Q.  Did you have any other problems that you had
03:37:18 16  to resolve with signing people up for benefits?
03:37:20 17     A.  The biggest thing we had coming on from FDNH
03:37:30 18  was the Teachers' Retirement System.
03:37:32 19     Q.  Tell me about that.
03:37:35 20     A.  Okay.  It's a manual system.  Nothing from
03:37:39 21  Ceridian can be imported into that system and
03:37:43 22  nothing from that system can be imported into
03:37:45 23  Ceridian.
03:37:45 24     Q.  In an automatic way, is that what you're

Page 668

03:37:48 1  talking about?
03:37:48 2      A.  Yes, because you can export and import.  So
03:37:53 3  what happened is, I'm assuming the payroll person
03:37:56 4  from Federated had updated the current year's base.
03:38:00 5      Q.  And you're talking about the contributions
03:38:02 6  that the teachers need to make under the Teachers'
03:38:05 7  Retirement System?
03:38:05 8      A.  Based on their monthly salary.
03:38:07 9      Q.  And is that determined by a formula?
03:38:09 10     A.  Yes, it is determined by a formula.  When
03:38:12 11  they came in, new hires, blah, blah, blah.  And the
03:38:15 12  guy taught you how to do that.  I went to a class
03:38:19 13  for that.
03:38:19 14     Q.  Where did you go to the class?
03:38:20 15     A.  It was in Boston.  It was in the North End
03:38:27 16  somewhere.
03:38:28 17     Q.  Do you know what agency or company provided
03:38:29 18  the training?
03:38:30 19     A.  The board, the Massachusetts Teachers'
03:38:34 20  Retirement Board.
03:38:35 21     Q.  Okay.  So you're telling me about the
03:38:36 22  formula that determines the contributions and the
03:38:39 23  benefits under the Massachusetts Teachers'
03:38:42 24  Retirement System?

66 (Pages 665 to 668)

6f17292b-b5fb-4467-9523-0d9097f86c8a

Janice L. Stevenson, Vol. 2                    09/14/2006

---

Page 673

03:43:25 1    A. At FDNH.
03:43:27 2    Q. You were the only person providing services
03:43:29 3    to NHCS who could solve this payroll issue involving
03:43:33 4    the Massachusetts Teachers' Retirement Board?
03:43:35 5    A. Yes, sir. And whoever the liaison was over
03:43:40 6    at that board.
03:43:41 7    Q. The Government employee?
03:43:42 8    A. Yes, sir.
03:43:43 9    Q. And we also talked about the payroll system
03:43:46 10   and how you implemented the new Ceridian system
03:43:48 11   after TuckNT took over from FDNH?
03:43:51 12   A. Yes, sir.
03:43:51 13   Q. Did anyone else at NHCS know how to do that?
03:43:56 14   A. The dean was supposed to know.
03:43:57 15   Q. Did he actually know?
03:43:59 16   A. I don't think he actually knew.
03:44:00 17   Q. So he didn't look over your shoulder and
03:44:10 18   tell you how to do the stuff; you had to figure it
03:44:10 19   out yourself?
03:44:10 20   A. Yes, sir. I had to either call customer
03:44:13 21   service at Ceridian or read the manual.
03:44:17 22   Q. Or conduct Internet research or whatever
03:44:20 23   else you needed to do to figure out how to make the
03:44:22 24   systems work the way they needed to work?

---

Page 674

03:44:24 1    A. Yes, sir.
03:44:24 2    Q. Is that why you believe you needed to work
03:44:29 3    so many hours?
03:44:30 4    A. No, that wasn't why I worked so many hours.
03:44:35 5    I worked so many hours because -- I think we briefly
03:44:41 6    discussed -- Remember when in August 2004 a lot of
03:44:44 7    changes happened to payroll records?
03:44:46 8    Q. You're talking about the August 2004 changes
03:44:48 9    to the regulations governing the Fair Labor
03:44:51 10   Standards Act?
03:44:52 11   A. Yes, sir.
03:44:52 12   Q. Okay.
03:44:53 13   A. And then when it came over to us I realized
03:44:56 14   that a lot of the master payroll that's required by
03:44:58 15   law was not there.
03:44:59 16   Q. You mean, information that needed to be
03:45:04 17   recorded in conjunction with the school's payroll
03:45:06 18   function because the Fair Labor Standards Act wasn't
03:45:09 19   being kept?
03:45:09 20   A. And because the law says that it has to be a
03:45:14 21   master record for people you paid and it had to
03:45:19 22   include name, address and blah, blah, blah, blah.
03:45:22 23   At least it had to be a minimum. A lot of that was
03:45:26 24   not there. A lot of the payroll records were not in

---

Page 675

03:45:31 1    compliance.
03:45:32 2    Q. How did you come to find that out?
03:45:33 3    A. SHRM.
03:45:37 4    Q. So through the courses you'd taken at the
03:45:40 5    Society for Human Resources Management you developed
03:45:43 6    an understanding of what the Fair Labor Standards
03:45:46 7    Act required and you looked at the payroll system
03:45:49 8    that NHCS actually had in place and you determined
03:45:51 9    based on your own understanding that it didn't
03:45:53 10   comply?
03:45:54 11   A. Well, yeah. And I told the dean these
03:45:57 12   didn't comply. If there was an audit and these
03:46:01 13   records were together, the Department of Labor would
03:46:04 14   come in and -- they told me the last thing should
03:46:08 15   have been separated and that some things should have
03:46:11 16   be kept that we didn't have. The I-9s were in
03:46:15 17   horrible shape. What can you say? Some of these
03:46:17 18   were years old.
03:46:18 19   Q. And these were all problems that you
03:46:20 20   recognized based on your training. They weren't
03:46:22 21   something that someone else told you needed to be
03:46:24 22   done?
03:46:24 23   A. Based on what I had read.
03:46:28 24   Q. And the preparations you made to get the PHR

---

Page 676

03:46:31 1    certification?
03:46:31 2    A. Yeah.
03:46:35 3    Q. Any other problems that you had to resolve
03:46:37 4    with respect to payroll?
03:46:38 5    A. No. Once you learned it and once -- Because
03:46:46 6    there was a worksheet I used to make sure that my
03:46:50 7    numbers matched what was in Ceridian so the payroll
03:46:53 8    would come out right the first time.
03:46:56 9    Q. So no other problems in terms of
03:46:58 10   implementing the payroll system or keeping it going?
03:47:00 11   A. No. It was just you did it. To me it was
03:47:09 12   always a problem, but you just did it.
03:47:11 13   Q. So each time you ran payroll were there
03:47:13 14   certain problems you had to resolve?
03:47:15 15   A. Only if someone had -- My biggest thing was
03:47:21 16   determining this bonus pay some teachers would get
03:47:25 17   because when you put it in and I looked at it,
03:47:27 18   sometimes that net pay was lower, so I had to make a
03:47:30 19   decision to run it on a separate check.
03:47:32 20   You could either include it with the
03:47:34 21   same amount and somehow we got taxed more or you put
03:47:38 22   it in a separate check, same payroll, put that 25
03:47:42 23   percent. It didn't interfere with their check. It
03:47:49 24   was preference, whichever was more beneficial to the

---

68 (Pages 673 to 676)

6f17292b-b5fb-4467-9523-0d9097f86c8a

Janice L. Stevenson, Vol. 2                    09/14/2006

---

Page 677

03:47:51 1  employee.
03:47:52 2      Q. And it was a logistical issue where you had
03:47:55 3  to figure out where the tax consequences to the
03:47:58 4  employee would be most favorable?
03:48:00 5      A. Yes, sir.
03:48:00 6      Q. Was anyone helping you with that?
03:48:01 7      A. No, sir, there was no one there to help me.
03:48:03 8      Q. Okay.
03:48:04 9      A. Pam had her chores. I was by myself. If I
03:48:0810  didn't call Ceridian or Jeanne --
03:48:1011      Q. Jeanne at FDNH?
03:48:1212      A. Jeanne at FDNH. It's like, figure it out.
03:48:1613  Man up.
03:48:1714      Q. Did Dean Chokshi ever help you solve any of
03:48:2115  these problems?
03:48:2116      A. No.
03:48:2217      Q. Do you think he could have if he wanted to?
03:48:2318      A. He probably could, but come on, he had his
03:48:2619  own stuff to do.
03:48:2720      Q. So he wasn't monitoring your progress on any
03:48:3021  of this stuff. He just assumed you would get it
03:48:3222  done?
03:48:3323      A. He assumed it would be done. And that was
03:48:3524  my expectation. Just do it. Whatever it takes,

Page 678

03:48:40 1  just do it.
03:48:41 2      Q. You didn't think you needed any supervision,
03:48:43 3  you could figure it out?
03:48:44 4      A. I was supervised because I was accountable.
03:48:46 5      Q. You were accountable for the ultimate
03:48:48 6  outcome of the few areas of responsibility that you
03:48:51 7  had?
03:48:51 8      A. That's right. If it went wrong, come on. I
03:48:53 9  don't want -- Pick a check that you want to come out
03:48:5610  wrong. You don't want that responsibility of
03:48:5811  someone not getting a check, a wrong check. So it
03:49:0312  was like, Okay. Everyone has to get a correct
03:49:1013  check.
03:49:1014      But see, we had this -- See, there was
03:49:1615  such bad blood with payroll that we had this
03:49:2116  standard that if you don't get it right, it's never
03:49:2517  been right before. So it was like you felt this
03:49:2818  pressure to -- So when the first one came out right,
03:49:3219  Okay. The second one came out right, Okay. The
03:49:3620  third one came out right, there may be a pattern
03:49:4021  here because they had never had correct payroll.
03:49:4322  They said they would go over there and it would be
03:49:4523  like pulling teeth.
03:49:4624      Q. That was a pretty significant accomplishment

Page 679

03:49:48 1  for the school to get the payroll right?
03:49:50 2      A. For the school and under the administration.
03:49:53 3  And it was a lot of pressure.
03:49:55 4      Q. And do you think you were primarily
03:49:56 5  responsible for that accomplishment? Did anyone
03:50:01 6  else at the school really contribute to it?
03:50:03 7      A. No.
03:50:03 8      Q. So it was all you?
03:50:05 9      A. It was all me. It was a lot of pressure.
03:50:0710      Q. Anything else in terms of issues you
03:50:1211  resolved with payroll?
03:50:1312      A. None I can think of specifically. When I
03:50:1813  think of payroll right now, I shudder. I don't know
03:50:2314  if I'd rather stay unemployed or do payroll. No, I
03:50:2615  don't want to do payroll no more.
03:50:2816      Q. Because it's so complicated and so many
03:50:3117  things can go wrong?
03:50:3118      A. First of all, there's a lot of compliance
03:50:3419  with payroll.
03:50:3420      Q. In terms of complying with federal and state
03:50:3621  law?
03:50:3722      A. Federal and state law. And then there is --
03:50:4023  Well, you know, state law determined wages. The
03:50:4324  dean and I was like, Oh, we can pay them this. We

Page 680

03:50:48 1  had this big discussion. He was going to go ahead
03:50:50 2  and give people who had not accrued sick and
03:50:54 3  vacation time their vacation. He says, We will take
03:50:57 4  it out if they leave early. I says, We can't do
03:51:01 5  that. He says, Yes, we can.
03:51:03 6      So I had to go pull state law that says
03:51:05 7  unless they agreed to it, unless they signed -- we
03:51:09 8  can't do it. He says, I didn't know that.
03:51:11 9      Q. So you had to educate Dean Chokshi on the
03:51:1410  requirements of state law to make sure the payroll
03:51:1611  got done right?
03:51:1712      A. And even though he knew, sometimes he still
03:51:1913  wanted you to do stuff that I felt uncomfortable
03:51:2214  doing.
03:51:2215      Q. So you had to advise him on what you thought
03:51:2516  was the best way to do payroll?
03:51:2717      A. I had to advise him and just go ahead and do
03:51:2918  it because I'm -- If I process a payroll and I have
03:51:3719  a document or I don't have any verification or some
03:51:4220  sort of authorization to do it, I'm uncomfortable
03:51:4621  doing it.
03:51:4822      The law says you can only pay this
03:51:5123  person, but you must have this. Come on. That's as
03:51:5424  specific as you can get. But you're given orders to

69 (Pages 677 to 680)

6f17292b-b5fb-4467-9523-0d9097f86c8a

Janice L. Stevenson, Vol. 2                    09/14/2006

Page 681

03:51:58 1    do something else.  No.
03:51:59 2        Q.  So we discussed you were solely responsible
03:52:01 3    for those compliance issues with payroll; is that
03:52:04 4    right?
03:52:04 5        A.  Well, yes.  Making him aware of them and
03:52:09 6    making employees aware of them.
03:52:11 7        Q.  Making sure that it was actually done right?
03:52:13 8        A.  Well, yeah.  According to the law.  And
03:52:16 9    maybe someone with experience would not have cared,
03:52:1910    but I didn't have experience, so I had to care.
03:52:2111        Q.  You had to use the training you had taken up
03:52:2412    in preparation for the PHR certificate to sort of
03:52:2713    train yourself up and apply those skills?
03:52:3014        A.  And then the dean says, you know, This has
03:52:3415    become a headache.
03:52:3516        Q.  The compliance issues?
03:52:3617        A.  Yes.
03:52:3718        Q.  Because they had not done that previously?
03:52:3919        A.  Yeah.  No one cared previously.  I says,
03:52:4620    There's a difference when there's a third party you
03:52:5021    can point to, but right now it's in our lap.
03:52:5122        Q.  In your lap, you mean?
03:52:5323        A.  Yeah, specifically me.
03:52:5424        Q.  Now, we've discussed the payroll function in

Page 682

03:52:59 1    some detail.  Before we get into details, you also
03:53:02 2    provided accounts payable services through TuckNT to
03:53:06 3    NHCS, correct?
03:53:08 4        A.  Yes.
03:53:08 5        Q.  And accounts receivable services through --
03:53:10 6        A.  Yes, sir.
03:53:10 7        Q.  -- TuckNT to NHCS?
03:53:14 8        A.  Yes, sir.
03:53:14 9        Q.  We talked about benefits enrollment?
03:53:1710        A.  Yes.  401(k), health, dental, life
03:53:2011    insurance.
03:53:2012        Q.  Okay.  You told me about how you went about
03:53:2313    the enrollments for the Teachers' Retirement System?
03:53:2614        A.  Yes, sir.
03:53:2715        Q.  Were there similar issues with the other
03:53:2916    benefits that you just mentioned?
03:53:3017        A.  No.  If they elected to take them, they were
03:53:3518    enrolled in them.
03:53:3619        Q.  Did you specifically enroll them?
03:53:3720        A.  Yes, sir.
03:53:3821        Q.  How did you go about them?
03:53:4022        A.  You're given access to each provider's
03:53:4223    Website and you put the employee in.
03:53:4424        Q.  And are there any strictures with which you

Page 683

03:53:48 1    have to comply in signing people up?
03:53:49 2        A.  Yes, sir.  Each one had its own quirk to it,
03:53:54 3    and each one had its own log in, each one had its
03:53:57 4    own manual.  You know, you had to -- To work in that
03:54:05 5    database you had to do it according to its rules.
03:54:10 6        Q.  Did you have to have an understanding of the
03:54:10 7    benefits that that provider was making available in
03:54:13 8    order to sign people up?
03:54:13 9        A.  I didn't have an understanding to begin
03:54:1610    with, but as you work with them, you heard people
03:54:1711    saying, Oh, you know, it's a dog, or, It's not worth
03:54:2112    it, or some of them they like, some of them I didn't
03:54:2413    because I didn't participate in it.
03:54:2514        Q.  You're talking about the specific benefits
03:54:2715    that were available from each provider and the
03:54:2916    options that people have?
03:54:3217        A.  Yes.
03:54:3218        Q.  And through administering those benefits you
03:54:3419    eventually became familiar with them?
03:54:3520        A.  Familiar with the -- Yes.  It's reputation.
03:54:3921        Q.  How many months would you say it took you
03:54:4422    until you were fully familiar with those benefits
03:54:4823    providers?
03:54:4924        A.  Probably toward April, May.  Six months into

Page 684

03:54:52 1    it, seven months into it.
03:54:54 2        Q.  By then you felt like you had a good
03:54:55 3    understanding of each of the benefits plans and the
03:54:59 4    employees' options?
03:55:00 5        A.  Yes, sir.
03:55:00 6        Q.  Did you ever have to resolve any issues
03:55:04 7    related to enrolling people in benefits other than
03:55:07 8    the Teachers' Retirement Board problem we talked
03:55:10 9    about?
03:55:1010        A.  Other than making sure that they changed
03:55:1511    your agency because if they were a Boston public
03:55:1912    school, they had to go in as -- in that database
03:55:2513    themselves and say, I'm no longer with Boston public
03:55:2914    schools.  I'm at Neighborhood House, because it's
03:55:3115    considered its own school district.  You had to make
03:55:3616    sure new teachers enrolled in it.
03:55:4017        Q.  New teachers enrolled in the benefits
03:55:4218    programs?
03:55:4219        A.  In the retirement, if they had never taught
03:55:4620    before.  If they had taught before, you had to make
03:55:4821    sure that they changed the agencies.  That was a big
03:55:5122    issue.
03:55:5223        Q.  How did you go about administrating that?
03:56:0024        A.  Well, for the first group that came in, the

70  (Pages 681 to 684)

6f17292b-b5fb-4467-9523-0d9097f86c8a

Janice L. Stevenson, Vol. 2                                    09/14/2006

Page 689

04:00:13 1    Q. And did you get involved in that situation
04:00:15 2   in any way?
04:00:16 3    A. I don't know if I called -- I think I called
04:00:22 4   Department of Education and they said, Well, if
04:00:24 5   she's already working at the school, she has this ID
04:00:27 6   number, because I think they wanted her to generate
04:00:30 7   something. PSI wanted her to have something.
04:00:33 8    I said, If she's getting a check from a
04:00:36 9   school, she has an ID number on that. Even if she
04:00:39 10  didn't have a social, something that they take taxes
04:00:41 11  from. And we can use that in our system.
04:00:45 12    Q. And you figured out how to reconcile the
04:00:48 13  compliance issues even though this person didn't
04:00:51 14  have a technically compliant I-9; is that what
04:00:54 15  you're telling me?
04:00:54 16    A. Yeah, a technically compliant, because PSI
04:00:57 17  manager brought it to me and I posed it to another
04:01:00 18  agency, like the Department of Education, and they
04:01:02 19  told me, If she has this, that's good.
04:01:05 20    So I told her, Per this person, if she
04:01:08 21  has this, this is good. It was up to the manager to
04:01:12 22  get it from her and give it to me, because I
04:01:15 23  couldn't put it into my system without that
04:01:17 24  information.

Page 690

04:01:17 1    Q. Okay. So you told them what you needed
04:01:19 2   regarding this woman?
04:01:20 3    A. Yes, sir.
04:01:21 4    Q. And did they ever actually give it to you?
04:01:23 5    A. I think they did.
04:01:23 6    Q. Okay. And then you determined that NHCS and
04:01:27 7   PSI were in compliance with all the applicable
04:01:31 8   regulations?
04:01:31 9    A. Yes, sir.
04:01:32 10    Q. Other human resources-related functions, did
04:01:37 11  you, for example, make up personnel files?
04:01:39 12    A. Yeah, you had to initiate a personnel file.
04:01:42 13    Q. And when you say "you," you mean you,
04:01:45 14  Ms. Stevenson, put together personnel files?
04:01:48 15    A. Yes.
04:01:48 16    Q. What did you do to do that?
04:01:49 17    A. Well, I had to determine exactly what needed
04:01:51 18  to be in there and what didn't need to be in there.
04:01:54 19    Q. How did you do that?
04:01:55 20    A. Research.
04:01:56 21    Q. Again, Internet-type research?
04:01:58 22    A. Internet-type research, no. I-9s should not
04:02:04 23  be in with the personnel file. It should be by
04:02:06 24  itself. And then there should be a place for just

Page 691

04:02:11 1   general information, a place for their licenses or
04:02:15 2   certificates, a place for even -- I didn't realize
04:02:21 3   this, but the drug test information had to be in a
04:02:25 4   separate thing.
04:02:26 5    Q. So you're actually talking about the
04:02:28 6   confluence of a bunch of different regulations?
04:02:31 7    A. Yes.
04:02:31 8    Q. And you had to figure out how those come
04:02:34 9   together and then make up the personnel files?
04:02:36 10    A. Yes. To make sure when someone hands you a
04:02:39 11  personnel file or someone had to review it they
04:02:41 12  wasn't seeing information that was restricted from
04:02:44 13  being seen outside of employment, drug test
04:02:49 14  information or --
04:02:49 15    Q. Basically, you just had to ensure that NHCS
04:02:55 16  complied with all of these various federal laws?
04:02:58 17    A. Yes.
04:02:58 18    Q. Did you set up a personnel file for
04:03:04 19  yourself, Ms. Stevenson, or did you not because
04:03:05 20  TuckNT was a vendor?
04:03:07 21    A. No. I was in accounts payable.
04:03:09 22    Q. So because you were providing services to
04:03:12 23  the school through TuckNT you didn't need to set up
04:03:15 24  a personnel file for yourself?

Page 692

04:03:16 1    A. No, sir.
04:03:17 2    Q. And you didn't, in fact, do that?
04:03:19 3    A. No. It wasn't my understanding that I
04:03:24 4   should or could.
04:03:26 5    Q. Based on the fact that you had your company,
04:03:29 6   and your company was the entity through which you
04:03:31 7   were providing services to NHCS?
04:03:33 8    A. Yeah. And it wasn't considered an employee.
04:03:36 9    Q. Okay. Any other HR functions that you
04:03:40 10  performed?
04:03:41 11    A. Other than also suggest that certain
04:03:50 12  employees didn't meet exempt status just because
04:03:53 13  you're called a manager. It wasn't based on title
04:03:56 14  anymore. It was based on duties.
04:03:58 15    Q. And again, you're talking about your
04:04:02 16  understanding and interpretation of the August 2004
04:04:06 17  regulations governing the FLSA?
04:04:06 18    A. Yeah. The way it read, it was duties. We
04:04:09 19  had a lot of people who weren't managers with the
04:04:11 20  job title managers.
04:04:13 21    Q. And so you informed some individual that you
04:04:14 22  thought there might be FLSA exemption compliance
04:04:18 23  issues as to those people?
04:04:19 24    A. The dean and --

72 (Pages 689 to 692)

6f17292b-b5fb-4467-9523-0d9097f86c8a