## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANICE STEVENSON, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO.  05-CV-11584-DPW |
| ) | |
| NEIGHBORHOOD HOUSE ) | |
| CHARTER SCHOOL, ) | |
| Defendant. ) | |
| ) | |

## DEFENDANT'S  OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL EMPLOYMENT, WAGE AND OTHER RECORDS

Defendant Neighborhood House Charter School ("NHCS" or the "School") submits this memorandum in Opposition to Plaintiff's Motion to Compel Employment, Wage, and Other Records from Defendant (docket no. 63).  Like the numerous other motions Plaintiff Janice Stevenson ("Plaintiff" or "Stevenson") has filed in this matter, her Motion to Compel is meritless and advanced in bad faith.  Plaintiff seeks an Order directing NHCS to produce a personnel file and records of hours she worked in performing services for the School, documents she contends NHCS was required to keep for each of its employees.  No such documents exist because Stevenson provided services to NHCS through her own Company, TuckNT, and all parties to that relationship treated Stevenson as an independent contractor, and not an employee of the School.  The depths of Stevenson's bad faith are illustrated by the fact that her own deposition testimony in this matter establishes that she knows the documents she seeks in her Motion to Compel never existed.  Stevenson's company, TuckNT, was charged with the maintenance of such records for the School, and she never created any such documents pertaining to herself because she understood that she was not an employee of NHCS.  Stevenson's latest Motion to

Compel is yet another act of dilatory gamesmanship, and the Court should deny her motion and sanction her harshly for her frivolous filing.

<u>BACKGROUND</u>

In conjunction with Plaintiff's fourth set of document requests,[1] Stevenson sent a cryptic e-mail message to NHCS's counsel in which she appeared to take the untenable position that the School was required by law to maintain certain documents pertaining to her. She stated, ". . . the School, my previous employer, has a statutory duty to maintain time records and employee records." *See* November 8, 2006 e-mail correspondence, attached hereto as Exhibit A, p. 2-3. In response, NHCS's counsel explained the flaw in Stevenson's reasoning to her, noting that the School had at all times treated the services that she provided to NHCS through her own company as those of an independent contractor, and not an employee. Exhibit A, p. 1. NHCS's counsel further explained that the statutes on which her request was based do not apply to independent contractors. *Id.*

Stevenson did not respond in substance to NHCS's communication regarding the documents she had requested. Instead, she sent a message stating that she did not understand NHCS's counsel's message. *See* November 9, 2006, e-mail correspondence, attached hereto as Exhibit B, p. 1. In response, NHCS's counsel offered to discuss further any point that Stevenson claimed not to understand. *Id.* Stevenson did not engage in any further communications with NHCS's counsel on this subject. Three months after her last communication with NHCS's counsel about her request for employment-related records, Stevenson filed her Motion to Compel.

---

[1] NHCS apprised Stevenson in writing that her numerous discovery requests were in excess of the limitations imposed by Local Rule 26.1(c). *See* Exhibit A, p. 1. Stevenson refused to withdraw her excessive requests. Notwithstanding Stevenson's refusal to comply with the applicable Local Rule, NHCS provided complete written responses to each of her sets of document requests.

Stevenson now seeks a Court Order requiring the School to compel the production of the same documents that NHCS's counsel has explained to her do not exist. In her Motion to Compel, she contends that NHCS has failed or refused to produce "statutorily required documents." *See* Motion to Compel, ¶ 2. She apparently contends that NHCS has withheld from its productions in this matter a personnel file and records of hours that Stevenson worked in providing services to the School.

<u>**ARGUMENT**</u>

Stevenson's Motion to Compel is defective in at least two respects. First, the documents she seeks do not exist and never existed because her requests are based on the false premise that she was an employee of the School. Second, Stevenson has disregarded the requirements of the Local Rules and this Court's Orders by filing a frivolous motion to compel without consulting in good faith with NHCS's counsel regarding the documents she seeks.

**I.     The Employment and Wage Records That Plaintiff Seeks Do Not Exist Because She Was Not an Employee of the School**

NHCS did not maintain a personnel file or the other "statutorily required documents" that Stevenson seeks because the statutes she cites in her Motion to Compel do not apply to independent contractors. Stevenson apparently argues that NHCS was required to maintain a personnel file on her pursuant to the Massachusetts Personnel Record Statute, Mass. Gen. Laws ch. 149, § 52C, and that the School was required to maintain documentation of the hours that she worked pursuant to the records keeping provision of the Fair Labor Standards Act, 29 U.S.C. § 211(c). By their express terms, each of these statutes are applicable only to "employees" and not to independent contractors. By insisting that NHCS must be in possession of records that employers are mandated to maintain regarding their employees, Stevenson has begged the ultimate question in this case: whether she was an employee or an independent contractor.

Stevenson's stubborn contention that NHCS *must* have a personnel file on her and records of the hours she worked is also made in bad faith because Stevenson knows that those documents, in fact, never existed. Even before NHCS's counsel described the flaw in Stevenson's reasoning to her, Stevenson knew that the documents that are the subject of her Motion to Compel were never created. At her deposition in this matter, Stevenson testified that as part of the human resources administrative services that her company provided to NHCS, she assumed responsibility for compiling personnel files for the School's employees. *See* excerpted transcript of deposition of Janice Stevenson, attached hereto as Exhibit C, 690:10-15. Stevenson further testified that *she did not create a personnel file for herself because she understood that she was an independent contractor, and not an employee of NHCS*. *Id*., 691:18 – 692:8. Similarly, Stevenson knows that NHCS has no records of the hours she worked in providing services for the School. She testified that, though she was responsible for collecting and analyzing time sheets for the School's employees, she never submitted any document to the School containing a record of the hours she worked or claimed to have worked. *Id*., 304:8-12, 329:12 – 330:1, 332:5-9, 697:16-18. Stevenson's claims that NHCS has withheld these documents described in her Motion to Compel is, therefore, entirely disingenuous.

II.    **Stevenson's Motion to Compel is Procedurally Improper and In Violation of the Magistrate Judge's Order**

Stevenson did not consult with counsel for NHCS in a good faith effort to narrow any areas of disagreement before she filed her Motion to Compel. She raised the issue of the documents she now seeks in a cryptic e-mail message, and NHCS's counsel explained to her the reasons that her requests for those documents were misplaced. *See* Exhibit A. Stevenson responded only to the effect that she did not understand NHCS's counsel's communication. *See*

4

Exhibit B.  NHCS's counsel offered to engage in further discussion of the issue, but Stevenson did not respond.  *Id.*  Instead, she opted to file a motion to compel three months later.

Stevenson's failure to discuss with NHCS's counsel in good faith the existence of the documents she now seeks to compel is a plain violation of Local Rule 37.1.  Moreover, the Magistrate Judge clearly and specifically Ordered Stevenson to confer with NHCS's counsel regarding the merits of filing any discovery-related motions before submitting such documents to the Court.  *See* Order dated November 7, 2006, p.4 (docket no. 48) ("Should Plaintiff wish to submit further discovery motions, Plaintiff must first discuss the merits and necessity of such motions with defense counsel and attempt to come to a resolution before filing said motion").  Stevenson's disregard of the rules and express Orders of this Court provides an independent justification for the Court to deny her Motion to Compel.

## REQUEST FOR SANCTIONS

Like her numerous other filings in this matter, Stevenson has advanced her most recent Motion to Compel in bad faith.  Stevenson seeks an Order requiring NHCS to produce documents that she knows do not exist.  Stevenson testified that she assumed responsibility for maintaining the employment-related documents she seeks, and she never created any such documents pertaining to herself because she knew she was not an employee of the School.  Against this background, the frivolous nature of her motion is unmistakable.  Stevenson filed her Motion to Compel for the sole purpose of imposing additional expense and distraction on NHCS and its constituents.  The Court clearly warned Stevenson against such making such frivolous filings in its November 7 Order, when Magistrate Judge Alexander wrote "Should Plaintiff either file a discovery motion without first consulting with defense counsel or file a motion such that the Court deems frivolous, Plaintiff will be subjected to monetary sanctions and the possibility of terminating sanctions, dismissing her case with prejudice."  November 7, 2006 Order (docket

entry no. 48), p. 4-5.  The Court then reinforced the seriousness of the Magistrate Judge's Order

at a hearing in this matter on January 23, 2007, and provided an unmistakable warning to

Stevenson that further misconduct would not be tolerated.  In the face of stark admonitions from

two federal judges, Stevenson has persisted with her pattern of misconduct and abuse and

demonstrated that her penchant for vexatious litigation is incorrigible.  If there is to be any

prospect of putting an end to Stevenson's antics, the Court must now substantiate its repeated

warnings to Stevenson with harsh sanctions against her.

WHEREFORE, Defendant Neighborhood House Charter School requests that this Court

deny Plaintiff's Motion to Compel Employment, Wage and Other Employment Records (docket

no. 63) in its entirety and enter sanctions against Plaintiff Janice Stevenson in the amount of the

attorneys' fees and costs NHCS has incurred in responding to her frivolous motion.

<div style="margin-left:45%">

Respectfully submitted,
NEIGHBORHOOD HOUSE
CHARTER SCHOOL,
By its attorneys,


    /s/ Barry J. Miller
Lynn A. Kappelman (BBO # 642017)
Barry J. Miller (BBO # 661596)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone:     (617) 946-4800
Telecopier:     (617) 946-4801

</div>

DATED:  February 16 , 2007

<div style="text-align:center; border:1px solid black">

### CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the Court's ECF system
and that a true copy of the above document was served
on Plaintiff *pro se* Janice Stevenson by first class U.S. mail to P.O. Box 400372,
Cambridge, MA 02140 on February 16, 2007.


    /s/ Barry J. Miller
Barry J. Miller

</div>

6

## Miller, Barry

| | |
|---|---|
| **From:** | Miller, Barry |
| **Sent:** | Wednesday, November 08, 2006 3:13 PM |
| **To:** | 'Stevenson Janice' |
| **Cc:** | Kappelman, Lynn |
| **Subject:** | RE: Stevenson v. NHCS |

Ms. Stevenson,

Your suggestion that you cannot appear at our Boston offices for your deposition is implausible. As an initial matter, you have twice appeared at our offices for previous sessions of your deposition, and you testified that you took public transportation to the World Trade Center T station that is directly across the street from our offices to do so. We also refer you to Local Rule 30.1, which states that any location in the City of Boston is deemed as a matter of law to be a convenient place for the taking of a deposition for any person who resides in the counties of Suffolk, Bristol, Essex, Middlesex, Norfolk, Plymouth or Worcester. Though you have improperly refused in prior sessions of your deposition to tell us where you reside, it is clear from your testimony and from the many judicial and administrative proceedings that we have known you to attend that you spend a significant amount of time in Cambridge and Boston, both of which are well within the territory described by the applicable Rule. We will not incur the expense or inconvenience of securing an alternative space within the City of Boston in which to take your deposition, and we will expect you to appear at our offices at or before 10:00 am on December 20, 2006.

Your most recent set of document requests is also wholly inappropriate. Despite your captioning it as your second set of document requests, it is in fact the fourth set of requests you have served on the School. You served three (3) separate sets of requests on NHCS by e-mail on June 22, 2006, to which we responded on July 24, 2006. We notified you both by correspondence dated June 26, 2006 and in our substantive responses to your first three sets of requests that you had exceeded the number of document requests allowed by Local Rule 26.1(C). Your continuing to serve discovery requests without leave of court is in further derogation of that Rule. We, therefore, request that you withdraw your most recent set of document requests immediately, and we reserve the right to seek a protective order and sanctions from the Court if you have not done so prior to the close of business on Wednesday, November 15.

The representations in your message below about documents to which you claim to be entitled by statute are also entirely specious. As you know, it is (and consistently has been) NHCS's position that you were never an employee of the School for purposes of state or federal wage and hour law. The record keeping provisions of the Fair Labor Standards Act and the provisions of Mass. Gen. Laws ch. 149, § 52C have no application to independent contractors. The gravamen of the case you have initiated against the School is a dispute regarding your status as a putative employee, rather than an independent contractor. As we have informed you many times, you cannot rely on your assumption that you may ultimately prevail on the merits of this case to impute additional statutory obligations to NHCS.

In light of the foregoing considerations, we are concerned that you have missed the central point of Magistrate Judge Alexander's Order of November 8. Your message below constitutes exactly the sort of behavior that the Court has clearly stated it will no longer tolerate. If you persist with these tactics, we will be forced to file a motion for further relief with the Court.

Regards,

Barry J. Miller
*Seyfarth Shaw LLP*
Two Seaport Lane, Suite 300
Boston, MA 02210
office phone: (617) 946-4800
direct phone: (617) 946-4806
office fax: (617) 946-4801
direct fax: (617) 790-6753

-----Original Message-----
**From:** Stevenson, Janice W. [mailto:janicestevensonus@gmail.com]
**Sent:** Wednesday, November 08, 2006 1:16 PM
**To:** Miller, Barry
**Subject:** RE: Stevenson v. NHCS

Mr. Miller:

The order states:

# Plaintiff's deposition will continue on

## December 20, 2006 at a time and place to be agreed to by the parties.

Because of my limited financial resources, we need to agree to a location that is
more accessible by me or I can walk to. A possible location could be near Dudley
station (Roxbury), China Town, or downtown crossing.

In addition,

1) Should Plaintiff wish to submit further discovery motions, Plaintiff must first

   discuss the merits and necessity of such motion with defense counsel and

   attempt to come to a resolution before filing said motion.


As you are aware, the School, my previous employer, has a statutory duty to maintain
time records and employee records.

Since these records are mandatory under FLSA and essential to my claim, I am
submitting further request for production of the School's documents. In addition the
School received a request for document production from John Davis, my previous
attorney over a year ago on or around August 2005. Please forward me my personnel
records ASAP.

There are Recordkeeping Requirements Under the Fair Labor Standards Act (FLSA).
The FLSA's recordkeeping Regulations are in 29 CFR Part 516.

What About Timekeeping?: Employers may use any timekeeping method they choose. For example, they
may use a time clock, have a timekeeper keep track of employee's work hours, or tell their workers to
write their own times on the records. Any timekeeping plan is acceptable as long as it is complete and
accurate.

The following is a sample timekeeping format employers may follow but are not required to do so:

| DAY | DATE | IN | OUT | TOTAL HOURS |
|-----|------|----|----|-------------|

Employee Name:

| | | | | |
|---|---|---|---|---|
| Sunday | 5/2/93 | | -------- | |
| Monday | 5/3/93 | 8:00 | 12:02 | |
| | | 1:00 | 5:03 | 8 |
| Tuesday | 5/4/93 | 7:57 | 11:58 | |
| | | 1:00 | 5:00 | 8 |
| Wednesday | 5/5/93 | 8:02 | 12:10 | |
| | | 1:06 | 5:05 | 8 |
| Thursday | 5/6/93 | | -------- | |
| Friday | 5/7/93 | | -------- | |
| Saturday | 5/8/93 | | -------- | |

Total Workweek Hours                    24

How Long Should Records Be Retained: Each employer shall preserve for at least three years payroll records, collective bargaining agreements, sales and purchase records. Records on which wage computations are based should be retained for two years, i.e., time cards and piece work tickets, wage rate tables, work and time schedules, and records of additions to or deductions from wages. These records must be open for inspection by the Division's representatives, who may ask the employer to make extensions, computations, or transcriptions. The records may be kept at the place of employment or in a central records office.

```
-----Original Message-----
From: Miller, Barry [mailto:BMiller@seyfarth.com]
Sent: Tuesday, November 07, 2006 4:12 PM
To: Stevenson, Janice W.
Subject: Stevenson v. NHCS

Ms. Stevenson,

As discussed in my e-mail to you of earlier this afternoon, attached is
a notice of your deposition for December 20 at our offices.  You may
disregard the notice issued for December 8.

Regards,

Barry J. Miller
Seyfarth Shaw LLP
Two Seaport Lane, Suite 300
Boston, MA 02210
office phone: (617) 946-4800
direct phone: (617) 946-4806
office fax: (617) 946-4801
direct fax: (617) 790-6753
```

<<Dec20depo.pdf>>

Any tax information or written tax advice contained herein (including any attachments) is not intended to be and cannot be used by any taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer. (The foregoing legend has been affixed pursuant to U.S. Treasury Regulations governing tax practice.)

This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). If you are not the intended recipient, any disclosure, copying, distribution, or use of the contents of this information is prohibited and may be unlawful. If you have received this electronic transmission in error, please reply immediately to the sender that you have received the message in error, and delete it. Thank you.

## Miller, Barry

| | |
|---|---|
| **From:** | Miller, Barry |
| **Sent:** | Thursday, November 09, 2006 9:43 AM |
| **To:** | 'Stevenson Janice' |
| **Cc:** | Kappelman, Lynn |
| **Subject:** | RE: Stevenson v. NHCS |

Ms. Stevenson,

There are many statements in my e-mail to you of November 8, and it is not feasible to rephrase the entire communication. In sum, we believe that you are required to appear at our offices for your deposition and that the various requests for documents in your message are improper. If there is a particular issue or phrase in my message that you are having difficulty understanding, please identify your question more precisely, and we will endeavor to explain our position further. I note that my message as you have quoted it below has one garbled sentence, and if that is the source of your confusion, it may help you to review a copy of the message in the form that I sent it to you.

I have received only 2 e-mails from you since the hearing on Monday, November 6. One of them is quoted below. The other, dated November 7, related to a scheduling conflict with your deposition on December 8, and that issue has been resolved by rescheduling your deposition for December 20. If you have attempted to send me any other messages since November 6, I have not received them.

Regards,

Barry J. Miller
*Seyfarth Shaw LLP*
Two Seaport Lane, Suite 300
Boston, MA 02210
office phone: (617) 946-4800
direct phone: (617) 946-4806
office fax: (617) 946-4801
direct fax: (617) 790-6753

-----Original Message-----
**From:** Stevenson, Janice W. [mailto:janicestevensonus@gmail.com]
**Sent:** Wednesday, November 08, 2006 10:56 PM
**To:** Miller, Barry
**Subject:** RE: Stevenson v. NHCS

I don't understand your email. Can you rephrase your statement? Did you get my email?

**From:** Miller, Barry [mailto:BMiller@seyfarth.com]
**Sent:** Wednesday, November 08, 2006 3:13 PM
**To:** Stevenson Janice
**Cc:** Kappelman, Lynn
**Subject:** RE: Stevenson v. NHCS

Ms. Stevenson,

Your suggestion that you cannot appear at our Boston offices for your deposition is implausible. As an initial matter, you have twice appeared at our offices for previous sessions of your deposition, and you testified that you took public transportation to the World Trade Center T station that is directly across the street from our offices to do so. We also refer you to Local Rule 30.1, which states that any location in the City of Boston is deemed as a matter of law to be a convenient place for the taking of a deposition for any

person who resides in the counties of Suffolk, Bristol, Essex, Middlesex, Norfolk, Plymouth or Worcester. Though you have improperly refused in prior sessions of your deposition to tell us where you reside, it is clear from your testimony and from the many judicial and administrative proceedings that we have known you to attend that you spend a significant amount of time in Cambridge and Boston, both of which are well within the territory described by the applicable Rule. We will not incur the expense or inconvenience of securing an alternative space within the City of Boston in which to take your deposition, and we will expect you to appear at our offices at or before 10:00 am on December 20, 2006.

Your most recent set of document requests is also wholly inappropriate. Despite your captioning it as your second set of document requests, it is in fact the fourth set of requests you have served on the School. You served three (3) separate sets of requests on NHCS by e-mail on June 22, 2006, to which we responded on July 24, 2006. We notified you both by correspondence dated June 26, 2006 and in our substantive responses to your first three sets of requests that you had exceeded the number of document requests allowed by Local Rule 26.1(C). Your continuing to serve discovery requests without leave of court is in further derogation of that Rule. We, therefore, request that you withdraw your most recent set of document requests immediately, and we reserve the right to seek a protective order and sanctions from the Court if you have not done so prior to the close of business on Wednesday, November 15.

The representations in your message below about documents to which you claim to be entitled by statute are also entirely specious. As you know, it is (and consistently has been) NHCS's position that you were never an employee of the School for purposes of state or federal wage and hour law. The record keeping provisions of the Fair Labor Standards Act and the provisions of Mass. Gen. Laws ch. 149, § 52C have no application to independent contractors. The gravamen of the case you have initiated against the School is a dispute regarding your status as a putative employee, rather than an independent contractor. As we have informed you many times to impute additional statutory obligations to NHCS.
, you cannot rely on your assumption that you may ultimately prevail on the merits of this case
In light of the foregoing considerations, we are concerned that you have missed the central point of Magistrate Judge Alexander's Order of November 8. Your message below constitutes exactly the sort of behavior that the Court has clearly stated it will no longer tolerate. If you persist with these tactics, we will be forced to file a motion for further relief with the Court.

Regards,

Barry J. Miller
*Seyfarth Shaw LLP*
Two Seaport Lane, Suite 300
Boston, MA 02210
office phone: (617) 946-4800
direct phone: (617) 946-4806
office fax: (617) 946-4801
direct fax: (617) 790-6753

-----Original Message-----
**From:** Stevenson, Janice W. [mailto:janicestevensonus@gmail.com]
**Sent:** Wednesday, November 08, 2006 1:16 PM
**To:** Miller, Barry
**Subject:** RE: Stevenson v. NHCS

Mr. Miller:

The order states:

# Plaintiff's deposition will continue on

## December 20, 2006 at a time and place to be agreed to by the parties

```
Because of my limited financial resources, we need to agree to a location
that is more accessible by me or I can walk to.  A possible location
could be near Dudley station (Roxbury), China Town, or downtown crossing.
```

```
In addition,
```

1)    Should Plaintiff wish to submit further discovery motions, Plaintiff must first

discuss the merits and necessity of such motion with defense counsel and

attempt to come to a resolution before filing said motion.

As you are aware, the School, my previous employer, has a statutory duty to maintain time records and employee records.

Since these records are mandatory under FLSA and essential to my claim, I am submitting further request for production of the School's documents.  In addition the School received a request for document production from John Davis, my previous attorney over a year ago on or around August 2005. Please forward me my personnel records ASAP.

There are Recordkeeping Requirements Under the Fair Labor Standards Act (FLSA).  The FLSA's recordkeeping Regulations are in 29 CFR Part 516.

What About Timekeeping?: Employers may use any timekeeping method they choose. For example, they may use a time clock, have a timekeeper keep track of employee's work hours, or tell their workers to write their own times on the records. Any timekeeping plan is acceptable as long as it is complete and accurate.

The following is a sample timekeeping format employers may follow but are not required to do so:

| DAY | DATE | IN | OUT | TOTAL HOURS |
|-----|------|-----|-----|-------------|
| Employee Name: | | | | |
| Sunday | 5/2/93 | | -------- | |
| Monday | 5/3/93 | 8:00 | 12:02 | |
| | | 1:00 | 5:03 | 8 |
| Tuesday | 5/4/93 | 7:57 | 11:58 | |
| | | 1:00 | 5:00 | 8 |
| Wednesday | 5/5/93 | 8:02 | 12:10 | |
| | | 1:06 | 5:05 | 8 |
| Thursday | 5/6/93 | | -------- | |

| Friday | 5/7/93 | -------- |
| Saturday | 5/8/93 | -------- |

Total Workweek Hours                    24

How Long Should Records Be Retained: Each employer shall preserve for at least three years payroll records, collective bargaining agreements, sales and purchase records. Records on which wage computations are based should be retained for two years, i.e., time cards and piece work tickets, wage rate tables, work and time schedules, and records of additions to or deductions from wages. These records must be open for inspection by the Division's representatives, who may ask the employer to make extensions, computations, or transcriptions. The records may be kept at the place of employment or in a central records office.

```
-----Original Message-----
From: Miller, Barry [mailto:BMiller@seyfarth.com]
Sent: Tuesday, November 07, 2006 4:12 PM
To: Stevenson, Janice W.
Subject: Stevenson v. NHCS

Ms. Stevenson,

As discussed in my e-mail to you of earlier this afternoon, attached is
a notice of your deposition for December 20 at our offices.  You may
disregard the notice issued for December 8.

Regards,

Barry J. Miller
Seyfarth Shaw LLP
Two Seaport Lane, Suite 300
Boston, MA 02210
office phone: (617) 946-4800
direct phone: (617) 946-4806
office fax: (617) 946-4801
direct fax: (617) 790-6753


  <<Dec20depo.pdf>>
```

Any tax information or written tax advice contained herein (including any attachments) is not intended to be and cannot be used by any taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer. (The foregoing legend has been affixed pursuant to U.S. Treasury Regulations governing tax practice.)

This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). If you are not the intended recipient, any disclosure, copying, distribution, or use of the contents of this information is prohibited and may be unlawful. If you have received this electronic transmission in error, please reply immediately

```
to the sender that you have received the message in error, and delete it.
Thank you.
```

Any tax information or written tax advice contained herein (including any attachments) is not intended to be and cannot be used by any taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer. (The foregoing legend has been affixed pursuant to U.S. Treasury Regulations governing tax practice.)

This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). If you are not the intended recipient, any disclosure, copying, distribution, or use of the contents of this information is prohibited and may be unlawful. If you have received this electronic transmission in error, please reply immediately to the sender that you have received the message in error, and delete it. Thank you.

Page 1

09:56:32

VOLUME: I

PAGES: 1 to 407

EXHIBITS: See Index

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

JANICE STEVENSON

        Plaintiff       Civil Action

    v.                No. 05-CV-11584-DPW

NEIGHBORHOOD HOUSE CHARTER SCHOOL

        Defendant

- - - - - - - - - - - - - - - - - - x

DEPOSITION of JANICE L. STEVENSON

Thursday, September 7, 2006

10:30 a.m.

Seyfarth Shaw LLP

Two Seaport Lane

Boston, Massachusetts

Michelle Keegan, Court Reporter

eb2827ab-6285-4fb1-b765-9962caa2bd64

Page 302

04:22:53 1    Q. What was the first thing you typically did
04:22:56 2   when you arrived at the school?
04:22:57 3       A. If I didn't go over to where I worked and I
04:23:08 4   thought there was some mail in my box, I would go
04:23:11 5   over there.
04:23:13 6       Q. So you checked your mail?
04:23:14 7       A. In the main office. And then I would go
04:23:17 8   over as I -- Usually it's the last thing I did at
04:23:22 9   night.
04:23:22 10      Q. What was the last thing you did at night?
04:23:24 11      A. I took mail over. Taking the mail over.
04:23:26 12      Q. You're talking about mail addressed to you?
04:23:29 13      A. Mail that's going out.
04:23:30 14      Q. So mail that you were sending out on behalf
04:23:33 15  of the school?
04:23:33 16      A. Yes.
04:23:33 17      Q. That was the last thing you did in the day?
04:23:36 18      A. The last thing I did in the day. If I
04:23:38 19  remembered there was mail, I would go over in the
04:23:40 20  morning and pull it.
04:23:42 21      Q. Mail that had come in to NHCS?
04:23:45 22      A. Mail that come in.
04:23:45 23      Q. And what would you do with that?
04:23:47 24      A. Take it over to the office.

Page 303

04:23:48 1    Q. And someone else would distribute it?
04:23:49 2       A. No. I had to.
04:23:50 3       Q. So you distributed all of the mail that came
04:23:55 4   into the school?
04:23:55 5       A. No. Just for business and Dean Chokshi.
04:23:58 6       Q. Just the administration stuff?
04:23:59 7       A. Yes.
04:24:00 8       Q. And how long did that typically take you?
04:24:05 9       A. 20 minutes. You'd just open it. Most of
04:24:18 10  them were bills. You'd just start processing them.
04:24:21 11      Q. And that was the first thing you did? You
04:24:23 12  didn't stop to get a cup of coffee or anything like
04:24:25 13  that?
04:24:25 14      A. I don't drink coffee.
04:24:27 15      Q. So at 7:30 you went promptly to performing
04:24:30 16  these services that you've just described?
04:24:31 17      A. I would open up offices and get going.
04:24:40 18      Q. So you told me that the first thing you did
04:24:45 19  was open the mail, see what it was, see who it
04:24:49 20  needed to go to and distribute it; is that right?
04:24:52 21      A. (No verbal response)
04:24:52 22      Q. And then what did you do?
04:24:54 23      A. And then if I didn't see Rich or I didn't
04:25:03 24  have any questions, I just started processing what I

Page 304

04:25:08 1   had to do.
04:25:08 2       Q. Who is Rich?
04:25:09 3       A. The facilities manager.
04:25:11 4       Q. What's his last name?
04:25:12 5       A. Minetta.
04:25:15 6       Q. And if you did see him --
04:25:18 7       A. He was always there early.
04:25:19 8       Q. And what would you do if you saw him?
04:25:21 9       A. If I had any issues, I would ask him, What's
04:25:25 10  going on? Mainly I was probably going down his time
04:25:29 11  sheet or reminding him it's time sheet week or
04:25:33 12  asking him about an invoice because he knew the
04:25:37 13  other vendors. He would tell me about some issues
04:25:42 14  or something. Basically, that was it.
04:25:46 15      Q. Okay. So you told me it took you 20 or 30
04:25:51 16  minutes to deal with the mail in the morning and
04:25:53 17  then you would start processing. What was it you
04:25:55 18  were processing?
04:25:56 19      A. Accounts payable was every day. So if there
04:25:59 20  was something I left in the dean's office that had
04:26:01 21  to be signed.
04:26:03 22      Q. Which dean was that? Dean Chokshi?
04:26:06 23      A. Chokshi. I would go over to his office and
04:26:10 24  see had he signed them and pick up what he left on

Page 305

04:26:13 1   his desk and take it back to my office and stuff the
04:26:27 2   checks to be mailed and process any more invoices.
04:26:31 3       Q. Okay. When you processed an invoice, how
04:26:34 4   did you go about that?
04:26:35 5       A. First it came back from the person who
04:26:39 6   received it and their boss with a signature, and
04:26:43 7   then I would set it up for payment in the accounts
04:26:47 8   payable system.
04:26:48 9       Q. And how would you do that?
04:26:49 10      A. I'd just go in and I'd pull it up and type
04:26:57 11  in the payment information. I'd do a whole stack.
04:27:07 12  I used to generate the payment sheet. Dean would
04:27:09 13  say, Go ahead and print the check. Then he says
04:27:12 14  that was too much steps.
04:27:13 15         Then I would just print the check
04:27:16 16  and at that point send notes to his office, pick up
04:27:21 17  the other ones. It was, like, almost daily.
04:27:23 18      Q. And Dean Chokshi actually signed the checks?
04:27:26 19      A. He signed it up to a point. If it was over
04:27:29 20  his signature, it went to -- well, no. Kevin Andrew
04:27:34 21  signed the checks.
04:27:35 22      Q. So Dean Chokshi didn't sign the checks?
04:27:37 23      A. He only signed mine.
04:27:39 24      Q. Okay. The checks payable to TuckNT?

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

eb2827ab-6285-4fb1-b765-9962caa2bd64

Page 326

04:48:56 1    A. No.
04:48:56 2    Q. And I think the record is still going to be
04:49:00 3  a little bit ambiguous, so I'm going to ask you one
04:49:02 4  more time so it's clear. Did you ever receive the
04:49:05 5  calendars that you submitted to the U.S. Department
04:49:07 6  of Labor back from that agency?
04:49:09 7    A. No.
04:49:09 8    Q. And what information was on those calendars
04:49:13 9  that helped you compile this document?
04:49:13 10   A. These hours.
04:49:16 11   Q. So you kept a log each day of the hours that
04:49:19 12  you'd actually worked?
04:49:20 13   A. Yes.
04:49:20 14   Q. And you did that on a daily basis?
04:49:22 15   A. Yes.
04:49:23 16   Q. So every day when you went to NHCS you would
04:49:27 17  mark that you had gotten there at 7:00?
04:49:29 18   A. No. It was my little hand thing that I
04:49:32 19  would keep with. You know how you have --
04:49:36 20   Q. Like a day runner?
04:49:38 21   A. Yeah.
04:49:38 22   Q. So you had a day runner and it had a
04:49:40 23  calendar in it. And what kind of notation would you
04:49:43 24  make in that calendar that would reflect the hours

Page 327

04:49:45 1  you worked?
04:49:46 2    A. Just the time. Basically, the total time,
04:49:51 3  because my specific description of the work I had
04:50:00 4  done was on the invoice.
04:50:04 5    Q. So for each day did you write a number that
04:50:06 6  represented the hours you worked? Is that right?
04:50:07 7    A. Yes, sir.
04:50:08 8    Q. And you did that for every single day during
04:50:10 9  the period of time we're talking about?
04:50:12 10   A. For the affected week there was overtime.
04:50:14 11   Q. So you wrote down only hours in excess of
04:50:17 12  40, is that what you're telling me?
04:50:18 13   A. (No verbal response)
04:50:25 14   Q. Do you understand the question?
04:50:26 15   A. Yeah. That's what I wrote here. These are
04:50:30 16  in excess of 40.
04:50:31 17   Q. I understand what this chart reflects. You
04:50:34 18  contend this chart reflects the number of hours you
04:50:36 19  worked -- Let me get this out because we need to be
04:50:39 20  clear about this. It's actually done by day,
04:50:42 21  correct?
04:50:42 22   A. Yes.
04:50:42 23   Q. What it reflects is the actual number of
04:50:44 24  hours per day you worked in excess of eight,

Page 328

04:50:46 1  correct?
04:50:46 2    A. Yes.
04:50:47 3    Q. So are you telling me that on the day runner
04:50:49 4  which you gave to DOL and never got back, for each
04:50:52 5  day you would write a number that corresponded to
04:50:56 6  the number of hours you worked in excess of eight?
04:51:00 7    A. Yes.
04:51:00 8    Q. And why did you stop doing that?
04:51:03 9    A. Because I wanted it just in case...
04:51:22 10   (Interruption)
04:51:29 11   A. Just in case historical time was needed,
04:51:34 12  like how many hours did it take to set up these
04:51:38 13  systems or did administrative devote to bring in
04:51:44 14  these systems. There was the billed hours and then
04:51:48 15  there was the actual hours that were committed.
04:51:50 16   Q. Okay. I understand what you've told me so
04:51:53 17  far. If that was the reason you were writing these
04:51:55 18  numbers down, why did you only write down the number
04:51:57 19  of hours you worked each day in excess of eight?
04:52:00 20  Why didn't you write down the total number of hours
04:52:02 21  you worked each day?
04:52:03 22   A. Because I didn't need to know if I did 13 or
04:52:19 23  14 or 15 hours. I needed to know the extra time I
04:52:23 24  expended beyond the eight-hour day.

Page 329

04:52:25 1    Q. Why? You're telling me that the reason you
04:52:27 2  tracked this is so that you could tell anybody else
04:52:30 3  who was looking into the matter how long it took to
04:52:32 4  complete a specific project, right?
04:52:33 5    A. That's right.
04:52:34 6    Q. So why didn't you write down the amount of
04:52:36 7  time it took to complete the project instead of the
04:52:38 8  hours in excess of eight?
04:52:39 9    A. Because I had those documented with my --
04:52:43 10  the time I turned in every week or every -- It was
04:52:48 11  every week and then it became every two weeks.
04:52:50 12   Q. Is it your testimony that you turned in a
04:52:52 13  time sheet every week or two weeks during the period
04:52:55 14  of time that you provided services to NHCS?
04:52:57 15   A. Yes.
04:52:57 16   Q. That was separate from the invoices that you
04:52:59 17  submitted?
04:52:59 18   A. No, no, no. That was what I considered time
04:53:02 19  sheets. And it listed tasks that were done.
04:53:06 20   Q. But it didn't list hours of any kind, did
04:53:08 21  it?
04:53:09 22   A. It had to reflect 40 hours.
04:53:11 23   Q. But there are no number of hours reflected
04:53:13 24  on the invoices you submitted to NHCS, are there?

83 (Pages 326 to 329)

Page 330

04:53:17 1    A. No.
04:53:17 2    Q. Okay. So I want you to explain to me, if
04:53:20 3  the purpose for which you kept this day runner was
04:53:23 4  to track the amount of time that you spent on each
04:53:26 5  project why you didn't write down the amount of time
04:53:29 6  you spent on each project but instead you wrote
04:53:32 7  down, you're telling me, the hours you worked in
04:53:34 8  excess of eight per day?
04:53:38 9    A. Because those reflected the excess number of
04:53:41 10  hours I devoted to -- happened to set up these
04:53:51 11  business processes to Neighborhood House Charter
04:53:54 12  School. They didn't want -- And when I spoke to the
04:53:58 13  dean in regard to the additional hours, this is what
04:54:04 14  I was going to base it on, you know, because they
04:54:08 15  said, We're going to pay you for 40 hours, but it's
04:54:11 16  not -- I can't do this in 40 hours or we would not
04:54:15 17  meet the deadline.
04:54:16 18        So I knew at some point in time I wanted
04:54:19 19  to be compensated, and I had to keep a record to
04:54:22 20  show. Memory is one thing. I know you always hear
04:54:27 21  it, Janice, but actual concise records speak for
04:54:32 22  themselves.
04:54:32 23    Q. So your testimony is when TuckNT began
04:54:39 24  providing services to NHCS under contract --

Page 331

04:54:39 1    A. The first time I was there for Ace I kept a
04:54:47 2  day log of my hours.
04:54:47 3    Q. I understood that your position through Ace
04:54:47 4  was an hourly position.
04:54:48 5    A. That's right, but I had the practice of
04:54:50 6  keeping my time.
04:54:51 7    Q. And when you did that you wouldn't write
04:54:53 8  down just the hours you worked in excess of eight
04:54:56 9  per day. You'd write down the total number of hours
04:54:58 10  you'd work per day, right?
04:54:59 11    A. Yes, because that's how I was paid with Ace.
04:55:02 12    Q. Exactly. So now what I want to know is,
04:55:05 13  you're telling me when the contract between TuckNT
04:55:10 14  and NHCS was formed, is it your testimony that
04:55:14 15  someone told you that we would be paying you 40
04:55:16 16  hours per week?
04:55:17 17    A. Yes, that was the agreement.
04:55:18 18    Q. Who told you that?
04:55:19 19    A. Dean Chokshi.
04:55:22 20    Q. And that was expressed? He said, We'll pay
04:55:24 21  you for 40 hours per week?
04:55:26 22    A. Yes.
04:55:26 23    Q. And in fact, you were working regularly more
04:55:34 24  than 40 hours per week?

Page 332

04:55:35 1    A. Yes.
04:55:36 2    Q. And did you ever submit these calendars to
04:55:39 3  anyone at NHCS?
04:55:40 4    A. No.
04:55:41 5    Q. During the period of time running from
04:55:42 6  August 2004 to July 2005, did you ever submit any
04:55:48 7  document to anybody at NHCS that reflected the
04:55:51 8  number of hours that you claim to have worked?
04:55:54 9    A. No.
04:55:55 10    Q. Okay. So your testimony is that at the
04:55:57 11  inception of this relationship, at the beginning,
04:56:00 12  between TuckNT and NHCS, it was represented to you
04:56:04 13  that the services you would be performing would be
04:56:07 14  roughly 40 hours a week?
04:56:08 15    A. Yes.
04:56:09 16    Q. And in fact, you worked somewhat more than
04:56:11 17  that on a number of weeks?
04:56:12 18    A. Yes.
04:56:13 19    Q. And for that 15-month period you never
04:56:17 20  sought compensation for the excess hours?
04:56:18 21    A. I did. Remember I had approached the dean?
04:56:23 22    Q. You told me that you spoke to Dean Chokshi
04:56:26 23  in April or May of 2005.
04:56:27 24    A. Yes.

Page 333

04:56:28 1    Q. So this is almost a year after this
04:56:30 2  relationship was started, right? Eight months?
04:56:33 3    A. Yes.
04:56:33 4    Q. So for eight months you regularly worked in
04:56:36 5  excess of 40 hours per week, is that your testimony?
04:56:38 6    A. That's right.
04:56:39 7    Q. And you never submitted any evidence of this
04:56:41 8  to anybody at the school; is that right?
04:56:42 9    A. Well, the only person I had a relationship
04:56:47 10  with in regard to this is Dean Chokshi.
04:56:49 11    Q. And you never gave him any document that
04:56:52 12  reflected the number of hours --
04:56:53 13    A. I did not give him a document. We had
04:56:56 14  discussions.
04:56:56 15    Q. You had a general discussion about the fact
04:56:58 16  that over this eight-month period you had been
04:57:01 17  working more than you anticipated? The services
04:57:05 18  that you took over from FDNH were greater than you
04:57:08 19  anticipated at the beginning of the inception?
04:57:10 20    A. That's right, because when I took on this
04:57:12 21  job I did not want to be in development because of
04:57:14 22  the long hours.
04:57:15 23    Q. Okay. And so when you had this conversation
04:57:20 24  with Dean Chokshi in April or May of 2005, did you

Page 689

04:00:13 1    Q. And did you get involved in that situation
04:00:15 2  in any way?
04:00:16 3    A. I don't know if I called -- I think I called
04:00:22 4  Department of Education and they said, Well, if
04:00:24 5  she's already working at the school, she has this ID
04:00:27 6  number, because I think they wanted her to generate
04:00:30 7  something. PSI wanted her to have something.
04:00:33 8    I said, If she's getting a check from a
04:00:36 9  school, she has an ID number on that. Even if she
04:00:39 10 didn't have a social, something that they take taxes
04:00:41 11 from. And we can use that in our system.
04:00:45 12   Q. And you figured out how to reconcile the
04:00:48 13 compliance issues even though this person didn't
04:00:51 14 have a technically compliant I-9; is that what
04:00:54 15 you're telling me?
04:00:54 16   A. Yeah, a technically compliant, because PSI
04:00:57 17 manager brought it to me and I posed it to another
04:01:00 18 agency, like the Department of Education, and they
04:01:02 19 told me, If she has this, that's good.
04:01:05 20   So I told her, Per this person, if she
04:01:08 21 has this, this is good. It was up to the manager to
04:01:12 22 get it from her and give it to me, because I
04:01:15 23 couldn't put it into my system without that
04:01:17 24 information.

Page 690

04:01:17 1    Q. Okay. So you told them what you needed
04:01:19 2  regarding this woman?
04:01:20 3    A. Yes, sir.
04:01:21 4    Q. And did they ever actually give it to you?
04:01:23 5    A. I think they did.
04:01:23 6    Q. Okay. And then you determined that NHCS and
04:01:27 7  PSI were in compliance with all the applicable
04:01:31 8  regulations?
04:01:31 9    A. Yes, sir.
04:01:32 10   Q. Other human resources-related functions, did
04:01:37 11 you, for example, make up personnel files?
04:01:39 12   A. Yeah, you had to initiate a personnel file.
04:01:42 13   Q. And when you say "you," you mean you,
04:01:45 14 Ms. Stevenson, put together personnel files?
04:01:48 15   A. Yes.
04:01:48 16   Q. What did you do to do that?
04:01:49 17   A. Well, I had to determine exactly what needed
04:01:51 18 to be in there and what didn't need to be in there.
04:01:54 19   Q. How did you do that?
04:01:55 20   A. Research.
04:01:56 21   Q. Again, Internet-type research?
04:01:58 22   A. Internet-type research, no. I-9s should not
04:02:04 23 be in with the personnel file. It should be by
04:02:06 24 itself. And then there should be a place for just

Page 691

04:02:11 1  general information, a place for their licenses or
04:02:15 2  certificates, a place for even -- I didn't realize
04:02:21 3  this, but the drug test information had to be in a
04:02:25 4  separate thing.
04:02:26 5    Q. So you're actually talking about the
04:02:28 6  confluence of a bunch of different regulations?
04:02:31 7    A. Yes.
04:02:31 8    Q. And you had to figure out how those come
04:02:34 9  together and then make up the personnel files?
04:02:36 10   A. Yes. To make sure when someone hands you a
04:02:39 11 personnel file or someone had to review it they
04:02:41 12 wasn't seeing information that was restricted from
04:02:44 13 being seen outside of employment, drug test
04:02:49 14 information or --
04:02:49 15   Q. Basically, you just had to ensure that NHCS
04:02:55 16 complied with all of these various federal laws?
04:02:58 17   A. Yes.
04:02:58 18   Q. Did you set up a personnel file for
04:03:04 19 yourself, Ms. Stevenson, or did you not because
04:03:05 20 TuckNT was a vendor?
04:03:07 21   A. No. I was in accounts payable.
04:03:09 22   Q. So because you were providing services to
04:03:12 23 the school through TuckNT you didn't need to set up
04:03:15 24 a personnel file for yourself?

Page 692

04:03:16 1    A. No, sir.
04:03:17 2    Q. And you didn't, in fact, do that?
04:03:19 3    A. No. It wasn't my understanding that I
04:03:24 4  should or could.
04:03:26 5    Q. Based on the fact that you had your company,
04:03:29 6  and your company was the entity through which you
04:03:31 7  were providing services to NHCS?
04:03:33 8    A. Yeah. And it wasn't considered an employee.
04:03:36 9    Q. Okay. Any other HR functions that you
04:03:40 10 performed?
04:03:41 11   A. Other than also suggest that certain
04:03:50 12 employees didn't meet exempt status just because
04:03:53 13 you're called a manager. It wasn't based on title
04:03:56 14 anymore. It was based on duties.
04:03:58 15   Q. And again, you're talking about your
04:04:02 16 understanding and interpretation of the August 2004
04:04:06 17 regulations governing the FLSA?
04:04:06 18   A. Yeah. The way it read, it was duties. We
04:04:09 19 had a lot of people who weren't managers with the
04:04:11 20 job title managers.
04:04:13 21   Q. And so you informed some individual that you
04:04:14 22 thought there might be FLSA exemption compliance
04:04:18 23 issues as to those people?
04:04:19 24   A. The dean and --

6f17292b-b5fb-4467-9523-0d9097f86c8a

Page 693

04:04:20 1    Q. By "the dean," you mean Dean Chokshi?
04:04:22 2    A. Dean Chokshi. And Mr. Rothman, the guy at
04:04:26 3    PSI.
04:04:27 4    Q. And what specifically did you inform them?
04:04:30 5    You informed them that the FLSA provides exemptions
04:04:34 6    to certain minimum wage and overtime requirements
04:04:37 7    based on --
04:04:38 8    A. I just said based on a test that they give
04:04:41 9    you.
04:04:47 10   Q. A test that looks to the employee's duties?
04:04:50 11   A. Yes. That some of these people didn't meet
04:04:52 12   managers, didn't meet exempt.
04:04:52 13   Q. And that you determined based on assessing
04:04:54 14   what the duties they actually performed were?
04:04:56 15   A. Yes.
04:04:57 16   Q. And then you made a determination that, Wait
04:04:59 17   a minute. These people aren't properly FLSA exempt?
04:05:02 18   A. Well, from my general reading, they didn't
04:05:06 19   meet it. And I just told the dean, I don't think --
04:05:09 20   For instance, like, Rich, I don't think he meets
04:05:12 21   this, or this person who makes below $22,000.
04:05:20 22   According to them, there's a test. They don't meet
04:05:26 23   that.
04:05:26 24   Q. So you understand that there's actually a

Page 694

04:05:28 1    few levels of complication to those regulations.
04:05:31 2    Employees must meet a duties test and, separate from
04:05:35 3    that, have to meet a salary basis test?
04:05:37 4    A. It's do they do this, do they do this and do
04:05:40 5    they do this. If you said no to any of that, they
04:05:42 6    can't be exempt.
04:05:45 7    Q. Okay. And what you're talking about are the
04:05:47 8    different white collar classifications? For
04:05:50 9    example, managerial, administrative and
04:05:51 10   professional?
04:05:52 11   A. Yeah.
04:05:52 12   Q. That's what you're talking about?
04:05:53 13   A. Yeah.
04:05:54 14   Q. And so with respect to these positions, you
04:05:57 15   assessed them for all three of those exemptions?
04:06:01 16   A. No. If the title is manager and you go into
04:06:06 17   that classification for managers and you read it and
04:06:13 18   if I still don't understand that I go into SHRM and
04:06:15 19   downloaded some more and it gives you more plain
04:06:18 20   language from people who done it, and then I take it
04:06:23 21   to them and I say, This is not meeting this.
04:06:25 22   Q. How many times would you say you did that?
04:06:27 23   A. About three or four times.
04:06:29 24   Q. Can you tell me the individuals who were at

Page 695

04:06:31 1    issue?
04:06:31 2    A. Well, PSI had an office manager position
04:06:39 3    that he changed to office coordinator, which -- but
04:06:43 4    he still -- they didn't still pay anybody. I think
04:06:49 5    they still list him as exempt.
04:06:51 6    Q. Let's just go through the individuals you
04:06:53 7    spoke about. The office manager for PSI, who held
04:06:56 8    that job?
04:06:57 9    A. When I was there it may have been two or
04:06:59 10   three people.
04:06:59 11   Q. You looked at that position rather than the
04:07:01 12   individuals; is that right?
04:07:02 13   A. Yeah. I looked at the duties they did.
04:07:04 14   Q. The duties attached to the position rather
04:07:06 15   than any specific individual?
04:07:07 16   A. Yeah. Yes.
04:07:08 17   Q. What other positions did you look at?
04:07:09 18   A. The facilities manager.
04:07:13 19   Q. Which was Rich; is that right?
04:07:15 20   A. Yeah. And then the development office
04:07:20 21   staff.
04:07:21 22   Q. What position specifically?
04:07:23 23   A. Well, there was a development associate and
04:07:27 24   database somebody.

Page 696

04:07:27 1    Q. And you looked at both of those positions?
04:07:29 2    A. Yes.
04:07:31 3    Q. Anybody else? Any other positions?
04:07:32 4    A. Yeah, but those are the ones that came since
04:07:36 5    I've been there.
04:07:36 6    Q. Those were new positions that were created
04:07:39 7    while you were providing services to NHCS?
04:07:41 8    A. Yes. I had an issue with most of them, but
04:07:44 9    they were not teachers. Like Pam, she didn't have
04:07:49 10   anyone who reported to her. And then they had
04:07:51 11   another person down there who was listed. I'm just
04:07:54 12   like, Okay. Just stuff you observe.
04:07:59 13   Q. Not only observe but --
04:08:01 14   A. If someone came in and he says they're going
04:08:06 15   to be -- Like, we had these two positions. They're
04:08:08 16   going to be a development associate, blue blah,
04:08:12 17   blah, blah. And I'm saying legally she's -- As of
04:08:19 18   overtime. If she's going to only work 30 hours, I
04:08:22 19   don't see her working overtime. But why do we have
04:08:25 20   to classify them wrongly?
04:08:27 21   Q. So this was a compliance issue, in your
04:08:29 22   view?
04:08:30 23   A. Yeah.
04:08:30 24   Q. And you raised this on three or four

73 (Pages 693 to 696)

6f17292b-b5fb-4467-9523-0d9097f86c8a

Page 697

04:08:32 1  occasions?
04:08:33 2      A. And they wasn't going to change anything.
04:08:36 3      Q. And what it did, it sounds like to me, to
04:08:38 4  meet the concerns that you raised was not to
04:08:41 5  reclassify the positions but made sure that people
04:08:43 6  worked less than 40 hours?
04:08:45 7      A. Yeah. But, you know, that was -- Then there
04:08:50 8  were people who turned in overtime. Say, for
04:08:52 9  instance, they were asked to only work 15 hours per
04:08:58 10 week, 30 hours a pay period, and they did 17 one
04:09:02 11 week and they would turn in the extra two, I can
04:09:08 12 remember the dean sending it back saying, We are
04:09:09 13 only going to pay you a set salary even though you
04:09:11 14 worked beyond that. We're not going to pay you any
04:09:17 15 money for that.
04:09:17 16     Q. That never happened to you specifically?
04:09:19 17 You never turned in a sheet --
04:09:21 18     A. I never had a time sheet.
04:09:22 19     Q. All right. Any other HR-related functions
04:09:24 20 that you've performed through TuckNT for NHCS?
04:09:28 21     A. That was it, just enrollment and filing.
04:09:33 22     Q. Okay. With respect to the administration of
04:09:37 23 benefits, you told me about how that system worked
04:09:41 24 and how individuals would elect their benefits. Did

Page 698

04:09:43 1  you ever attempt to elect benefits for yourself?
04:09:47 2      A. No.
04:09:47 3      Q. That was because you understood that because
04:09:50 4  you provided services through your company, TuckNT,
04:09:52 5  you weren't eligible for those benefits?
04:09:55 6      A. No. If you were not a full-time, regular
04:10:01 7  employee, you did not -- you were not given that
04:10:04 8  until they hired a particular teacher who was a temp
04:10:09 9  and she got benefits.
04:10:10 10     Q. Did you raise the issue at that time?
04:10:12 11     A. Well, yeah. I asked. I says, Are we giving
04:10:16 12 a temporary teacher benefits? She said, Yeah.
04:10:20 13     Q. But you never inquired as to whether you
04:10:22 14 could enroll yourself for benefits?
04:10:24 15     A. No. I know at one time he wanted me to do,
04:10:26 16 like, a worker's claim. I says, No. I'm not even
04:10:30 17 an employee.
04:10:32 18     Q. You mean, he wanted --
04:10:34 19     A. Something had happened and I got struck.
04:10:38 20     Q. Like, hit?
04:10:40 21     A. Hit.
04:10:40 22     Q. You got hurt?
04:10:41 23     A. I didn't get hurt. He heard it. He says,
04:10:48 24 File workers' comp. I'm like, No. I'm not even an

Page 699

04:10:53 1  employee.
04:10:53 2      Q. So Dean Chokshi was saying because this is
04:10:56 3  an on-the-job injury, you should file a workers'
04:10:59 4  comp. claim, and you said, No, I'm not an employee
04:11:01 5  because I have my own company, TuckNT, and I can't
04:11:05 6  collect that?
04:11:05 7      A. I said I wasn't an employee. I thought
04:11:08 8  employees got only --
04:11:09 9      Q. You weren't an employee for whatever --
04:11:11 10     A. I wasn't an employee.
04:11:11 11     Q. So you didn't, in fact, file that workers'
04:11:15 12 comp. claim?
04:11:15 13     A. No.
04:11:15 14     Q. You never attempted to get any other kind of
04:11:18 15 benefits that weren't made available to employees
04:11:20 16 during the period of time that you were providing
04:11:22 17 services to NHCS, correct?
04:11:23 18     A. No, because, remember, even when I was a
04:11:26 19 temp I wasn't getting benefits. And I just assumed
04:11:33 20 those people who came in -- I didn't get them until
04:11:37 21 one particular teacher came in and she got them.
04:11:40 22 That surprised me. I'm like, Hey.
04:11:42 23     Q. Her situation was different than yours
04:11:44 24 because she was clearly an employee. There was no

Page 700

04:11:46 1  question about that. It was just that she was
04:11:48 2  part-time. That raised the question for you?
04:11:49 3      A. She wasn't part-time. She was temporary.
04:11:52 4      Q. I see what you're saying. Typically these
04:11:54 5  are only made available to --
04:11:57 6      A. Full-time, regular employees.
04:11:58 7      Q. And because she was only going to be around
04:12:00 8  for a limited period of time, you thought typically
04:12:03 9  she wouldn't be eligible for benefits?
04:12:05 10     A. Yeah.
04:12:05 11     Q. Accounts payable. What did you do to
04:12:14 12 transfer the accounts payable function from FDNH to
04:12:17 13 NHCS?
04:12:18 14     A. A whole lot of data input because there was
04:12:22 15 nothing exportable. I says, Can't you, like, export
04:12:27 16 it to Excel, all the vendor files, and we could at
04:12:32 17 least download it into Excel? They couldn't even do
04:12:34 18 that or they wouldn't do that. So every vendor they
04:12:38 19 had had to be input by hand.
04:12:42 20     Q. Okay.
04:12:42 21     A. And then when we finished that the system
04:12:46 22 crashed, the whole network went down, and then we
04:12:48 23 had to do it twice.
04:12:49 24     Q. Okay. So was there any sort of processes

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

6f17292b-b5fb-4467-9523-0d9097f86c8a